**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| Plaintiff, | **24 Civ. 4578 (       )** |
| -against- | |
| **CONSENSYS SOFTWARE INC.** | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("Commission" or "SEC"), for its Complaint against Defendant Consensys Software Inc. ("Consensys"), alleges as follows:

## SUMMARY

1.      Since 2016, Consensys has developed and operated a suite of crypto asset-related services under the brand "MetaMask."  Consensys markets itself as a leader and innovator in the crypto asset industry, but certain products that Consensys offers its customers perform age-old functions:  (1) brokering securities transactions for retail investors and (2) engaging in the offer and sale of securities.

2.      Consensys violated the federal securities laws by failing to register as a broker and failing to register the offer and sale of certain securities, thereby depriving investors of crucial protections that those laws afford.  Since October 2020, Consensys has acted as an unregistered broker of crypto asset securities through its MetaMask Swaps service.  Since January 2023, Consensys has engaged in the unregistered offer and sale of securities in the form of crypto asset staking programs, and acted as an unregistered broker, through its MetaMask Staking service.  By its conduct as an unregistered broker, Consensys has collected over $250 million in fees.

3.      MetaMask Swaps is a digital platform that brokers transactions in crypto asset securities on behalf of MetaMask Swaps users—including retail investors in crypto asset securities. As its name suggests, through "MetaMask Swaps," Consensys effects the exchange of one crypto asset for another on the investor's behalf.  Consensys solicits potential investors in crypto asset securities, holds itself out as a place to buy and sell crypto assets (which include crypto asset securities), recommends trades with—as Consensys itself puts it—the "best" value, accepts investor orders, routes investor orders, handles customers assets, carries out trading parameters and instructions on the customer's behalf, and receives transaction-based compensation.

4.      MetaMask Swaps functions as follows.  An investor enters the name and amount of the crypto asset that they wish to sell, as well as the name of the crypto asset that they wish to buy in return.  MetaMask Swaps then pulls available rates for the requested exchange from a Consensys-curated group of execution venues and other third-party liquidity providers (referred to herein as "third-party liquidity providers") and displays those rates to the investor, highlighting the option that Consensys deems "best."  With one additional click by the investor, MetaMask Swaps performs the functions necessary to effect the trade, on the investor's behalf, with the third-party liquidity provider.  As described in further detail below, Consensys's software routes the investor's order by transferring their asset and trading instructions through Consensys's own smart contracts on the blockchain, which interface with third-party liquidity providers on the investor's behalf.  As is typically the case in traditional securities markets, the investor here never interacts directly with the third party; all investor interactions are directly with Consensys's platform.  And Consensys collects a fee on most transactions.

5.      Since 2020, through MetaMask Swaps, Consensys has brokered over 36 million crypto asset transactions—including at least 5 million transactions in crypto asset securities—

between investors, on one hand, and third-party liquidity providers (such as purportedly "decentralized" crypto asset trading platforms and market makers) on the other.

6.      In addition to operating as an unregistered broker with respect to MetaMask Swaps, Consensys performs another traditional function of the securities market: offering and selling securities.  Specifically, Consensys has offered and sold tens of thousands of securities for two issuers:  Lido and Rocket Pool.  By this conduct, Consensys acts as an underwriter of those securities and participates in the key points of their distribution.

7.      Lido and Rocket Pool each offer what are commonly referred to as "liquid staking" programs.  "Staking," in the context of a blockchain network, refers to the commitment of the native crypto asset of the blockchain (in the case of the Ethereum blockchain, for example, ether or "ETH") in order to act as a "validator" of transactions recorded on that network.  Blockchain validators perform certain functions to earn rewards in the form of additional tokens and, when selected, proposing new blocks to the blockchain.  Lido and Rocket Pool offer an investment program known as a "staking program," centered around this feature of the Ethereum blockchain. In essence, Lido and Rocket Pool each pool ETH contributed by investors and stakes it on the blockchain, using their technological expertise to earn returns that the typical investor would not be able to earn on their own.  Upon receipt of an investor's ETH, Lido and Rocket Pool issue the investor a new crypto asset in return—stETH or rETH, respectively—representing the investor's pro-rata interest in the staking pool and its rewards.  Lido and Rocket Pool refer to their staking programs as "liquid" because investors' interests in the programs—represented by the stETH and rETH tokens—are tradable on the secondary market, thereby providing investors a mechanism to exit their investment position, whereas tokens staked directly on the blockchain cannot be easily accessed while they are staked.

8.      The Lido and Rocket Pool staking programs are each offered and sold as investment contracts and, therefore, securities.  Specifically, as described in more detail below, investors make an investment of ETH in a common enterprise with a reasonable expectation of profits from the managerial efforts of Lido and Rocket Pool, respectively.  Yet, neither Lido nor Rocket Pool has filed a registration statement with the Commission for the offer and sale of these investment contracts.

9.      Consensys, for its part, brokers and also offers and sells these securities in unregistered transactions through its "MetaMask Staking" platform.  By soliciting investors to participate in the Lido and Rocket Pool staking programs and by acting as an intermediary between Lido and Rocket Pool, on one hand, and investors in their respective staking programs on the other, Consensys was an integral part of the distribution of these securities.  Indeed, Consensys developed and deployed MetaMask Staking for the specific purpose of offering and selling the Lido and Rocket Pool staking program investment contracts.  Consensys solicits investments in the Lido and Rocket Pool staking programs through "MetaMask Staking."  When an investor makes a request to invest with Lido or Rocket Pool via MetaMask Staking, Consensys transfers the ETH to Lido or Rocket Pool on the investor's behalf and transfers newly issued stETH or rETH from Lido or Rocket Pool to the investor's MetaMask Wallet (a Consensys-developed software application for storing investors' crypto assets, as explained below).  MetaMask Staking investors never interact directly with Lido or Rocket Pool; all investor interactions are directly with Consensys's platform.

10.     Despite performing brokerage functions, Consensys has not registered as a broker with the Commission, in violation of the federal securities laws.  As further explained below, those provisions mandate transparency, including the disclosure of conflicts of interest, so that investors receive information necessary to make informed investment decisions.  Registration also requires

broker-dealers to comply with applicable financial responsibility requirements that protect customers and other market participants.

11.     Consensys's unregistered offer and sale of the Lido and Rocket Pool securities, as to which it also acts as an unregistered broker, violates the federal securities laws.  It deprives investors of the protections afforded to them by the federal securities laws.  Indeed, registration statements provide investors with material information about the securities offering and the issuer's business and financial condition, so that investors can make informed investment decisions.

12.     With MetaMask Swaps and MetaMask Staking, Consensys has inserted itself into the U.S. securities markets, yet failed to act in accordance with the provisions of the federal securities laws to which it is subject and that exist to protect investors.

## VIOLATIONS

13.     By engaging in the conduct set forth in this Complaint, including the operation of its MetaMask Swaps and MetaMask Staking platforms, Consensys has acted as a broker, without registering as such, in violation of Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o].

14.     In addition, through the MetaMask Staking program, Consensys has engaged in unregistered offers and sales of securities in violation of Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)].

15.     Unless Defendant is restrained and enjoined, it will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

**NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

16.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)], and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

17.     The Commission seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws this Complaint alleges it has violated; (b) ordering Defendant to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and (c) ordering any other and further relief, including equitable relief and other relief pursuant to Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], the Court may deem just and proper.

**JURISDICTION AND VENUE**

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d), and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

19.     Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

20.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].  Defendants may be found in, are inhabitants of, or transact business in the Eastern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District.  Prior to February 2024, Consensys was based in Brooklyn, New York, and still maintains offices in Brooklyn.

## DEFENDANTS

21.     **Consensys** was founded in 2014.  In June 2020, Consensys was incorporated in Delaware.

## OTHER RELEVANT ENTITIES

22.     **Lido Finance ("Lido")** is a Cayman Islands company.  Lido operates a program for staking on the Ethereum blockchain.  Lido launched its staking program in December 2020.

23.     **Rocket Pool** is headquartered in Australia.  Rocket Pool also operates a program for staking on the Ethereum blockchain.  Rocket Pool launched its staking program in October 2021.

## FACTS

I.     **BACKGROUND**

        A.     <u>**Statutory and Legal Framework**</u>

24.     The Securities Act and the Exchange Act "form the backbone of American securities laws."  *Slack Tech., LLC v. Pirani*, 598 U.S. 759, 762 (2023).  These acts define "security" broadly, to include a wide range of assets, including "investment contracts."  [15 U.S.C. §§ 77b(a), 78c(a)(10)].

25.     Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits derived from the entrepreneurial or managerial efforts of others.

26.     Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946).

     *i.*  *Registration of Securities Offerings*

27. Congress enacted the Securities Act in part to regulate the offer and sale of securities.

28. Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)] require registration of offers and sales of securities with the SEC.

29. Registration is intended to assure that the persons offering or selling the securities give the investing public required information about the issuer, the securities, and the transaction. With that information, investors can then make more informed investment decisions.

     *ii.*  *Registration of Brokers*

30. Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(a)(4)] defines "broker" generally as "any person engaged in the business of effecting transactions in securities for the account of others."

31. Section 15(a) of the Exchange Act [15 U.S.C. § 78c(a)(4)] generally requires brokers to register with the SEC, and a broker must also become a member of one or more "self-regulatory organizations" ("SROs"), which, in turn, require members to adhere to rules governing the SRO's members' activities.

32. The regulatory regime applicable to brokers is a cornerstone of the federal securities laws and provides important safeguards to investors and market participants.  Registered brokers are subject to comprehensive regulation and rules that include recordkeeping and reporting obligations, SEC and SRO examinations, and general and specific requirements aimed at addressing certain conflicts of interest, among other things.  All of these rules and regulations are critical to the soundness of the national securities markets and to protecting investors in the public markets who interact with brokers and invest in securities.

### B.    Crypto Assets

33.    As used herein, the terms "crypto asset" or "token" generally refers to an asset issued and/or transferred using blockchain or distributed ledger technology, including assets referred to colloquially as "cryptocurrencies," "virtual currencies," and digital "coins."

34.    A blockchain or distributed ledger is a database spread across a network of computers that records transactions in theoretically unchangeable, digitally recorded data packages, referred to as "blocks." These systems typically rely on cryptographic techniques to secure the recording of transactions.

35.    Crypto asset owners typically store the cryptographic key information that gives them control over their crypto assets on a piece of hardware or software called a "crypto asset wallet." Crypto asset wallets, among other functions, provide a user-friendly way to store and manage the "public keys" and the "private keys" associated with an investor's crypto assets. The public key is used to derive the user's blockchain "address," and it can be freely shared with others. The private key is roughly analogous to a password; its use confers the ability to transfer a crypto asset and transact using the user's public blockchain address. Whoever controls the private key controls the crypto asset(s) associated with that key.

### C.    Consensys and MetaMask

36.    Under its "MetaMask" brand, Consensys provides investors with a variety of services related to crypto assets.

37.    MetaMask Wallet, which Consensys has offered since July 2016, is the foundational application for its MetaMask suite of products.

38.    MetaMask Wallet is a Consensys-developed and Consensys-maintained software program, downloaded to an investor's device (in the form of a mobile app or a browser extension), that stores the public and private keys to a user's crypto assets.

9

39.     The blockchain address (i.e., a derivation of the public key) stored in the investor's MetaMask Wallet is, in essence, the investor's MetaMask "account."

40.     Indeed, for each blockchain that a new investor selects to interact with, MetaMask Wallet generates a public and private key pair and derives a blockchain address from the public key. MetaMask Wallet refers to these blockchain addresses as the investor's "Accounts." By default, MetaMask Wallet creates an Account labeled "Account 1" for each blockchain selected by the investor.

41.     If an investor already owns a crypto asset—and stores the keys to that asset outside MetaMask Wallet—the investor can import the public and private keys associated with that asset to a MetaMask Wallet using its "import" account function.

42.     An investor's MetaMask Wallet blockchain address is also the address where crypto assets purchased and sold through other MetaMask services—such as MetaMask Swaps and MetaMask Staking—are received and sent.

43.     An investor can view a list of crypto assets held in the investor's MetaMask accounts, the investor's total holdings in each asset, and the aggregate value of the investor's assets, through a feature Consensys calls MetaMask Portfolio Dashboard. According to an article by Consensys on July 17, 2023, MetaMask Portfolio Dashboard acts as a "home base" for tracking, buying, selling, and staking crypto assets.

## II.     THROUGH THE METAMASK SWAPS PLATFORM, CONSENSYS PROVIDES BROKERAGE SERVICES TO U.S. INVESTORS.

44.     Consensys has never registered with the Commission as a broker with respect to its brokerage activities on MetaMask Swaps (or on MetaMask Staking, *see infra* § VI), and no exemption or exception from registration applies. Nonetheless, from at least October 2020 to the present, Consensys has acted as a broker of crypto asset securities that it makes available through its MetaMask Swaps platform.

45.     MetaMask Swaps is a Consensys-developed and Consensys-maintained software tool that brokers trades in crypto assets on behalf of investors who use MetaMask.  As described below, Consensys solicits potential investors in crypto asset securities, holds itself out as a place to buy and sell crypto asset securities, provides pricing and other information relevant to the purchase and sale of crypto asset securities, advises investors by highlighting trades with the "best" value, accepts investor orders, routes investor orders—including by handling customers assets and carrying out trading parameters and instructions on the customer's behalf, thereby facilitating execution—and receives transaction-based compensation.

46.     While Consensys has branded the transaction a "swap," it is simply a trade, or exchange, of one crypto asset for another—a crypto asset that the investor wants to sell ("Crypto Asset A"); and a crypto asset that the investor wants to buy ("Crypto Asset B").

47.     Specifically, if an investor holds Crypto Asset A in their MetaMask Wallet and wishes to trade it for Crypto Asset B, MetaMask Swaps will (1) find and display to the investor the "best" exchange rate; (2) route the investor's order and transfer Crypto Asset A through Consensys's smart contracts; (3) interface with a third-party liquidity provider that executes the investor's order, thereby selling Crypto Asset A and acquiring Crypto Asset B on behalf of the investor; (4) divert a fee into a Consensys-controlled smart contract address; and (5) transfer Crypto Asset B into the investor's MetaMask Wallet.

**A.**     **Consensys Solicits Investors And Holds Itself Out As A Place To Buy and Sell Crypto Asset Securities Through Its MetaMask Swaps Brokerage Service.**

48.     On October 6, 2020, Consensys released MetaMask Swaps to the public.

49.     Since then, Consensys has advertised and promoted MetaMask Swaps on its MetaMask website, metamask.io, and social media such as X (formerly, Twitter) as a way for investors to participate in the markets for crypto assets, including crypto asset securities.

50.     In its October 6, 2020, launch announcement, Consensys claimed that MetaMask Swaps "offers [investors] the best trading experience in Defi" (referring to so-called "decentralized finance").

51.     More specifically, Consensys stated that the MetaMask Swaps platform offered investors the "best prices" and "deepest liquidity."

52.     The announcement concluded:  "MetaMask enables more trades more efficiently by providing an optimized path for every trade."

53.     Consensys conveyed similar promotional messages on its website, at least as of December 2023.

54.     Its website stated, "Find the best price every time.  Swaps ensures that you always have access to the largest selection of tokens and the most competitive prices."

55.     Its website continued to explain that, as part of its efforts to "locate the best trade," Consensys "sources the best prices and determines which liquidity source is the most gas efficient." ("Gas" is the fee that investors pay to record a transaction on the Ethereum blockchain.  Gas fees are demand-based and increase as more users seek to use the platform.  The higher the gas price paid for the transaction, the faster the transaction is likely to be mined.  Gas is not refundable even if a transaction fails.)

56.     In a January 2022 blog post, Consensys touted MetaMask Swaps as "The Optimized DeFi Trading Experience" and argued that its methodology increased the likelihood of best execution.

57.     Consensys also maintains a social media accounts on X called "@MetaMask" and "@MetaMaskSupport" through which it has promoted MetaMask Swaps, apprised investors of new platform developments, and provided customer support.

58.     For example, on December 21, 2022, Consensys posted on X, "We've expanded the Swaps experience," including a link to a MetaMask news release on its website, which touted the expansion of the MetaMask Swaps platform capabilities to additional networks.

59.     In another December 21, 2022, post on X, Consensys targeted potential investors who may have been unfamiliar with MetaMask Swaps.  It stated, "Wait – what even is a Swap?!  We got you.  Learn all about MetaMask Swaps here."  The accompanying image stated that MetaMask is "[t]he best way to swap your digital tokens" and "Effortless Crypto Swapping and Token Exchange on MetaMask."

60.     Consensys posted another "news" release promoting MetaMask Swaps on its website on July 17, 2023.  In a section titled "Unrivaled convenience," Consensys stated, "Swaps is undeniably convenient.  You never have to leave MetaMask to execute your transaction through our vetted group of providers."  The release continued, "Swaps ensures you receive . . . the maximum value for your transaction."

61.     On its MetaMask website and Consensys's YouTube channel, Consensys has also published a video about its MetaMask Swaps service in which it casts MetaMask Swaps as, in essence, a broker of crypto assets for investors:  "Introducing MetaMask Swaps . . . The easiest way to trade Ethereum tokens right from inside your MetaMask Wallet."  This video has been publicly available since March 2021.

62.     The video touts the user-friendly nature of the MetaMask Swaps platform and explains that "what makes the [MetaMask Swaps platform] so useful is what it's doing behind the scenes."

63.     The video narration states (referring to what in the crypto asset markets are called "decentralized exchanges" or "DEXs") that MetaMask Swaps "compares various DEXs,

aggregators, and market makers to find you the best price, with the lowest network fees, and the least slippage."

64.     The video also notes that MetaMask Swaps can split the investor's trade up "among several providers to give [the investor] access to greater combined liquidity."

65.     The video concludes that MetaMask Swaps does "all that, without you having to, well, think about it, really."

**B.      Consensys Effects Transactions for MetaMask Swaps Investors.**

66.     Indeed, Consensys acts as a quintessential broker because it developed, deploys, and maintains MetaMask Swaps to, among other things, (1) interface with an investor to receive the investor's trade request (i.e., the investor's order); (2) seek out prices in the market; (3) identify the "best" one; (4) transfer the investor's asset out of the investor's possession; (5) effectuate the trade on the investor's behalf; and (6) obtain transaction-based compensation for itself.

67.     From the investor's perspective, the process is simple—requiring no more than a few clicks or taps on the screen.

68.     To use the MetaMask Swaps platform, the investor needs no technical or blockchain expertise.

69.     "Behind the scenes," however, Consensys's software engages in a series of technological tasks to intermediate the purchase and sale of crypto assets on behalf of investors who use MetaMask Swaps.

70.     The MetaMask Swaps User Guide (the "User Guide") emphasizes the ease and simplicity of the investor experience as compared to the breadth of technological work Consensys has programmed its software to perform to broker the transactions for the benefit of the investors.

71.     In the "Preparing your Swap" section of the User Guide, Consensys explains: "There's a lot going on behind the scenes while you're watching Swaps search" for the best price.

"This process is the secret ingredient in making MetaMask Swaps the cheapest and best swapping service out there."

72.     This User Guide section continues:  "Swaps is searching across decentralized token exchanges and token swapping protocols to find you the most advantageous exchange rate.  At the same time, it's running test transactions, checking to make sure that if you do end up submitting a transaction, that it's likely to go through—and if not, those options are filtered out.  MetaMask is saving users here from the pain of a failed transaction [including gas fees]. . . . Swaps failure rate is very low, and improvements are in the works to make it almost nonexistent."

73.     The User Guide further explains that "Slippage," explained below, "is yet another parameter that Swaps is using in your favor."

74.     It says that the MetaMask software does the "DeFi number-crunching" for the investor.

75.     The "Executing your Swap" section of the User Guide further states:  "There's a lot going on here [on the quote screen] but don't be alarmed. . . . [MetaMask] Swaps is continuing to do all the work we mentioned previously on an ongoing basis, ensuring that you're getting the most up-to-date price and availability."

76.     The User Guide also notes that, by interfacing with third-party platforms on your behalf, MetaMask Swaps "lessen[s] your exposure to potentially hackable or malicious smart contracts."

> i.     *Consensys's MetaMask Swaps Provides Pricing Information, Advises on the "Best" Trade, and Accepts Orders.*

77.     Consensys designed MetaMask Swaps to provide investors with an intuitive and easy-to-use way to trade crypto assets, including crypto asset securities.

78.     To request a trade through MetaMask Swaps, the investor begins by clicking a button labelled "Swap" inside the MetaMask Wallet application.

79.     Next, MetaMask Wallet presents investors with a screen on which they can select (from two drop-down menus) the asset they want to sell (i.e., one they currently hold in their wallet address, or "account," for the relevant blockchain) and the asset they want to buy.

80.     As the below screenshot shows, investors also select the quantity of the currently held asset (Crypto Asset A) that they want to spend to acquire the new asset (Crypto Asset B).



81.     Under "advanced options," the investor can adjust the "slippage tolerance."

82.     In the words of Consensys's MetaMask Swaps User Guide:  "Slippage is the amount of change between the price you click on and the final transaction price that MetaMask Swaps will tolerate. . . .  [MetaMask] Swaps allows a little bit of a difference between the price you agree on and the final price, to ensure your transaction goes through—but not too much, in order to protect you from sudden spikes or drops."  (Setting a slippage tolerance effectively creates a "limit order," which is an extremely common type of order offered by traditional brokers.)

83.     The investor then clicks a button labelled "Get quotes," at which point they are taken to another screen, on which MetaMask Swaps recommends the "best quote" or "best overall value" for the requested exchange.

84.     In the browser extension version of the software, MetaMask Swaps allows the investor to view a list of other options, with the recommended option at the top.

85.     For example, by clicking the "Best of 5 quotes" link on the left, MetaMask Swaps will display to the investor the screen on the right.



86.     In the browser extension, an investor is able to select an option other than the one Consensys deems the "best."

87.     The mobile application, however, only permits the user to select the quote Consensys identifies as the "best."

88.     Consensys has designed its MetaMask software to display to the investors the "best" quote according to parameters Consensys has determined the software will use to calculate such a quote—such as likelihood of success (as described above) and transaction fees.

89.     Below are additional visualizations of the MetaMask Swaps investor interface, taken from the MetaMask Swaps website and the Consensys video demonstration of MetaMask Swaps, respectively:

 

90.     The investor can then click "Swap," which causes MetaMask Swaps to attempt to effect the requested transaction on the investor's behalf.

91.     If Consensys's MetaMask software successfully effects the transaction, the investor sees a screen that says, "Transaction complete."



92.    To place an order through MetaMask Swaps, the investor does not need to know or enter their private key (the cryptographic "passcode" that is necessary to transfer Crypto Asset A out of their wallet).

93.    The investor does not even need to know or enter the entire public blockchain address for the asset they seek to sell.  Indeed, Consensys does not present this information to the investor by default.

94.    When placing orders through MetaMask Swaps, the investor never interfaces directly with any of the third-party liquidity providers.

　　　　ii.    _Consensys Exercises Discretion In Providing Pricing Information and A Recommendation To The Investor._

95.    Indeed, Consensys does "do all the work" by employing its own market knowledge and exercising its own discretion when displaying pricing information and providing investment advice to the investor.  This type of market knowledge and discretion is employed by traditional

brokers in their business of effecting transactions in securities for the account of others, including through software programs they may develop.

96.     When the investor clicks the "Get quotes" button described above, Consensys has programmed its software to send a query to a Consensys "Token API" server, which pulls and aggregates pricing (i.e., exchange rate) information from certain third-party liquidity providers.

97.     More specifically, Consensys has chosen approximately 14 different external markets and market makers (the "third-party liquidity providers") to make available crypto assets for buying and selling by investors, some of whom it has contracted with to integrate with the MetaMask Swaps product.

98.     Consensys has configured its software to interface directly with each of these third-party liquidity providers.

99.     These third-party liquidity providers include crypto asset trading platforms and other private market makers.

100.     Consensys's Token API Server pulls pricing information from these third-party liquidity providers and displays it to the investor on the quote screen (subject to the conditions described herein).

101.     Consensys's software does not query *all* third-party liquidity providers; it only pulls pricing information from the approximately 14 providers that Consensys configured it to interface with, at least some of whom have contracted with Consensys and with whom Consensys may share a portion of the fees it charges investors.

102.     Therefore, the quotes displayed to investors on MetaMask Swaps are those sourced from third parties at Consensys's discretion—specifically, this is how Consensys has programmed the MetaMask software to function.  In other words, Consensys is using its own market knowledge

just like brokers in the traditional securities markets do, to suggest to investors what Consensys considers the best execution venues for their customers.

103.    The crypto asset pairs available for "swapping"—i.e., trading—through MetaMask Swaps generally include whatever crypto asset pairs are available to trade via the third-party liquidity providers with whom Consensys has configured its software to interface, so long as those crypto assets are compatible with the blockchains known as Ethereum, Polygon, and BNB Smart Chain, as well as certain other specified blockchains.

104.    Consensys, however, exercises further discretion over which crypto assets it makes available to investors.

105.    Pursuant to a "Token Restriction Policy" adopted first in August 2021 and later amended throughout 2022, Consensys does not permit investors to trade in crypto assets that are "restricted assets," as determined by Consensys.  In accordance with the token restriction policy, restricted assets include tokens that Consensys has determined: (1) appear to resemble other tokens and have a likelihood of creating investor confusion; (2) extract hidden fees; or (3) tokens that Consensys legal counsel have a very strong reason to believe might constitute regulated assets, such as securities or commodity derivatives, under U.S. law.

106.    So long as a token is not deemed "restricted" by Consensys, Consensys collects prices for the requested trade, runs test transactions, estimates gas fees, and, based on this information, and advises the investor of the "best."

        *iii.*    *Consensys Effects Transactions on the Investor's Behalf—Routing Investor Orders, Handling Investor Assets, and Taking A Fee.*

107.    If the investor selects the "best price"—or any other price—displayed on the screen and clicks "Swap," that signals Consensys's software to proceed with submitting a blockchain transaction to a Consensys owned and operated node, routing the investor's trade request (i.e., the investor's order) and transferring the investor's crypto asset to the third-party liquidity provider.

During this process, Consensys-developed and Consensys-deployed smart contracts handle the investor's assets and carry out instructions in accordance with the investor's order.

108.    Specifically, to route the investor's order and exchange Crypto Asset A for Crypto Asset B on the investor's behalf, Consensys has programmed its software—including its MetaMask Wallet software and other software (e.g., smart contracts) that it has deployed on Ethereum and other blockchains, interacting with each other and with other third-party software interfaces—to take the following steps:

109.    First, the Consensys software reads the investor's private key from the MetaMask Wallet. This is the digital password that cryptographically unlocks Crypto Asset A so that it can be transferred out of the investor's MetaMask Wallet.

110.    Second, the Consensys software submits a blockchain transaction to a Consensys-operated and controlled remote procedure call or "RPC" node. The RPC node stores the blockchain transaction in a mempool (a collection of proposed transactions that are in a queue) until it is included in a block and executed, as per the steps below. More specifically, the Consensys software creates, signs (using the investor's private key), and submits this blockchain transaction to Consensys's RPC node, which when executed will transfer the specified amount of Crypto Asset A from the investor's wallet address to a Consensys-developed smart contract called "Spender.sol."

111.    This Spender.sol smart contract has its own, separate public address on the Ethereum blockchain.

112.    Accordingly, the Consensys software transfers Crypto Asset A to Consensys's Spender.sol smart contract's blockchain address.

113.    The investor has no control over Consensys's Spender.sol smart contract blockchain address.

114.     Indeed, the investor does not have any control over Crypto Asset A once Consensys software transfers it out of the investor's MetaMask Wallet.

115.     Consensys's Spender.sol smart contract address temporarily holds the investor's Crypto Asset A.

116.     Third, Consensys's Spender.sol smart contract will interact with a number of Consensys-developed "Adapter" smart contracts.

117.     Because each third-party liquidity provider is different, Consensys has built unique "Adapter" contracts to allow its Spender.sol smart contract to interact with each of the approximately 14 unique third-party liquidity providers.

118.     Accordingly, for example, if the quote selected by the investor was offered on Liquidity Provider A, the Spender.sol smart contract would rely on Consensys's Liquidity Provider A Adapter smart contract to interact with Liquidity Provider A or its liquidity pool (which refers to, in essence, a blockchain address into which crypto assets are deposited for buying and selling).

119.     Fourth, the corresponding Adapter smart contract facilitates the exchange with the third-party liquidity provider.

120.     Specifically, through the Adapter smart contract, the third-party liquidity provider will take Crypto Asset A from the Spender.sol smart contract address and place Crypto Asset B into the Spender.sol smart contract address.

121.     From the perspective of the third-party liquidity provider, Consensys's "Spender.sol" smart contract is the counterparty to the trade.

122.     The third-party liquidity provider never interacts directly with the MetaMask Swaps investor or their wallet address.

123.     Fifth, the Consensys software transfers a fee—0.875% in most circumstances—from its Spender.sol contract to a "fees" smart contract blockchain address controlled by Consensys.

124.     Sixth, the software transfers the remainder of Crypto Asset B from Consensys's Spender.sol contract to the investor's wallet address.

125.     When using the MetaMask Swaps platform to request a trade, the investor does not—indeed, cannot—interface directly with the third-party liquidity provider; rather, Consensys effects the trade through software that it has programmed, including (a) MetaMask Wallet, (b) blockchain-based smart contracts, and (c) "Adapter" smart contracts that interface with third-party software applications.

126.     As explained by the MetaMask Swaps User Guide:  "[MetaMask] Swaps enables you to trade tokens on any Ethereum-compatible network . . . *without having to interface directly with third-party platforms.*"  (Emphasis added.)

127.     Consensys acts as a broker and, through software it has written, performs each step necessary to intermediate the transaction between the investor and the third-party liquidity provider.

128.     Consensys, through the MetaMask Swaps platform, has effected over 36 million crypto asset transactions on behalf of investors and collected fees worth over $250 million.

## III.     THE CRYPTO ASSETS "SWAPPED" THROUGH THE METAMASK SWAPS PLATFORM INCLUDE ASSETS THAT ARE OFFERED AND SOLD AS SECURITIES.

129.     Since approximately October 2020, Consensys—through the MetaMask Swaps platform—has effected transactions in various crypto assets that are being offered and sold as investment contracts, and thus securities, for the accounts of investors.  This includes, but is not limited to, the units of each of the crypto asset securities described below—with trading symbols MATIC, MANA, CHZ, SAND, and LUNA—(the "Crypto Asset Securities").

130.     The crypto assets on the MetaMask Swaps platform, including but not limited to each of the Crypto Asset Securities to the extent Consensys continues to make them available today, can be bought, sold, or traded for consideration, including other crypto assets.

131.    Each unit of a particular crypto asset on the MetaMask Swaps platform, including but not limited to each of the Crypto Asset Securities, trades at the same price as another unit of that same asset.

132.    These assets, including but not limited to each of the Crypto Asset Securities, are interchangeable (e.g., any MATIC or fraction thereof is just like any other).  Accordingly, to the extent the assets change in price, all tokens of the same asset increase or decrease in price in the same amounts and to the same extent, such that one token is equal in value to any other one token, on a pro rata basis.

133.    The purchase of any particular asset, including but not limited to each of the Crypto Asset Securities, does not appear to give an investor any special rights not available to any other investor in that asset, such as separately managed accounts, or different capital appreciation as to the value of the crypto assets that other investors in the same assets hold.

134.    The crypto assets on the MetaMask Swaps platform, including but not limited to each of the Crypto Asset Securities, are available for sale broadly to any person who creates an account with MetaMask Swaps, and a MetaMask website displays information (like asset price changes) in a format highly similar to that offered by registered broker-dealers in the traditional securities markets, who permit investors to transact in securities.  Consensys makes these crypto assets available for trading without restricting transactions to those who might acquire or treat the asset as anything other than as an investment.

135.    For example, the below page on MetaMask Portfolio's website provides price movement and other information for MATIC:



136.    Investors can access the page for MATIC and other asset-specific pages from the "Tokens" page on MetaMask Portfolio's website; they simply search for a particular crypto asset and are redirected to a page where Consensys provides additional information about that crypto asset. The information on each asset-specific page includes, but is not limited to: (i) market cap; (ii) the 24-hour total volume for the crypto asset; (iii) circulating supply; (iv) historical information about the "price" of the asset including its "all-time high" price and the option to view the asset's price history over the last day, week, month and year including as a percentage return on investment; and (v) the opportunity to trade the asset using MetaMask Swaps.  Consensys states that it uses information gathered from third-party sources as the basis for the asset-specific information displayed on MetaMask Portfolio.  Because Consensys has not registered as a broker, there is no formal mechanism to ensure the accuracy or consistency of the information Consensys discloses about the crypto assets it makes available for sale, including each of the Crypto Asset Securities.

137.     Consensys does not restrict how many units of a crypto asset, including but not limited to each of the Crypto Asset Securities, any given investor may purchase.  Moreover, investors are not required to purchase quantities tied to a purported non-investment "use" that may exist for the asset, if any.  To the contrary, investors may and typically do purchase these assets in any amount.

138.     The assets available for sale on the MetaMask Swaps platform, including but not limited to each of the Crypto Asset Securities, are transferable and immediately eligible for resale on the MetaMask Swaps platform, or other crypto asset trading platforms without any apparent restrictions on resale (including as to the prices or amounts of resale, or the identity of the new buyers).

139.     Consensys has brokered crypto assets that have been the subject of prior SEC enforcement actions based upon their status as crypto asset securities.  Those crypto assets include but are not limited to the following assets for which Consensys has offered brokerage services: AMP (the AMP token, available through MetaMask Swaps since October 2020), AXS (Axie Infinity Shards, available since November 2020), BNB (a token of the Binance blockchain, available since March 2021), CHZ (discussed below), COTI (the COTI token, available since October 2020), DDX (the DerivaDAO token, available since December 2020), FLOW (the FLOW token, available since November 2020), HEX (the HEX token, available since October 2020), LCX (the LCX token, available since October 2020), MANA (discussed below), MATIC (discussed below), NEXO (the NEXO platform token, available since October 2020), OMG (the OMG Network token, available since October 2020), POWR (the Powerledger token, available since October 2020), SAND (discussed below), LUNA (discussed below), RLY (the Rally token, available since October 2020), XYO (the XYO token, available since October 2020).

140. Set forth below are additional details regarding a non-exhaustive list of five Crypto Asset Securities in which Consensys, through its MetaMask Swaps platform, effected transactions for the accounts of investors.

141. From the time of their first offer or sale, each of these Crypto Asset Securities was offered and sold, and continued to be offered and sold on Conensys's platform, as an investment contract and thus a security.  For each of the Crypto Asset Securities, statements by the crypto asset issuers and promoters have led investors reasonably to expect profits based on the managerial or entrepreneurial efforts of such issuers and promoters (and associated third persons).  This was investors' reasonable expectation whether they acquired the Crypto Asset Securities in their initial offering, from prior investors, or through crypto asset brokerage platforms including the MetaMask Swaps platform.  For each of the Crypto Asset Securities, such statements by issuers and promoters include statements made and/or available to the investing public during the period when those Crypto Asset Securities were available for trading through the MetaMask Swaps platform, as well as other statements described below.

### A.  <u>MATIC</u>

142. "MATIC" is the native token of the Polygon blockchain.  Polygon, originally called the Matic Network and rebranded as Polygon in 2021, is a blockchain platform created in 2017 in Mumbai, India by, among others, Jaynti Kanani, Sandeep Nailwal, and Anurag Arjun.  Since its creation, Polygon's founders have remained actively involved with Polygon through "Polygon Labs" ("Polygon"), an entity they also founded for "the development and growth of Polygon."

143. According to the Polygon website, https://polygon.technology/, the Polygon network is an Ethereum scaling platform that enables developers to build scalable user-friendly dApps with low transaction fees, purportedly by hosting "sidechains" that run alongside the

Ethereum blockchain, and allows users to process transactions and initiate the transfer of assets and technology development on Polygon's supposedly less congested sidechain network.

144.    Polygon issued a fixed supply of 10 billion MATIC tokens.  MATIC holders can earn additional MATIC for staking their MATIC on the Polygon platform and becoming a validator, from delegating their MATIC to other validators in return for a portion of the fees collected from validating transactions, or from staking their MATIC with other third parties, such as crypto asset platforms that offer staking services.

145.    According to the initial whitepaper for MATIC, "Matic Tokens [we]re expected to provide the economic incentives … on the Matic Network [now Polygon] … [W]ithout the Matic Token, there would be no incentive for users to expend resources to participate in activities or provide services for the benefit of the entire ecosystem on the Matic Network."

146.    In or around 2018, Polygon sold approximately 4 percent of the total supply of MATIC in two early rounds of sales raising $165,000 at a price of $0.00079 USD per 1 MATIC and $450,000 at a price of $0.00263 USD per 1 MATIC.  In April 2019, Polygon sold another 19% of the total supply of MATIC to the public through a so-called "initial exchange offering" (or "IEO"— essentially, an initial offer and sale of a crypto asset security on a crypto trading platform) on the Binance.com crypto asset trading platform at a price of $0.00263 USD per 1 MATIC, raising an additional $5 million to fund development of the network.

147.    From the time of its offering, MATIC was offered and sold as an investment contract and therefore a security.

148.    The price of all MATIC tokens goes up or down together.

149.    MATIC has been available for buying and selling through the brokerage services offered by MetaMask Swaps since at least July 2021.

150.    The information Polygon publicly disseminated would lead a reasonable investor, including those who purchased MATIC since October 2020, to view MATIC as an investment. Specifically, MATIC holders would reasonably expect to profit from Polygon's efforts to grow the Polygon protocol because this growth would in turn increase the demand for and the value of MATIC.

151.    For example, Polygon stated publicly, including in the whitepaper, that it would pool investment proceeds through its private and public fundraising to develop and grow its business.

152.    Following the IEO, moreover, Polygon engaged in additional MATIC sales, stating publicly that it was doing so in order to raise the funds needed to support the growth of its network. On February 7, 2022, Polygon reported on its blog that it raised about $450 million through a purportedly private sale of its native MATIC token in a funding round to several prominent venture capital firms.  Polygon reported, "[w]ith this warchest, the core team can secure Polygon's lead in paving the way for mass adoption of Web3 applications, a race that we believe will result in Ethereum prevailing over alternative blockchains."

153.    Polygon has also reported fundraising from other marquee and celebrity investors.

154.    Polygon also stated that it would reserve roughly 67% of MATIC to support the Polygon ecosystem, the Foundation, and network operations.  Another 20% of MATIC was further reserved to compensate the Polygon team members and advisors, aligning their fortunes with investors' with respect to MATIC.

155.    In addition, the Polygon blog provides frequent updates on network growth and developments at Polygon, including, prior to December 2022, weekly statistics on active wallets and transactions per day, as well as financial metrics such as revenue per day and total network revenue.

156.    Polygon has also routinely announced when crypto asset trading platforms have made MATIC available for trading.

157.    Polygon has explicitly encouraged MATIC purchasers to view MATIC as an investment in other ways.  For example, in a February 5, 2021 tweet, 14 months after MATIC's single biggest price drop, Nailwal compared the token to a prize fighter that came back from defeat to become a champion:



158.    Also, on November 3, 2022, Nailwal stated on Twitter: "I will not rest till @0xPolygon gets its well-deserved 'Top 3' spot alongside BTC & ETH. No other project comes even close."  In a May 24, 2022 "Fireside Chat" with CNBC posted on YouTube, Bejelic described part of "what's different about Polygon" as: "[w]e are as a team very, very committed, we have a very hands on approach with all the projects out there, we are working around the clock on adoption and that is why we are currently the most adopted scaling infrastructure platform."  Into 2023, the founders of Polygon continued to promote the platform through various social media.  For example, on February 21, 2023, Nailwal tweeted, and Kanani retweeted, "Polygon has grown exponentially.  To continue on this path of stupendous growth we have crystallized our strategy for the next 5 yrs to drive mass adoption of web3 by scaling Ethereum.  Our treasury remains healthy with a balance of over $250 million and over 1.9 billion MATIC."

159.    Since January 2022, Polygon has also marketed that it "burns" MATIC tokens accumulated as fees, indicating that the total supply of MATIC would decrease.  For example, in January 2022, Polygon emphatically announced a protocol upgrade that enabled burning in a blog

post titled, "Burn, MATIC, Burn!"  As Polygon explained in another blog post on its website around the same time, "Polygon's MATIC has a fixed supply of 10 billion, so any reduction in the number of available tokens will have a deflationary effect."  As of March 28, 2023, Polygon had burned approximately 9.6 million MATIC tokens.  This marketed burning of MATIC as part of the Polygon's network's "deflationary effect" has led investors reasonably to view their purchase of MATIC as having the potential for profit to the extent there is a built-in mechanism to decrease the supply and therefore increase the price of MATIC.

160.    In another white paper, Nailwal and others recently announced a revised Polygon protocol where a new token, POL, would succeed MATIC "as the native token of the Polygon ecosystem."  The white paper states that:  "As the successor of MATIC, POL is envisioned to become an instrumental tool for coordination and growth of the Polygon ecosystem and the main driver of the vision of Polygon as the Value Layer for the Internet."

161.    The whitepaper lays out a model "to simulate important performance indicators of the POL-powered ecosystem."  The model estimates a $5 average POL price during the proposed 10-year period, a significant increase from the current price of MATIC.

**B.**    **MANA**

162.    "MANA" is the digital token minted by Decentraland.  Decentraland is a virtual reality platform that began development in June 2015 but was not made available to the public until its launch in February 2020.  Decentraland was launched through an entity named Metaverse Holdings by a team of core individual developers: Ariel Meilich, Esteban Ordano, Manual Araoz, and Yemel Jardi.  Decentraland operates on the Ethereum blockchain.  According to Decentraland's

website, www.decentraland.org, Decentraland is a three-dimensional virtual reality platform, where users can create, experience, and monetize their content and applications.

163.     According to Decentraland's website, MANA serves as the crypto asset involved in all transactions in the Decentraland virtual reality ecosystem.  On August 18, 2017, Decentraland held an initial coin offering in which MANA tokens were exchanged for ETH tokens, raising approximately $24.1 million.  Currently, there is a total supply of approximately 2.19 billion MANA tokens.

164.     Decentraland offered early contributors to the Decentraland ecosystem a discounted price when purchasing MANA.

165.     From the time of its offering, MANA was offered and sold as an investment contract and therefore a security.

166.     The price of all MANA tokens goes up or down together.

167.     MANA has been available for buying and selling through MetaMask Swaps since at least October 2020.

168.     The information Decentraland publicly disseminated would lead a reasonable investor, including those who have purchased MANA since October 2020, to view MANA as an investment.  Specifically, MANA holders would reasonably expect to profit from Decentraland's efforts to grow the Decentraland protocol because this growth would in turn increase the demand for and value of MANA.

169.     Investor proceeds raised during the MANA ICO were pooled to fund the marketing, business expenses, and completion of the Decentraland platform.  For instance, on July 5, 2017—a few weeks before the MANA ICO—Jardi published a blog post detailing Decentraland's intended use of revenue from the token sale as follows:



170.    The blog post further explained that the "top priority" for use of the revenue was to develop a virtual world and that even after Decentraland was created, "the development budget will focus on the continued improvement of the end-user experience within the world browser."

171.    Indeed, Meilich explained in a separate blog post that after the ICO, Decentraland would implement a "Continuous Token Model," where it would increase the MANA supply by 8 percent in the first year, followed by a lower rate in subsequent years, to allow Decentraland to "regularly expand while accommodating new users … The proceeds of the tokens sold by [the Continuous Token Model] will finance Decentraland over the long haul, perpetually aligning it with the prosperity of the network."

172.    In April 2020, the Decentraland Team announced the creation of the Decentraland Foundation (the "Foundation"), which today holds the intellectual property rights over and makes available the products and services, including virtual environment and tools, offered on the Decentraland platform.  Meilich publicly stated that the distribution of the initial supply of MANA tokens issued at the time of the ICO would be as follows: 20 percent to the founding team, advisors, and early contributors; 20 percent to the Foundation; 40 percent to be available for purchase by the

public; and 20 percent reserved to "incentivize early users, developers, and partners who want to build within Decentraland."

173.     As Meilich explained in his public blog post, "To incentivize value creation within Decentraland, extra tokens will be allocated to the [development team], organization, and a reserve to accelerate Community and Partner engagement."

174.     For example, Decentraland publicly issued a whitepaper ("Decentraland Whitepaper") describing the architecture that would be built in the virtual reality platform and steps that would be taken to support Decentraland's growth.  It further made clear that the development of the platform was only beginning, and listed a number of "Challenges" that would need to be addressed in the development process in order for the platform to succeed.

175.     Decentraland has continued to invest efforts in new developments and tools for the platform.  According to Melich, even after the ICO, Decentraland was still "preparing a land allocation policy to ensure fair distribution, as well as a method for groups to purchase larger contiguous plots of land."  Since the ICO, Decentraland has developed tools for purported use on its platform (e.g., the "Marketplace" and "Builder" tools).  In a public blog post published on March 19, 2018, the Decentraland team described the marketplace tool as the "first … in what will be a series of tools."

176.     Additionally, the Decentraland Whitepaper explained how the Foundation would "Foster[] the Network" in that it will "hold contests to create art, games, applications, and experiences, with prizes contingent on meeting a set of milestones.  At the same time, new users will be assigned allowances, allowing them to participate in the economy immediately."  The Decentraland Whitepaper further claimed, "These financial incentives will help bootstrap the utility value of the network until it independently attracts users and developers."

177.    The Decentraland Whitepaper and website have also marketed that the protocol "burns" (or destroys) MANA tokens when used within the Decentraland ecosystem.

178.    The Decentraland Whitepaper is still available on the Decentraland website.

**C.      CHZ**

179.    CHZ is a token on the Ethereum blockchain, advertised as the "native digital token for the Chiliz sports & entertainment ecosystem currently powering Socios.com," a sports fan engagement platform built on the Chiliz blockchain.  The Chiliz blockchain was introduced in early 2018 by protocol founder and current CEO Alexandre Dreyfus, under a Maltese entity named HX Entertainment Ltd.  The Chiliz whitepaper describes the Chiliz protocol as "a platform where fans get a direct Vote in their favorite sports organizations, connect and help fund new sports and esports entities."

180.    The CHZ token purportedly allows "fans to acquire branded Fan Tokens from any team or organization partnered with the Socios.com platform and enact their voting rights as their fan influencers."  Examples of voting polls that allow holders of "Fan Tokens" (purchased with CHZ tokens) to influence team decisions with their vote include selecting player warm-up apparel and choosing team pennant designs.

181.    According to the Chiliz whitepaper dated November 2018, during the second quarter of 2018 the Chiliz team completed fund-raising of approximately $66 million in exchange for approximately 3 billion CHZ in "Chiliz's Token Generation Event" purportedly "executed via private placement."  CHZ were originally minted in 2018, and there is a maximum supply of 8,888,888,888 CHZ tokens.  However, it was not until the second quarter of 2019 that Chiliz made "Fan Tokens" on Socios.com available for purchase with CHZ.

182.    CHZ has been available for buying and selling through the MetaMask Swaps platform since at least December 2020.

183. From the initial "private" offering of CHZ tokens in 2018, through public statements made in 2023, the Chiliz team has disseminated information and made statements, including statements made and available during the period when CHZ was available to trade on MetaMask Swaps, that have led CHZ holders reasonably to view CHZ as an investment in and to expect profits from the team's efforts to develop, expand, and grow the platform, which, in turn, would increase the demand for and the value of CHZ.

184. For example, the Chiliz website, www.chiliz.com, introduces the Chiliz team, which is "comprised of nearly 350+ cross-industry professionals across 27 different nationalities and is constantly growing." The Chiliz team operates both the Chiliz protocol and Socios.com.

185. In fact, the whitepaper and other public statements by Chiliz also identify several members of the Chiliz leadership team, the bios of these "Leadership" or "Advisory" teams, and their past entrepreneurial and technology experiences and successes. The Chiliz website touts that the Chiliz team is "building the web3 infrastructure for sports and entertainment."

186. The Chiliz team also stated publicly that it would use the proceeds from CHZ sales to fund the development, marketing, business operations, and growth of the Chiliz protocol and, consequently, to increase the demand for CHZ in connection with the protocol. For example, the whitepaper explains that funding raised through token sales would be allocated as follows: 58% to Operational Expenses ("A majority of funds will be passed on from the Issuer to an affiliate to develop the Socios.com platform, secure partnerships & realize the platform's digital infrastructure."); 20% to User Acquisition ("Funds will be used to acquire new users for the Socios.com platform and grow engagement in its voting utilities."); 10% to Corporate Structuring; 5% to Security and Legal; and 7% to Ecosystem Support.

187.    Moreover, 5% and 3% of the total CHZ tokens distributed were allocated to the Chiliz team and an advisory board, respectively—the two groups responsible for the creation and development of the platform—aligning the fortunes of management with those of CHZ investors.

188.    The CHZ whitepaper further makes evident the mutuality of interest (and the alignment of fortunes) between promoter and investor when it cautions that "if the value of BTC, ETH and/or Chiliz fluctuates, the Company may not be able to fund development to the extent necessary, or may not be able to develop or maintain the Socios.com Platform in the manner that it intended."

189.    The Chiliz team also frequently touts the growth potential in the sports and esports industry that it seeks to monetize through the Chiliz team's efforts to expand its platform.  For example, the CHZ whitepaper highlighted the size of the gaming industry and potential for esports revenue as well as the use of CHZ to drive and monetize fan engagement for traditional sports.  In reference to the June 2018 "Token Generation Event," the whitepaper stated:  "[w]e are no longer pursuing fundraising measures, instead focusing our efforts on leveraging accrued resources to realize the Chiliz/Socios.com vision."  The whitepaper continued:  "[w]ith foundations set, Chiliz and the Socios.com platform it powers will look to use Football as a benchmark to expand our Tokenized Fan Voting model to other sports in order to cater to a global marketplace where different competitive verticals are dominant – prime examples of diversification are Cricket in the Indian market, Baseball for Japan, and the like."

190.    Public statements that the Chiliz team and its executives made indicate that CHZ tokens are primarily deployed for purchasing "Fan Tokens" on Socios.com and that the demand for and price of CHZ tokens is directly reliant on demand for Socios fan tokens and their benefits.

191.    The Chiliz team also made other public statements that emphasize the economic reality inherent in the design of the Chiliz blockchain's reliance on CHZ to function—that as Chiliz

is able to grow its platform by partnering with more teams, and those teams grant attractive opportunities to token holders, the value of the respective "Fan Tokens" will increase, and in turn, the value of CHZ will also increase.

192.     For instance, the FAQ section located on the Chiliz website, which was publicly available from at least December 2021 to December 2022, provided:  "Demand for the Chiliz token will increase as more esports teams, leagues and game titles are added to the platform, and as more fans want voting rights."

193.     Chiliz' CEO has echoed this same sentiment in other public statements.  In February 2020, he stated:  "Tens of thousands of regular football fans have already started to use crypto, purchasing $CHZ in order to buy Fan Tokens, and in time we expect millions more to do so as we continue to add more partners to the platform and increase our reach and grow the brand."  In March 2021, he tweeted:  "Monthly Active Users (MAU) of the @socios app, powered by $CHZ. You can see how the demand for $CHZ (exchanges, Etherscan wallets, …) exploded.  Everything is correlated.  We are building a mainstream consumer-facing product, powered by @chiliz blockchain."  And in February 2023, he tweeted:  "I'm biased but I'm very confident that the Chiliz ecosystem is gonna bring a lot of value to fans, sports properties, and innovation in general.  Long journey ahead of us. $CHZ."

194.     The Chiliz team has also made efforts to drive secondary trading of CHZ by offering the token on crypto asset trading platforms.  For example, an earlier version of the whitepaper highlighted "ongoing discussions" to offer CHZ on trading platforms across Asia, and the Chiliz website features a "Listing Content and Q&A" document reflecting a proposal to offer CHZ on the Binance DEX platform.

195.     The Chiliz team also tells investors that it plans to engage in "burning" (or destroying) CHZ tokens as a mechanism to support the price of CHZ by reducing their total supply.

For instance, in 2020, the Chiliz team announced through its Fan Token exchange that it would burn 20% received in net trading fees, 10% of proceeds from "Fan Token" offering sales, and 20% of net proceeds of NFT & Collectibles. As with other crypto asset securities set forth herein, this marketed burning of CHZ has led investors reasonably to view their purchase of CHZ as having the potential for profit.

**D.**      **SAND**

196.     "SAND" was created on the Ethereum blockchain as the native token of the Sandbox platform, a virtual gaming platform first released in 2012 by Pixowl, Inc. ("Pixowl") as a game for download on mobile phones. Pixowl, which is headquartered in San Francisco, was founded in 2011 by Arthur Madrid ("Madrid") and Sebastien Borget ("Borget"). In 2018, Animoca Brands, Inc. ("Animoca"), headquartered in Hong Kong, acquired Pixowl and announced its intention to build a new 3D version of the Sandbox by leveraging blockchain technology. After Pixowl's acquisition, the Sandbox's intellectual property, along with the rest of Pixowl's assets, were transferred to TSB Gaming Ltd ("TSB"), a wholly owned subsidiary of Animoca. Madrid is CEO of TSB, and Borget is the COO.

197.     According to Sandbox's website, SAND is required to access the Sandbox platform, participate in the platform's governance, and earn rewards through the staking program on the platform.

198.     On or about May 23, 2019, before the minting of SAND in July 2019, Animoca raised approximately $2.5 million in cash and crypto assets through TSB via the issuance of Simple Agreements for Future Equity ("SAFEs") and SAND tokens, to "fund the development of the upcoming blockchain version of The Sandbox." According to Animoca's May 23, 2019 press release, the majority of investors allocated their investment to the purchase of both SAND tokens and future equity in TSB via the SAFE agreements (in the amount of $2 million), while some

investors allocated their investment exclusively to the purchase of SAND tokens ($500,000).  Per the release, the funding round was led by Hashed, for approximately $1 million, and also included a number of other crypto venture capital investors.

199.    TSB then minted a total supply of 3 billion SAND on the Ethereum blockchain in or around July 2019 and offered and sold SAND through purportedly private sales and in an IEO that raised $3 million on the Binance.com crypto asset trading platform starting August 13, 2020.

200.    SAND has been available for buying and selling through the MetaMask Swaps platform since approximately October 2020.

201.    The information TSB publicly disseminated has led SAND holders, including those who have purchased SAND since May 2022, reasonably to view SAND as an investment in and to expect to profit from TSB's efforts to grow the Sandbox protocol, which, in turn, would increase the demand for and the value of SAND.

202.    On its blog posts announcing "exchange listings," Sandbox touted its efforts to obtain "listings" and the SAND token's liquidity in the secondary market. For example, in a September 21, 2021, Medium blog post, Sandbox stated that "$SAND is listed on over 60 global cryptocurrency exchanges, including a dozen of the top exchanges by market capitalization."

203.    In addition, the Sandbox stated that it would pool the proceeds from the private token sales and the IEO to develop and promote use of the platform. For example, the May 23, 2019, press release stated: "[t]he funds raised through this transaction will be used to grow the development team and infrastructure for the [Sandbox] Game Platform, support marketing efforts through the acquisition of creators and IP licenses, and provide for security, legal, and compliance expenses as well as general and administrative costs."  The Sandbox whitepaper similarly described identical uses for the $3 million in funds intended to be raised during the IEO.

204.     Moreover, according to the Sandbox whitepaper, of the 3 billion SAND tokens that were initially minted, 19% were to be allocated to the Sandbox founders and team, and another 25.8% were to be allocated to the Company Reserve.

205.     In addition, the Sandbox's Medium blog post on July 25, 2019, stated that "an interesting feature of [the $SAND] token is that it can accrue in value over time, due to the fact that it is scarce.  There will be a limited supply of 3 billion units of $SAND available."

206.     Moreover, TSB stated publicly that it would take steps to manage the market for SAND, including the SAND whitepaper stating that the Sandbox team controls the supply of SAND tokens and has implemented a "controllable supply mechanism, such as purchasing SAND from multiple exchanges," and that "while the total supply of SAND is fixed, the initial amount of SAND offered will provide a scarcity effect reducing the SAND available per capita and therefore fostering demand."

207.     Additionally, in many instances, Animoca has touted the backgrounds of Pixowl, TSB, and the Sandbox core members, including Madrid and Borget, in describing the success and future development of the Sandbox:

- After the acquisition of Pixowl, Yat Siu, the co-founder and director of Animoca, stated in a press release, dated August 27, 2018 (the "2018 Press Release") that "Pixowl's experienced developers will significantly increase our development capabilities. Its founders are highly respected game industry veterans who have developed multimillion dollar franchises. We believe the blockchain version of The Sandbox has incredible potential … We look forward to utilising the many opportunities for growth conferred by this acquisition."

- In the 2018 Press Release, Madrid also commented: "'Animoca Brands is a perfect fit for Pixowl and we are happy to add our brand relationships to its portfolio while accelerating growth for our key IP, The Sandbox …"

- The 2018 Press Release also touted that "Ed Fries, the creator of Microsoft Game Studios and co-founder of the Xbox project, is a special advisor to The Sandbox's original game developer Pixowl" and will therefore continue to serve on the advisory team.

- The Sandbox whitepaper further provided: "We have a strong product roadmap ahead and a top team to execute a strong vision to build a unique virtual world gaming platform where players can build, own, and monetize their gaming experiences and spread the power of blockchain as the lead technology in the gaming industry."

208.    Moreover, the Sandbox whitepaper describes that the role of the "Sandbox Foundation" is to support the ecosystem of the Sandbox by, among other things, offering grants to incentivize high quality content and game production on the platform and further notes that the "overall valuation of the metaverse grows through the valuation of all games funded by the Foundation, creating a virtuous circle to enable funding bigger games." The Sandbox's Gitbook also notes that the Sandbox Foundation has, among other things, (a) supported play-to-earn tournaments and cross-gaming to encourage the broader adoption of SAND and (b) supported marketing activities contributing to the growth of awareness about NFTs, Metaverse and SAND adoption, including co-marketing with exchanges and influencers.

### E.    LUNA

209.    LUNA was a token native to the Terra blockchain, created by Terraform and its founder, Do Kwon. The Terra blockchain was launched in April 2019 along with the creation of one billion LUNA tokens.

210.    At all relevant times, Terraform and Kwon retained hundreds of millions of LUNA tokens for themselves.

211.    At least one "bridge," called "Shuttle," allowed LUNA holders to create "wrapped" versions of LUNA ("wLUNA"). The wLUNA tokens were identical in all material respects to LUNA, except that they could be traded on the Ethereum blockchain, as opposed to the Terra blockchain.

212.    From the time of their offerings through at least May 2022, LUNA and wLUNA were offered and sold as investment contracts and therefore securities.

213.    Investors tendered fiat currency and/or crypto assets to obtain LUNA and wLUNA.

214.    Each unit of LUNA was fungible with and was indistinguishable from any other unit of LUNA.  Each unit of wLUNA was fungible with and was indistinguishable from any other unit of wLUNA.  LUNA and wLUNA prices were the same, and they were exchangeable with each other on a one-to-one basis.  Any holder of wLUNA had the right and ability at any time to exchange the wLUNA for LUNA.

215.    Thus, investors in LUNA and wLUNA shared equally in price increases and decreases, such that if one investor profited, all investors did so as well in equal proportion to their total LUNA or wLUNA holdings.

216.    LUNA or wLUNA was first made available for trading through MetaMask Swaps in January 2021.

217.    The repeated drumbeat of information Terraform publicly disseminated about LUNA or wLUNA and Terraform's plans to undertake efforts to make those assets more valuable led reasonable investors, including those who purchased LUNA or wLUNA since January 7, 2021, to view LUNA and wLUNA as investments into Terraform's efforts.  Specifically, LUNA and wLUNA holders would reasonably expect to profit from Terraform's efforts to grow the Terraform blockchain because this growth would in turn increase the demand for, and the value of, LUNA and wLUNA.

218.    Terraform and Kwon told investors that Terraform would use proceeds from LUNA sales to fund operations and help build and expand the Terraform ecosystem.  For example, in a July 2018 token sale agreement, Terraform represented to potential investors that the funding round was "in furtherance of the establishment and operation of the systems" to be developed by Terraform.

219.    In a 2021 public interview, Terraform's business development lead stated that LUNA "is the 'equity' in our co[mpany]."

220.    On April 7, 2021, Kwon posted on X, "in the long run, $Luna value is actionable—it grows as the ecosystem grows."  Luna holders could simply "sit back and watch me kick ass."

221.    The Terraform Director of Special Projects similarly stated in a June 2021 video presentation, "[o]wning LUNA is essentially owning a stake in the network and a bet that the value will continue to accrue over time."

222.    In marketing materials, Terraform further touted the professional expertise of its team, claiming that Terraform was "led by serial entrepreneurs" and was a team with "deep relevant expertise."

223.    On December 28, 2023, based on these facts, and others, a federal court in the Southern District of New York found that both LUNA and wLUNA have been offered and sold as investment contracts.  *SEC v. Terraform Labs Pte. Ltd et al.*, 23-cv-1346, 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023).

## IV.    CONSENSYS, THROUGH METAMASK STAKING, ENGAGED IN THE UNREGISTERED OFFER AND SALE OF LIDO'S AND ROCKET POOL'S STAKING PROGRAMS, WHICH ARE SECURITIES.

### A.    Background:  Staking

224.    "Proof of Stake" ("PoS") refers to a consensus mechanism used by some blockchain networks to reach agreement about which transactions are valid, to add transactions in new blocks to the blockchain, and to reward participants with additional crypto assets.

225.    A blockchain network using a PoS consensus mechanism typically selects a "validator" from a group of blockchain participants who have agreed to certain requirements necessary to maintain the blockchain and add new blocks.

226.     To be considered for selection into the group or pool of validators, a potential validator must among other things commit, or "stake," a pre-established minimum set amount of the blockchain's native asset (e.g., ETH for the Ethereum blockchain).

227.     On Ethereum, a validator must stake 32 ETH, and these staked assets are "locked up" while staked in the blockchain's PoS consensus mechanism, in part to incentivize validators to faithfully perform required functions.

228.     A "correction penalty" is deducted from the staked crypto assets of validators who do not meet a variety of standards including server uptime, consistency, and accuracy.

229.     "Slashing"— forced removal of a validator's node from the network and an associated gradual loss of all of its staked ETH—occurs when a validator engages in affirmatively malicious activity.

230.     Conversely, validators earn rewards for their efforts, in the form of additional amounts of ETH—for example, by timely voting on proposed blocks, proposing new blocks, and participating in other consensus-related activities.

231.     To create a new block to add to the chain of blocks, the protocol chooses a validator from among those that have staked.  The more the holder stakes, and the less server downtime a potential validator exhibits, the more likely that holder is to be selected as a validator and receive the maximum staking reward.  Thus, the most successful staking operations maximize the chances of being selected by staking a large number of assets across nodes and having better computer resources to minimize server downtime.

232.     Since September 2022, the Ethereum network has employed the PoS mechanism described above.

233.     To serve as an Ethereum validator and potentially earn rewards, a validator must stake at least 32 ETH (worth more than $100,000 as of June 25, 2024) and run an Ethereum node.

234.     The ETH used for staking is held in a smart contract called the "Beacon Deposit Contract" (referred to herein as the "Ethereum validator deposit contract," which is part of the Ethereum staking and validation system).

235.     For those staking ETH, "rewards" are paid out in the form of additional ETH.  The amount of rewards that each validator earns depends on the validator's performance.

236.     For example, a validator earns rewards for keeping its node online and participating in various blockchain maintenance activities, including but not limited to timely voting and proposing new blocks.

237.     Conversely, validators can be penalized for poor performance or slashed for malicious activity.

**B.     Liquid Staking Pool Providers:  Lido and Rocket Pool**

238.     Lido and Rocket Pool have each created and maintained respective staking programs, designed to capture the staking rewards described above.

239.     Lido and Rocket Pool each call their program a "liquid staking" program because— as described below—investors are issued a tradable token in exchange for depositing funds into the program.  This token represents the investor's interest in the program.  The token issued in exchange is referred to as a "liquid staking token" or "LST" and the LST can be traded on the secondary market.

240.     In Lido, the LST is called stETH; in Rocket Pool, the LST is called rETH.

241.     The amount of LST an investor receives is proportional to the amount of ETH they deposit.

242.     These staking programs allow investors to both obtain the rewards of staking and also purportedly retain the ability to redeem the value of their investment at any time.

       i.     *The Lido Staking Program Is An Investment Contract.*

243.    Lido launched its liquid staking platform in December 2020.

244.    To participate, investors deposit ETH with Lido.

245.    In return, Lido issues the investor another crypto asset, "stETH," representing the investor's pro rata interest in Lido's staking program, including the investor's original deposit of ETH plus any accumulated returns.

246.    Lido then uses investors' deposited ETH in the Ethereum consensus mechanism to earn staking rewards—the financial returns for investors.

247.    Specifically, Lido pools the ETH deposited by investors into a Lido smart contract, which initiates the creation of a validator by depositing a 32 ETH bundle to the Ethereum validator deposit contract.

248.    As of June 25, 2024, over 28% of all staked ETH on Ethereum is staked in Lido's staking program.

249.    Lido takes, as a fee, 10% of the staking rewards earned.

250.    The remaining rewards are accrued, pro rata, by stETH token holders.

251.    Lido markets its staking program as an investment opportunity.

252.    Lido also leads investors to reasonably expect that investors' profits will come from Lido's efforts.

253.    According to Lido's website, from December 2020 to February 2024, Lido's staking program returned an annualized percentage gain of 3% to 9%.

254.    In a blog post dated December 28, 2020, Lido stated:  "Lido allows users to stake any amount of ETH – without the need to maintain complex infrastructure."

255.     From at least June 2021 to June 2024, in a "Help" article on its website, Lido stated that staking "requires expert knowledge and complex and costly infrastructure" and that through Lido "users can eliminate these inconveniences."

256.     Lido claimed in an October 2020 document posted to its website that it is "more profitable" than other staking pool providers because of its fee model and the quality of its node operators.

257.     From at least February 2023 to June 2024, another "Help" article on Lido's website claims to allocate investors' staked ETH across multiple, high-quality validator node operators (that is, participants in the Ethereum network consensus mechanism), minimizing the risks associated with staking ETH.

258.     In the same Help article, Lido states that it elects "professional and reputable node operators" and that the penalty and slashing risks are reduced "given the quality of the Lido validator set and its proven track record."

259.     In short, Lido purportedly offers investors a "simplified participation in staking"— deploying its resources and expertise to achieve staking rewards that individual investors typically would not be able to achieve on their own.

260.     The holder of any stETH—whether issued directly from Lido or purchased in the secondary market—has the right to deliver the stETH to Lido to get back the pro-rata staked ETH plus accrued rewards.

261.     Lido treats all investors' deposited ETH as fungible.  It does not purport to segregate investor funds.

262.     In light of the above, Lido offered and sold its staking program as an investment contract.

ii.     *The Rocket Pool Staking Program Is An Investment Contract*

263.    Rocket Pool launched its platform in October 2021.

264.    To participate, investors deposit ETH with Rocket Pool.

265.    In return, Rocket Pool issues another crypto asset, "rETH," representing the investor's pro rata interest in Rocket Pool's staking program, including the investor's original deposit of ETH plus any accumulated returns.

266.    Rocket Pool then uses investors' deposited ETH in the Ethereum consensus mechanism to earn staking rewards—the financial returns for investors.

267.    Specifically, Rocket Pool pools the ETH deposited by investors into a Rocket Pool smart contract, which initiates the creation of a validator by depositing a 32-ETH bundle to the Ethereum validator deposit contract.

268.    Rocket Pool takes a 0.05% fee of the staking rewards it earns.

269.    The remaining staking rewards accrue, pro-rata, to investors.

270.    Rocket Pool also markets its staking program as an investment opportunity.

271.    According to Rocket Pool's website, rETH "accrues value over time."

272.    Rocket Pool also leads investors to reasonably expect that investors' profits will come from the efforts of Rocket Pool.

273.    As of June 2024, Rocket Pool advertised on its website an annual percentage return of approximately 3.11%.

274.    In an FAQ available on its website, Rocket Pool notes that its staking service makes staking available to investors who might not otherwise have the technical expertise necessary to interact with smart contracts or keep a node running 24/7.

275.    Indeed, according to Rocket Pool's FAQ, its program "removes several high barriers to entry that exist with Proof of Stake on Ethereum."

276.    In a January 22, 2021, Medium Post, Rocket Pool stated that its program was "an easy and permissionless way to engage in staking without needing to run any staking infrastructure or even have 32 ETH."

277.    The Rocket Pool FAQ states that it will "allow anyone to earn rewards on deposits as small as 0.01 ETH."

278.    On its website, Rocket Pool also attempts to differentiate itself from other staking pool providers, claiming that "Rocket Pool is the only staking platform with a perfect score on ethereum.org."

279.    According to Rocket Pool's website, its protocol is highly secure and its "smart contracts have been extensively audited, multiple times, by some of the best auditors in the Ethereum ecosystem."

280.    Rocket Pool also touts other reasons for investors to stake their ETH with Rocket Pool.

281.    In the January 2021 Medium post, Rocket Pool notes that the value of rETH is "protected against node slashing and downtime by several built in insurance mechanisms."

282.    Specifically, Rocket Pool requires individuals that run Rocket Pool validator nodes to put up collateral to protect against losses that may result from penalties and slashing.

283.    Rocket Pool's website states that "every rETH token is exactly the same, you will **automatically receive the benefits of staking just by holding the token!**" (Emphasis in original.)

284.    In light of the above, Rocket Pool offered and sold its staking program as an investment contract.

285.    Neither Lido nor Rocket Pool have ever filed registration statements with the SEC for the offer and sale of their respective staking program investment contracts.

C.     **Consensys—through MetaMask Staking—Offers and Sells the Lido and Rocket Pool Investment Contracts.**

  i.     *Through MetaMask Staking, Consensys Promotes, Offers, and Sells the Lido and Rocket Pool Investment Contracts To Its Users.*

286.    On January 13, 2023, Consensys publicly announced the release of a program called MetaMask Staking.

287.    Consensys created MetaMask Staking to offer and sell the Lido and Rocket Pool staking program investment contracts to investors.

288.    The January 13 announcement stated:  "MetaMask Staking allows you to engage in liquid staking with two prominent providers, Lido and Rocket Pool, where by you can deposit your ETH and receive a token representing the value of your stake in return."

289.    It called MetaMask Staking "an easy and convenient way to stake ETH."

290.    On January 13, 2023, Consensys posted on the MetaMask Twitter account:  "We are extremely happy to announce that you can now stake ETH with Lido or Rocket Pool through the [MetaMask] Portfolio Dapp."  This post included an image advertising "5.22% rewards" with Lido and "4.59% rewards" with Rocket Pool—highlighting the former as the "Highest rewards."

291.    On May 16, 2023, Consensys posted on the MetaMask Twitter account:  "[U]sers can now stake and withdraw ETH directly from our liquid staking providers, Rocket Pool and Lido."  And "Get started here," pointing to a link to the MetaMask portfolio website.

292.    In promotional materials, Consensys claimed that MetaMask Staking would make it easier for individual holders of ETH to participate in staking.

293.    Specifically, in its January 13, 2023, announcement on its website, Consensys stated: "[S]taking can be a convoluted and complicated process for end-users.  MetaMask Staking will offer an easy-to-understand and trusted entry point for users interested in staking.  Through this new

feature, users can compare the rewards rate, network control, and popularity of different liquid staking providers and choose the one they want to stake with."

        *ii.*    <u>*Consensys's MetaMask Staking User Interface.*</u>

294.    To use MetaMask Staking, investors must have ETH in their MetaMask Wallet.

295.    First, from the browser extension or mobile app, the investor clicks on "Stake," or "Staking." They are then taken to the MetaMask Portfolio site, where they can then choose "ETH."

296.    At this point, Consensys's graphical interface presents the investor with two options: Lido and Rocket Pool.



297.    Consensys's MetaMask Staking program will highlight the option with the "highest rewards."

298.    If either Lido or Rocket Pool is at or near capacity, Consensys's MetaMask Staking software disables the ability to stake with that program.

299.    In any event, an investor can choose either the Lido or Rocket Pool staking program by clicking "Stake."

300.    On the following screen, an investor can input the number of ETH that they would like to invest in one of the staking program investment contracts and click "review."

301.    At that point, Consensys's MetaMask Staking software shows the investor a screen with the number of the staking pool tokens they will receive in return, their "estimated rewards," and the "estimated gas fee."

302.    If the investor wishes to proceed with their request to invest in the staking program investment contract, the investor clicks "confirm."

303.    If MetaMask Staking successfully completes the transaction, the investor will see a screen that says, "Transaction Complete."

iii.    *Consensys Offers and Sells the Lido and Rocket Pool Investment Contracts To Investors.*

304.    Accordingly, Consensys offers and sells the Lido and Rocket Pool investment contracts to investors through the MetaMask Staking platform.

305.    Consensys makes this process appear simple and easy to non-technical investors, while performing the technical series of actions necessary to transfer the investor's ETH to Lido or Rocket Pool and transfer stETH or rETH to the investor in return.

306.    When the investor clicks "confirm," this signals the MetaMask Staking software to take the steps necessary to exchange the investor's ETH for rETH or stETH.  Specifically, Consensys has programed MetaMask Staking software to take the steps described below.

307.    First, Consensys's MetaMask Staking software reads the private key associated with the ETH in the investor's MetaMask Wallet.

308.    Second, using this key, the software creates a blockchain transaction and transfers the investor's ETH from the investor's MetaMask Wallet into a smart contract called the MetaMask Staking Aggregator Router Smart Contract (the "MM Staking Router Smart Contract").

309.    The MM Staking Router Smart Contract has its own Ethereum blockchain address.

310.    The investor has no control over the MM Staking Router Smart Contract.

311.    The MM Staking Router Smart Contract address temporarily holds the investor's ETH.

312.    Although Consensys has programmed its MetaMask Staking software so that Consensys can take a fee for each transaction, Consensys currently sets the fee variable at zero (i.e., it does not take a fee at this time).

313.    Consensys could, however, change the software at any time to assess a fee, in which case the amount of the fee would be diverted from the MM Staking Router Smart Contract into a blockchain address designated by Consensys.

314.    Third, Consensys's software transfers the investor's ETH from the MM Staking Router Smart Contract to the Lido or Rocket Pool Proxy smart contract (deployed by Lido and Rocket Pool, respectively).

315.    These Proxy smart contracts mint stETH or rETH, respectively, upon receiving a deposit of ETH, and, if the MM Staking Router Smart Contract sends ETH to the Proxy smart contracts, the Proxy smart contracts will transfer newly minted stETH or rETH, respectively, to the MM Staking Router Smart Contract.

316.    Fourth, the MM Staking Router Smart Contract transfers the stETH or rETH, as the case may be, to the investor's MetaMask Wallet.

317.    As of March 11, 2024, investors had invested 100,252 ETH in the Lido staking program through MetaMask Staking and 8,375 ETH in the Rocket Pool staking program through MetaMask Staking.

318.    As of March 11, 2024, Consensys, through MetaMask Staking, offered and sold the Lido staking program to 32,449 unique blockchain addresses and offered and sold the Rocket Pool staking programs to 2,215 unique blockchain addresses.

319.     For its part, Lido embraced MetaMask Staking as a platform through which its staking program would be offered and sold.

320.     On January 17, 2023, Lido announced on its blog that "Ethereum staking with Lido is now live on MetaMask!  Stake your ETH on MetaMask to earn yield and secure the Ethereum network from the comfort of your wallet."

321.     Moreover, a former Lido employee testified that "in terms of a distribution channel [Consensys's MetaMask was] a very highly valued target."

322.     Accordingly, by the conduct described above, Consensys offered and sold, and continues to offer and sell, investment contracts for Lido and Rocket Pool, participating directly in the distribution of securities from the issuers—Lido and Rocket Pool—to the investor.

## V.     CONSENSYS WAS REQUIRED TO, BUT DID NOT, REGISTER AS A BROKER WITH RESPECT TO METAMASK SWAPS.

323.     As fully set forth in the preceding paragraphs, Consensys, through MetaMask Swaps, used the means and instrumentalities of interstate commerce to engage in the business of effecting transactions in securities for the account of others by, for example, soliciting potential investors in crypto asset securities, holding itself out as a place to buy and sell crypto assets (including crypto asset securities), providing investment advice by highlighting the "best" prices or "best" value, and otherwise facilitating trading in crypto asset securities by creating customer wallets (i.e., "accounts"), routing customer orders, handling customer crypto asset securities through Consensys-operated smart contract addresses, facilitating order execution by submitting blockchain transactions to a Consensys node, and receiving transaction-based compensation for doing so.  Consensys was

therefore required to register with the SEC as a broker or operate pursuant to an exemption or exception but did not do so.

## VI.   CONSENSYS ALSO ACTS AS A BROKER WITH RESPECT TO THE LIDO AND ROCKET POOL INVESTMENT CONTRACTS.

324.   Through its MetaMask Staking program, Consensys also acts as a broker by effecting transactions in the Lido and Rocket Pool investment contracts for the account of others.

325.   As alleged above, Consensys solicits potential investors, holds itself out as a place to buy and sell the investment contracts, and recommends which of the two investment contracts will offer the highest rewards.

326.   Consensys then effects the transaction on the investor's behalf.

327.   Specifically, as noted, Consensys through the MetaMask Staking software handles the investor's assets by removing the investor's ETH from the investor's MetaMask wallet and transferring it to the MM Staking Router Smart Contract, which, in turn, transfers it to the Lido or Rocket Pool proxy smart contract.

328.   Finally, Consensys's software, transfers the acquired token—stETH or rETH—into the investor's MetaMask Wallet.

### FIRST CLAIM FOR RELIEF
### Violation of Exchange Act Section 15(a)

329.   The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 329.

330.   By engaging in the acts and conduct described in this Complaint, Consensys, a person other than a natural person under the Exchange Act, is a broker and made use of the mails and the means and instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities for the account of others, without registering as

a broker, and without having an exemption or exception from such registration.

331.    By reason of the foregoing, Consensys violated, and, unless enjoined, will continue to violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Securities Act Sections 5(a) and 5(c)

332.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 331.

333.    By virtue of the foregoing, Consensys, through its offers and sales of the Lido and Rocket Pool staking program investment contracts, directly and indirectly: (a) without a registration statement in effect as to those securities, (1) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of any prospectus or otherwise, and (2) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale; and (b) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

334.    By reason of the conduct described above, Consensys violated, is violating, and, unless enjoined, will continue to violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Defendant and its agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Sections 5(a) and (c) [15 U.S.C. §§ 77e(a), 77e(c)] and Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

**II.**

Ordering Defendant to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

**III.**

Granting any other and further relief this Court may deem appropriate or necessary for the benefit of investors pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

**JURY DEMAND**

The Commission demands a trial by jury.

Dated:  New York, New York
June 28, 2024

/s Jorge G. Tenreiro

Jorge G. Tenreiro
Samuel Wasserman
Daphna Waxman
Amy Mayer
Abigail Cooper

SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-1100
Email: tenreiroj@sec.gov

*Attorneys for the Plaintiff*

Of Counsel
Kristin Pauley
Mark Sylvester