# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

          *Plaintiff,*

    v.

CONSENSYS SOFTWARE INC.,

          *Defendant.*

24 Civ. 4578 (MKB) (TAM)

## CONSENSYS'S ANSWER TO PLAINTIFF'S COMPLAINT

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000

*Attorneys for Defendant*

Dated: November 1, 2024

## PRELIMINARY STATEMENT

1.      This action is the product of regulatory overreach and the ambition of the administrative state to control innovative technologies.

2.      Plaintiff Consensys Software Inc. ("Consensys") is a leading blockchain software developer. One of its core products is MetaMask — free "wallet" software used by millions of people to access their crypto tokens on the decentralized web. The software is "non-custodial," which means that users store their keys on their personal devices, where they can be accessed only by the user — never by Consensys — to directly control their digital assets without the need for a third-party custodian or financial intermediary.

3.      For years, the SEC openly acknowledged its lack of authority over crypto trading platforms and assured the marketplace that two of the leading crypto tokens were not securities. And it never once suggested that ubiquitous wallet software like MetaMask implicated the securities laws. But in 2021, a new Administration brought with it a new SEC Chair and a new agenda to arrogate to the agency unprecedented powers over the crypto sector. In this bid to control the future of crypto, the SEC targeted Consensys and MetaMask, contending that the software's non-custodial "Swaps" and "Staking" features act as a broker and as an offeror and seller of securities.

4.      The SEC is wrong on the facts and wrong on the law. Its claims fail for the following two independent reasons.

5.      *First*, Consensys neither carries out broker activities nor sells any digital assets — that alone dooms the SEC's entire case. MetaMask Swaps and Staking are simply user interfaces — like a web browser — that help users interact and exchange crypto tokens with third-party blockchain-based "liquidity providers" and "liquid staking" protocols. Transacting on blockchains requires composing and encrypting instructions in computer code. MetaMask Swaps and Staking

allow users to avoid manually composing those instructions: they provide users with an intuitive interface to input commands that are then formatted into the appropriate code, which the user can choose to sign and send to the blockchain for processing.

6. The SEC's contention that this constitutes "broker" or "offeror" activity cannot be squared with well-settled law. MetaMask doesn't provide investment advice or recommendations, negotiate transaction terms, hold assets, route orders, or carry out any other transaction functions. Rather, MetaMask Swaps and Staking both just fetch information from third parties to display to users, and then format and forward users' instructions to those third parties, thereby making it easier for crypto holders to interact with those blockchain-based protocols. No court has found anything like the MetaMask wallet software to be a broker or offeror. To the contrary, in March of this year, a court rejected the SEC's near-identical claims against substantially similar software. *SEC* v. *Coinbase, Inc.*, 2024 WL 1304037, at *35 (S.D.N.Y. Mar. 27, 2024). On this ground alone, the SEC's case against Consensys is due to be dismissed.

7. *Second*, in any event, the SEC's claims fail for the independent reason that none of the activities at issue even involve securities.

8. The SEC contends that Consensys, through MetaMask Swaps, has allowed users to swap certain digital assets that the SEC called "Crypto Asset Securities." The SEC asserts that these digital assets fall within the statutory definition of "investment contracts," but this requires among other things a contractual undertaking to deliver value past the point of the asset sale itself. The Complaint alleges no such undertakings made to users — whether by Consensys or anyone else — to deliver any future value. And unlike traditional debt or equity securities, holders in these digital assets have no expectation in the income, profits, or assets of any business. To escape this fatal deficiency, the SEC has advanced a construction of the term "investment contract" that is

divorced from its plain meaning and contrary to the historical and statutory context the Supreme Court and the SEC itself long ago agreed must inform the term's meaning. And not only have courts repeatedly rejected the view that a digital asset itself is a security, but the SEC itself has since the filing of the Complaint disavowed its use of the term "Crypto Asset Security" — expressly acknowledging the "confusion" it wrought.

9.      The SEC also alleges that the Lido and Rocket Pool liquid staking protocols that users can access through MetaMask Staking offer investment contracts. But liquid staking simply allows users to participate in the validation of Ethereum blockchain transactions and to earn fees for those efforts. This is a fee-for-service relationship, not an investment of money, and involves no managerial efforts on the part of the liquid staking protocols or anyone else.

10.      For these reasons, the SEC's allegations concern transactions that involve no "investment contracts" as a matter of law and therefore fall beyond the ambit of the securities laws.

11.      Even were the sweeping breadth of the SEC's construction of the securities laws colorable, the major questions doctrine would require its rejection. The digital asset industry has become a significant economic force. At least one in five adults in the United States owns crypto today, with hundreds of millions of people globally using crypto assets for financial and nonfinancial purposes. And digital assets have achieved a market capitalization of nearly $2.5 trillion, with tens of billions of dollars of crypto traded on a daily basis. Where, as here, an agency claims "to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy," it must have "clear congressional authorization." The SEC does not.

12.      Finally, the SEC's crypto regulatory power grab violates core principles of due process and fair notice and constitutes an unlawful abuse of process. Essential to due process is

the "fundamental principle . . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC* v. *Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). The SEC's new position that nearly all transactions in digital assets involve securities is contrary to not only common sense but also years of SEC guidance about when transactions in digital assets are not investment contracts, the SEC's own statements about the limits of its authority, and declarations by its sister agency, the Commodity Futures Exchange Commission, about the regulatory status of digital assets. Indeed, two SEC Commissioners recently criticized as "fiction" the SEC's claim to have provided "clarity on which crypto assets are securities" with standards that "are so opaque and arbitrary that the Commission itself is unwilling to stand by its own analysis." And as another federal court recently noted, "the agency's decision to oversee this billion dollar industry through litigation — case by case, coin by coin, court after court — is probably not an efficient way to proceed, and it risks inconsistent results that may leave the relevant parties and their potential customers without clear guidance." *SEC* v. *Binance Holdings Limited*, 2024 WL 3225974, at *11 (D.D.C. June 28, 2024).

13.     This action is just the latest step in the SEC's recent campaign to seize control over the future of blockchains and cryptocurrency, one of the fastest-growing and most innovative technologies in the world. Consensys's MetaMask software embodies the core promise of blockchain technology: enabling individuals to transact directly and securely with each other through automated software, without the need for human intermediaries or financial institutions. The SEC's attempt to impose its regulatory authority on this technology and insert itself into this crypto architecture is unsupported in the law — its claims must fail.

## RESPONSES TO PLAINTIFF'S ALLEGATIONS

Consensys, by and through its undersigned counsel, hereby responds to the numbered allegations in the Complaint. All allegations not expressly admitted herein, including those

-4-

contained in the structural headings or footnotes of the Complaint, are denied. By acknowledging the existence of or referring the Court to documents, reports, or testimony, Consensys makes no admission as to the truth of the contents of such documents, reports, or testimony, and reserves all rights (and waives no rights) to argue that such documents, reports, or testimony, or any documents, reports, or testimony referenced therein, are objectionable as hearsay or on any other ground.

## SUMMARY

1.      Since 2016, Consensys has developed and operated a suite of crypto asset-related services under the brand "MetaMask." Consensys markets itself as a leader and innovator in the crypto asset industry, but certain products that Consensys offers its customers perform age-old functions: (1) brokering securities transactions for retail investors and (2) engaging in the offer and sale of securities.

**RESPONSE:** Consensys admits that it develops and offers the MetaMask digital assets "wallet" software. Consensys further admits that the earliest version of MetaMask was released in 2016. Consensys otherwise denies the allegations in Paragraph 1, including that the term "investor" fairly or accurately describes users of MetaMask. Consensys avers that it does not offer and has never offered any products that broker securities transactions or engage in the offer and sale of securities.

2.      Consensys violated the federal securities laws by failing to register as a broker and failing to register the offer and sale of certain securities, thereby depriving investors of crucial protections that those laws afford. Since October 2020, Consensys has acted as an unregistered broker of crypto asset securities through its MetaMask Swaps service. Since January 2023, Consensys has engaged in the unregistered offer and sale of securities in the form of crypto asset staking programs, and acted as an unregistered broker, through its MetaMask Staking service. By its conduct as an unregistered broker, Consensys has collected over $250 million in fees.

**RESPONSE:** Consensys denies the allegations in Paragraph 2, including that the term "investor" fairly or accurately describes users of MetaMask, except it admits that it offers a software interface called MetaMask Swaps that helps users interact with third-party decentralized exchanges ("DEXs"), DEX aggregators, and market makers (collectively, "liquidity providers")

to exchange tokens and an application called MetaMask Staking that helps users interact with certain third-party protocols called Lido and Rocket Pool, each of which offers a liquid staking service for validating transactions on the Ethereum blockchain, and that users have paid Consensys over $250 million in fees to use MetaMask Swaps. Consensys avers that it is not, and was never, operating as an unregistered securities broker through MetaMask Swaps or MetaMask Staking nor engaged in the offer and sale of securities through MetaMask Staking.

3.    MetaMask Swaps is a digital platform that brokers transactions in crypto asset securities on behalf of MetaMask Swaps users—including retail investors in crypto asset securities. As its name suggests, through "MetaMask Swaps," Consensys effects the exchange of one crypto asset for another on the investor's behalf. Consensys solicits potential investors in crypto asset securities, holds itself out as a place to buy and sell crypto assets (which include crypto asset securities), recommends trades with—as Consensys itself puts it—the "best" value, accepts investor orders, routes investor orders, handles customers assets, carries out trading parameters and instructions on the customer's behalf, and receives transaction-based compensation.

**RESPONSE:** Consensys admits that it offers a software interface called MetaMask Swaps that helps users interact with liquidity providers to exchange tokens and that for the majority of successful transactions users pay Consensys a fee for using MetaMask Swaps that is a percentage of the notional amount of the transaction. Consensys otherwise denies the allegations in Paragraph 3, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

4.    MetaMask Swaps functions as follows. An investor enters the name and amount of the crypto asset that they wish to sell, as well as the name of the crypto asset that they wish to buy in return. MetaMask Swaps then pulls available rates for the requested exchange from a Consensys-curated group of execution venues and other third-party liquidity providers (referred to herein as "third-party liquidity providers") and displays those rates to the investor, highlighting the option that Consensys deems "best." With one additional click by the investor, MetaMask Swaps performs the functions necessary to effect the trade, on the investor's behalf, with the third-party liquidity provider. As described in further detail below, Consensys's software routes the investor's order by transferring their asset and trading instructions through Consensys's own smart contracts on the blockchain, which interface with third-party liquidity providers on the investor's behalf. As is typically the case in traditional securities markets, the investor here never interacts directly with the third party; all investor interactions are directly with Consensys's platform. And Consensys collects a fee on most transactions.

**RESPONSE:** Consensys admits that a user can identify in the MetaMask Swaps user interface the name and amount of the token that he or she wishes to instruct the third-party liquidity provider to swap and the name of the token that he or she wishes to receive through the swap. Consensys further admits that when a user requests a quote using MetaMask Swaps, the MetaMask Swaps user interface and related software queries pricing information from third-party liquidity providers, sorts that information, and indicates the price quote that would return the largest quantity of tokens based on a mathematical calculation that factors in blockchain network transaction fees. Consensys further admits that when users transmit instructions they have prepared using the MetaMask Swaps user interface, they "call" (i.e., cause the execution of the code of) smart contracts deployed on the blockchain by Consensys and by third-party liquidity providers. Consensys further admits that for the majority of successful transactions, users pay a portion of the notional amount of the transaction to Consensys as a fee for using MetaMask Swaps. Consensys otherwise denies the allegations in Paragraph 4, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

5. Since 2020, through MetaMask Swaps, Consensys has brokered over 36 million crypto asset transactions—including at least 5 million transactions in crypto asset securities—between investors, on one hand, and third-party liquidity providers (such as purportedly "decentralized" crypto asset trading platforms and market makers) on the other.

**RESPONSE:** Consensys admits that users have completed more than 36 million swaps with third-party liquidity providers by using MetaMask Swaps to format and transmit their transaction instructions. Consensys otherwise denies the allegations in Paragraph 5, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

6. In addition to operating as an unregistered broker with respect to MetaMask Swaps, Consensys performs another traditional function of the securities market: offering and selling securities. Specifically, Consensys has offered and sold tens of thousands of securities for two issuers: Lido and Rocket Pool. By this conduct, Consensys acts as an underwriter of those securities and participates in the key points of their distribution.

**RESPONSE:** Denied.

7.      Lido and Rocket Pool each offer what are commonly referred to as "liquid staking" programs. "Staking," in the context of a blockchain network, refers to the commitment of the native crypto asset of the blockchain (in the case of the Ethereum blockchain, for example, ether or "ETH") in order to act as a "validator" of transactions recorded on that network. Blockchain validators perform certain functions to earn rewards in the form of additional tokens and, when selected, proposing new blocks to the blockchain. Lido and Rocket Pool offer an investment program known as a "staking program," centered around this feature of the Ethereum blockchain. In essence, Lido and Rocket Pool each pool ETH contributed by investors and stakes it on the blockchain, using their technological expertise to earn returns that the typical investor would not be able to earn on their own. Upon receipt of an investor's ETH, Lido and Rocket Pool issue the investor a new crypto asset in return—stETH or rETH, respectively—representing the investor's pro-rata interest in the staking pool and its rewards. Lido and Rocket Pool refer to their staking programs as "liquid" because investors' interests in the programs—represented by the stETH and rETH tokens—are tradable on the secondary market, thereby providing investors a mechanism to exit their investment position, whereas tokens staked directly on the blockchain cannot be easily accessed while they are staked.

**RESPONSE:** Consensys admits that both Lido and Rocket Pool allow users to stake ETH and receive a transferable digital asset token as a form of receipt, which is a process that is commonly referred to as "liquid staking." Consensys further admits that "staking," in the context of a blockchain network, generally refers to the process of depositing that network's native token to act as a validator of blocks recorded on the network. Consensys further admits that certain blockchains that use a proof-of-stake consensus mechanism are designed to transfer reward tokens to validators who satisfy defined standards for the work they complete on behalf of the network. Consensys further admits that when a user stakes ETH through Lido or Rocket Pool, the user receives stETH or rETH, respectively. Consensys further admits that markets exist where stETH and rETH tokens can be swapped for other digital asset tokens. Consensys otherwise denies the allegations in Paragraph 7, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

8.      The Lido and Rocket Pool staking programs are each offered and sold as investment contracts and, therefore, securities. Specifically, as described in more detail below, investors make an investment of ETH in a common enterprise with a reasonable expectation of profits from the managerial efforts of Lido and Rocket Pool, respectively. Yet, neither Lido nor Rocket Pool has

filed a registration statement with the Commission for the offer and sale of these investment contracts.

**RESPONSE:** Consensys denies the allegations in Paragraph 8, including that the term "investor" fairly or accurately describes users of MetaMask Staking, except it admits that, to the best of its knowledge, no registration statement has been filed with the SEC in connection with the Lido or Rocket Pool protocols.

9.     Consensys, for its part, brokers and also offers and sells these securities in unregistered transactions through its "MetaMask Staking" platform. By soliciting investors to participate in the Lido and Rocket Pool staking programs and by acting as an intermediary between Lido and Rocket Pool, on one hand, and investors in their respective staking programs on the other, Consensys was an integral part of the distribution of these securities. Indeed, Consensys developed and deployed MetaMask Staking for the specific purpose of offering and selling the Lido and Rocket Pool staking program investment contracts. Consensys solicits investments in the Lido and Rocket Pool staking programs through "MetaMask Staking." When an investor makes a request to invest with Lido or Rocket Pool via MetaMask Staking, Consensys transfers the ETH to Lido or Rocket Pool on the investor's behalf and transfers newly issued stETH or rETH from Lido or Rocket Pool to the investor's MetaMask Wallet (a Consensys-developed software application for storing investors' crypto assets, as explained below). MetaMask Staking investors never interact directly with Lido or Rocket Pool; all investor interactions are directly with Consensys's platform.

**RESPONSE:** Consensys admits that users can transmit instructions that they prepared via the MetaMask Staking user interface to transact with the Lido and Rocket Pool staking protocols. Consensys further admits that when users transmit such instructions, they "call" (i.e., cause the execution of the code of) smart contracts deployed on the blockchain by Consensys and by Lido or Rocket Pool. Consensys further admits that MetaMask Staking users interact directly with the MetaMask Staking user interface. Consensys otherwise denies the allegations in Paragraph 9, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

10.     Despite performing brokerage functions, Consensys has not registered as a broker with the Commission, in violation of the federal securities laws. As further explained below, those provisions mandate transparency, including the disclosure of conflicts of interest, so that investors receive information necessary to make informed investment decisions. Registration also requires broker-dealers to comply with applicable financial responsibility requirements that protect customers and other market participants.

**RESPONSE:** Consensys denies the allegations in the first sentence of Paragraph 10, except admits that it has not registered as a broker with the Commission. The remainder of Paragraph 10 sets forth legal conclusions to which no response is required. To the extent a further response is required, Consensys otherwise denies any remaining allegations in Paragraph 10.

11.     Consensys's unregistered offer and sale of the Lido and Rocket Pool securities, as to which it also acts as an unregistered broker, violates the federal securities laws. It deprives investors of the protections afforded to them by the federal securities laws. Indeed, registration statements provide investors with material information about the securities offering and the issuer's business and financial condition, so that investors can make informed investment decisions.

**RESPONSE:** Consensys denies the allegations in the first sentence of Paragraph 11. The remainder of Paragraph 11 sets forth legal conclusions to which no response is required. To the extent a further response is required, Consensys otherwise denies any remaining allegations in Paragraph 11, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

12.     With MetaMask Swaps and MetaMask Staking, Consensys has inserted itself into the U.S. securities markets, yet failed to act in accordance with the provisions of the federal securities laws to which it is subject and that exist to protect investors.

**RESPONSE:** Consensys denies the allegations in Paragraph 12, including that the term "investor" fairly or accurately describes users of MetaMask Swaps or MetaMask Staking.

## VIOLATIONS

13.     By engaging in the conduct set forth in this Complaint, including the operation of its MetaMask Swaps and MetaMask Staking platforms, Consensys has acted as a broker, without registering as such, in violation of Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o].

**RESPONSE:** Denied.

14.     In addition, through the MetaMask Staking program, Consensys has engaged in unregistered offers and sales of securities in violation of Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)].

**RESPONSE:** Denied.

15.     Unless Defendant is restrained and enjoined, it will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

**RESPONSE:** To the extent Paragraph 15 references acts, practices, transactions, and courses of business to which Consensys has otherwise admitted in this Answer, Consensys admits that it may continue to engage in such acts, practices, transactions, and courses of business. Consensys otherwise denies any remaining allegations in Paragraph 15.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

16.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)], and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

**RESPONSE:** Paragraph 16 states a legal conclusion to which no response is required. To the extent a further response is required, Consensys denies any remaining allegations in Paragraph 16. Consensys further avers that the Commission lacks authority to bring this action.

17.     The Commission seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws this Complaint alleges it has violated; (b) ordering Defendant to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and (c) ordering any other and further relief, including equitable relief and other relief pursuant to Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], the Court may deem just and proper.

**RESPONSE:** Consensys admits that the Commission seeks the specified relief and denies that the Commission has authority to seek any of it.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d), and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

**RESPONSE:** Paragraph 18 states a legal conclusion to which no response is required. To the extent a further response is required, Consensys denies any remaining allegations in Paragraph 18.

19. Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

**RESPONSE:** Paragraph 19 states a legal conclusion to which no response is required. To the extent a further response is required, Consensys denies any remaining allegations in Paragraph 19.

20. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Defendants may be found in, are inhabitants of, or transact business in the Eastern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. Prior to February 2024, Consensys was based in Brooklyn, New York, and still maintains offices in Brooklyn.

**RESPONSE:** Consensys admits that it maintains office space in Brooklyn, New York. The remainder of Paragraph 20 sets forth legal conclusions to which no response is required. To the extent a further response is required, Consensys denies any remaining allegations in Paragraph 20.

## DEFENDANTS

21. **Consensys** was founded in 2014. In June 2020, Consensys was incorporated in Delaware.

**RESPONSE:** Consensys admits that it was incorporated in the State of Delaware in June 2020 and otherwise denies the allegations in Paragraph 21.

## OTHER RELEVANT ENTITIES

22. **Lido Finance ("Lido")** is a Cayman Islands company. Lido operates a program for staking on the Ethereum blockchain. Lido launched its staking program in December 2020.

**RESPONSE:** Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 22. Consensys admits that the Lido protocol launched on the Ethereum mainnet in December 2020 and that it allows users to stake

ETH and receive a transferable digital asset token as a form of receipt. Consensys otherwise denies the allegations in Paragraph 22.

23.     **Rocket Pool** is headquartered in Australia. Rocket Pool also operates a program for staking on the Ethereum blockchain. Rocket Pool launched its staking program in October 2021.

**RESPONSE:** Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 23. Consensys admits that the Rocket Pool protocol launched on the Ethereum mainnet in October 2021 and that it allows users to stake ETH and receive a transferable digital asset token as a form of receipt. Consensys otherwise denies the allegations in Paragraph 23.

**FACTS**

I.     **BACKGROUND**

    A.     <u>**Statutory and Legal Framework**</u>

24.     The Securities Act and the Exchange Act "form the backbone of American securities laws." *Slack Tech., LLC v. Pirani*, 598 U.S. 759, 762 (2023). These acts define "security" broadly, to include a wide range of assets, including "investment contracts." [15 U.S.C. §§ 77b(a), 78c(a)(10)].

**RESPONSE:** Paragraph 24 purports to quote from and characterize the Supreme Court's opinion in *Slack Technologies, LLC* v. *Pirani*, 598 U.S. 759 (2023), the Securities Act, and the Exchange Act, to which Consensys respectfully refers the Court for their complete and accurate contents. Paragraph 24 also states legal conclusions to which no responses are required. To the extent a further response is required, Consensys denies any remaining allegations in Paragraph 24.

25.     Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits derived from the entrepreneurial or managerial efforts of others.

**RESPONSE:** Paragraph 25 states a legal conclusion to which no response is required. To the extent a further response is required, Consensys denies any remaining allegations in Paragraph 25.

26.     Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946).

**RESPONSE:** Paragraph 26 purports to quote from and characterize the Supreme Court's opinion in *SEC* v. *W.J. Howey Co.*, 328 U.S. 293 (1946), to which Consensys respectfully refers the Court for its complete and accurate contents. Paragraph 26 also states legal conclusions to which no responses are required. To the extent a further response is required, Consensys denies any remaining allegations in Paragraph 26.

> i.     *Registration of Securities Offerings*

27.     Congress enacted the Securities Act in part to regulate the offer and sale of securities.

**RESPONSE:** Paragraph 27 states a legal conclusion to which no response is required. To the extent a further response is required, Consensys denies any remaining allegations in Paragraph 27.

28.     Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)] require registration of offers and sales of securities with the SEC.

**RESPONSE:** Paragraph 28 purports to characterize Sections 5(a) and 5(c) of the Securities Act, to which Consensys respectfully refers the Court for their complete and accurate contents. Paragraph 28 also states legal conclusions to which no responses are required. To the extent a further response is required, Consensys denies any remaining allegations in Paragraph 28.

29.     Registration is intended to assure that the persons offering or selling the securities give the investing public required information about the issuer, the securities, and the transaction. With that information, investors can then make more informed investment decisions.

**RESPONSE:** Paragraph 29 states a legal conclusion to which no response is required. To the extent a further response is required, Consensys denies any remaining allegations in Paragraph 29.

      ii.    *Registration of Brokers*

30.    Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(a)(4)] defines "broker" generally as "any person engaged in the business of effecting transactions in securities for the account of others."

**RESPONSE:** Paragraph 30 purports to quote from and characterize Section 3(a)(4) of the Exchange Act, to which Consensys respectfully refers the Court for its complete and accurate contents. Paragraph 30 also states legal conclusions to which no responses are required. To the extent a further response is required, Consensys denies any remaining allegations in Paragraph 30.

31.    Section 15(a) of the Exchange Act [15 U.S.C. § 78c(a)(4)] generally requires brokers to register with the SEC, and a broker must also become a member of one or more "self-regulatory organizations" ("SROs"), which, in turn, require members to adhere to rules governing the SRO's members' activities.

**RESPONSE:** Paragraph 31 purports to quote from and characterize Section 15(a) of the Exchange Act, to which Consensys respectfully refers the Court for its complete and accurate contents. Paragraph 31 also states a legal conclusion to which no response is required. To the extent a further response is required, Consensys denies any remaining allegations in Paragraph 31.

32.    The regulatory regime applicable to brokers is a cornerstone of the federal securities laws and provides important safeguards to investors and market participants. Registered brokers are subject to comprehensive regulation and rules that include recordkeeping and reporting obligations, SEC and SRO examinations, and general and specific requirements aimed at addressing certain conflicts of interest, among other things. All of these rules and regulations are critical to the soundness of the national securities markets and to protecting investors in the public markets who interact with brokers and invest in securities.

**RESPONSE:** Paragraph 32 states legal conclusions to which no responses are required. To the extent a further response is required, Consensys denies any remaining allegations in Paragraph 32.

### B. Crypto Assets

33.     As used herein, the terms "crypto asset" or "token" generally refers to an asset issued and/or transferred using blockchain or distributed ledger technology, including assets referred to colloquially as "cryptocurrencies," "virtual currencies," and digital "coins."

**RESPONSE:** Paragraph 33 defines the terms "crypto asset" and "token" as used in the Complaint, and thus no response is required.

34.     A blockchain or distributed ledger is a database spread across a network of computers that records transactions in theoretically unchangeable, digitally recorded data packages, referred to as "blocks." These systems typically rely on cryptographic techniques to secure the recording of transactions.

**RESPONSE:** Admitted.

35.     Crypto asset owners typically store the cryptographic key information that gives them control over their crypto assets on a piece of hardware or software called a "crypto asset wallet." Crypto asset wallets, among other functions, provide a user-friendly way to store and manage the "public keys" and the "private keys" associated with an investor's crypto assets. The public key is used to derive the user's blockchain "address," and it can be freely shared with others. The private key is roughly analogous to a password; its use confers the ability to transfer a crypto asset and transact using the user's public blockchain address. Whoever controls the private key controls the crypto asset(s) associated with that key.

**RESPONSE:** Admitted.

### C. Consensys and MetaMask

36.     Under its "MetaMask" brand, Consensys provides investors with a variety of services related to crypto assets.

**RESPONSE:** Consensys admits that it develops and offers the MetaMask digital assets "wallet" software. Consensys otherwise denies the allegations in Paragraph 36, including that the term "investor" fairly or accurately describes users of MetaMask.

37.     MetaMask Wallet, which Consensys has offered since July 2016, is the foundational application for its MetaMask suite of products.

**RESPONSE:** Consensys admits that it develops and offers the MetaMask digital assets "wallet" software. Consensys further admits that the earliest version of MetaMask was released in 2016. Consensys otherwise denies the allegations in Paragraph 37.

38.     MetaMask Wallet is a Consensys-developed and Consensys-maintained software program, downloaded to an investor's device (in the form of a mobile app or a browser extension), that stores the public and private keys to a user's crypto assets.

**RESPONSE:** Consensys admits that MetaMask is Consensys-developed software (in the form of a mobile app or a browser extension) that users must download to and run on their local device. Consensys further admits that users may elect to store the private and public keys to a blockchain address in their downloaded instance of MetaMask. For the avoidance of doubt, Consensys avers that it does not have access to the user's locally downloaded MetaMask wallet, including the private key(s) stored therein. Consensys otherwise denies the allegations in Paragraph 38, including that the term "investor" fairly or accurately describes users of MetaMask.

39.     The blockchain address (i.e., a derivation of the public key) stored in the investor's MetaMask Wallet is, in essence, the investor's MetaMask "account."

**RESPONSE:** Consensys admits that it has referred to a user's blockchain addresses as the user's blockchain "accounts." Consensys otherwise denies the allegations of Paragraph 39, including that the term "investor" fairly or accurately describes users of MetaMask.

40.     Indeed, for each blockchain that a new investor selects to interact with, MetaMask Wallet generates a public and private key pair and derives a blockchain address from the public key. MetaMask Wallet refers to these blockchain addresses as the investor's "Accounts." By default, MetaMask Wallet creates an Account labeled "Account 1" for each blockchain selected by the investor.

**RESPONSE:** Consensys denies the allegations in the first sentence of Paragraph 40. Consensys admits that it refers to a user's blockchain addresses as the user's blockchain "Accounts" and that, if a user chooses to have their locally downloaded MetaMask software generate a public and private key pair for that user, by default it creates an account labeled Account 1 for that user. Consensys otherwise denies the allegations in the second and third sentences of Paragraph 40. Consensys further denies that the term "investor" fairly or accurately describes users of MetaMask.

41.     If an investor already owns a crypto asset—and stores the keys to that asset outside MetaMask Wallet—the investor can import the public and private keys associated with that asset to a MetaMask Wallet using its "import" account function.

**RESPONSE:** Consensys admits that users may elect to store the private and public keys to a blockchain address in their downloaded instance of MetaMask. For the avoidance of doubt, Consensys avers that it does not have access to the user's locally downloaded MetaMask software, including the private key(s) stored therein. Consensys otherwise denies the allegations in Paragraph 41, including that the term "investor" fairly or accurately describes users of MetaMask.

42.     An investor's MetaMask Wallet blockchain address is also the address where crypto assets purchased and sold through other MetaMask services—such as MetaMask Swaps and MetaMask Staking—are received and sent.

**RESPONSE:** Consensys admits that when a user transmits instructions using MetaMask Swaps or MetaMask Staking, the user may cause the transfer of digital assets associated with any blockchain address for which the user has a private key stored locally in his or her downloaded instance of MetaMask. Consensys otherwise denies the allegations in Paragraph 42, including that the term "investor" fairly or accurately describes users of MetaMask.

43.     An investor can view a list of crypto assets held in the investor's MetaMask accounts, the investor's total holdings in each asset, and the aggregate value of the investor's assets, through a feature Consensys calls MetaMask Portfolio Dashboard. According to an article by Consensys on July 17, 2023, MetaMask Portfolio Dashboard acts as a "home base" for tracking, buying, selling, and staking crypto assets.

**RESPONSE:** Consensys admits that a  user can utilize MetaMask Portfolio Dashboard to view the list of digital assets associated with a public blockchain address, the total amount of each digital asset associated with that blockchain address, and the aggregate value of those digital assets in fiat currency, including blockchain addresses for which the user has stored the private keys in his or her device using MetaMask. The second sentence of Paragraph 43 purports to quote from and characterize a July 17, 2023 article on metamask.io, to which Consensys respectfully refers

the Court for its complete and accurate contents. Consensys otherwise denies the allegations in

Paragraph 43, including that the term "investor" fairly or accurately describes users of MetaMask.

## II. THROUGH THE METAMASK SWAPS PLATFORM, CONSENSYS PROVIDES BROKERAGE SERVICES TO U.S. INVESTORS.

44.     Consensys has never registered with the Commission as a broker with respect to its brokerage activities on MetaMask Swaps (or on MetaMask Staking, *see infra* § VI), and no exemption or exception from registration applies. Nonetheless, from at least October 2020 to the present, Consensys has acted as a broker of crypto asset securities that it makes available through its MetaMask Swaps platform.

**RESPONSE:** Consensys denies the allegations in Paragraph 44, except admits that it has

not registered with the Commission as a securities broker.

45.     MetaMask Swaps is a Consensys-developed and Consensys-maintained software tool that brokers trades in crypto assets on behalf of investors who use MetaMask. As described below, Consensys solicits potential investors in crypto asset securities, holds itself out as a place to buy and sell crypto asset securities, provides pricing and other information relevant to the purchase and sale of crypto asset securities, advises investors by highlighting trades with the "best" value, accepts investor orders, routes investor orders—including by handling customers assets and carrying out trading parameters and instructions on the customer's behalf, thereby facilitating execution—and receives transaction-based compensation.

**RESPONSE:** Consensys admits that MetaMask Swaps is Consensys-developed and

Consensys-maintained software. Consensys further admits that when a user requests a quote using

MetaMask Swaps, the MetaMask Swaps user interface queries pricing information from third-

party liquidity providers, sorts that information, and indicates the price quote that would return the

largest quantity of tokens based on a straightforward mathematical calculation that factors in

blockchain network transaction fees. Consensys further admits that for a majority of successful

transactions users pay a fee to Consensys for their use of MetaMask Swaps that is a percentage of

the notional amount of the transaction. Consensys denies the remaining allegations in Paragraph

45, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

46.     While Consensys has branded the transaction a "swap," it is simply a trade, or exchange, of one crypto asset for another—a crypto asset that the investor wants to sell ("Crypto Asset A"); and a crypto asset that the investor wants to buy ("Crypto Asset B").

**RESPONSE:** Consensys admits that MetaMask Swaps allows users to interact with third-party liquidity providers to exchange one type of digital asset for another type of digital asset, in transactions commonly referred to as "swaps." Consensys otherwise denies the allegations in Paragraph 46, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

47.     Specifically, if an investor holds Crypto Asset A in their MetaMask Wallet and wishes to trade it for Crypto Asset B, MetaMask Swaps will (1) find and display to the investor the "best" exchange rate; (2) route the investor's order and transfer Crypto Asset A through Consensys's smart contracts; (3) interface with a third-party liquidity provider that executes the investor's order, thereby selling Crypto Asset A and acquiring Crypto Asset B on behalf of the investor; (4) divert a fee into a Consensys-controlled smart contract address; and (5) transfer Crypto Asset B into the investor's MetaMask Wallet.

**RESPONSE:** Consensys admits that MetaMask Swaps allows users to interact with third-party liquidity providers to exchange one type of digital asset for another type of digital asset, that when a user requests a quote using MetaMask Swaps, the MetaMask Swaps user interface queries swap pricing information from other parties, sorts that information, and indicates the price quote that would return the largest quantity of tokens based on a mathematical calculation that factors in blockchain network transaction fees, and that for a majority of successful transactions users pay Consensys a fee for using MetaMask Swaps that is a percentage of the notional amount of the transaction. Consensys otherwise denies the allegations in Paragraph 47, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

A.      **Consensys Solicits Investors And Holds Itself Out As A Place To Buy and Sell Crypto Asset Securities Through Its MetaMask Swaps Brokerage Service.**

48.     On October 6, 2020, Consensys released MetaMask Swaps to the public.

**RESPONSE:** Admitted.

49.     Since then, Consensys has advertised and promoted MetaMask Swaps on its MetaMask website, metamask.io, and social media such as X (formerly, Twitter) as a way for investors to participate in the markets for crypto assets, including crypto asset securities.

**RESPONSE:** Consensys admits that Consensys has advertised and promoted the features of MetaMask Swaps on metamask.io and social media such as X, and respectfully refers the Court to those sources for their context. Consensys otherwise denies the allegations in Paragraph 49, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

50. In its October 6, 2020, launch announcement, Consensys claimed that MetaMask Swaps "offers [investors] the best trading experience in Defi" (referring to so-called "decentralized finance").

**RESPONSE:** Consensys admits that Paragraph 50 purports to quote from and characterize Consensys's October 6, 2020 launch announcement for MetaMask Swaps, available at https://consensys.io/blog/consensys-introduces-token-swaps-for-metamask, to which Consensys respectfully refers the Court for its full and complete context. Consensys otherwise denies the allegations in Paragraph 50, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

51. More specifically, Consensys stated that the MetaMask Swaps platform offered investors the "best prices" and "deepest liquidity."

**RESPONSE:** Consensys admits that Paragraph 51 purports to quote from and characterize Consensys's October 6, 2020 launch announcement for MetaMask Swaps, available at https://consensys.io/blog/consensys-introduces-token-swaps-for-metamask, to which Consensys respectfully refers the Court for its full and complete context. Consensys otherwise denies the allegations in Paragraph 51, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

52. The announcement concluded: "MetaMask enables more trades more efficiently by providing an optimized path for every trade."

**RESPONSE:** Consensys admits that Paragraph 52 purports to quote from and characterize Consensys's October 6, 2020 launch announcement for MetaMask Swaps, available at https://consensys.io/blog/consensys-introduces-token-swaps-for-metamask, to which Consensys

respectfully refers the Court for its full and complete context. Consensys otherwise denies the allegations in Paragraph 52.

53.     Consensys conveyed similar promotional messages on its website, at least as of December 2023.

**RESPONSE:** Consensys admits that Paragraph 53 purports to characterize the content of Consensys's website, consensys.io, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 53.

54.     Its website stated, "Find the best price every time. Swaps ensures that you always have access to the largest selection of tokens and the most competitive prices."

**RESPONSE:** Consensys admits that Paragraph 54 purports to quote from and characterize the content of Consensys's website, consensys.io, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies Paragraph 54.

55.     Its website continued to explain that, as part of its efforts to "locate the best trade," Consensys "sources the best prices and determines which liquidity source is the most gas efficient." ("Gas" is the fee that investors pay to record a transaction on the Ethereum blockchain. Gas fees are demand-based and increase as more users seek to use the platform. The higher the gas price paid for the transaction, the faster the transaction is likely to be mined. Gas is not refundable even if a transaction fails.)

**RESPONSE:** Consensys admits that the first sentence of Paragraph 55 purports to quote from and characterize the content of its website, consensys.io, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in the first sentence of Paragraph 55. Consensys admits the allegations in the second, third, fourth and fifth sentences of Paragraph 55, except it denies that the term "investor" fairly or accurately describes users of MetaMask.

56.     In a January 2022 blog post, Consensys touted MetaMask Swaps as "The Optimized DeFi Trading Experience" and argued that its methodology increased the likelihood of best execution.

**RESPONSE:** Consensys admits that Paragraph 56 purports to quote from and characterize the contents of a webpage published on January 24, 2022 at https://consensys.io/blog/metamask-swaps-the-optimized-defi-trading-experience, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 56.

57.     Consensys also maintains a social media accounts on X called "@MetaMask" and "@MetaMaskSupport" through which it has promoted MetaMask Swaps, apprised investors of new platform developments, and provided customer support.

**RESPONSE:** Consensys admits that it maintains social media accounts on X called "@MetaMask" and "@MetaMaskSupport." Consensys further admits that it has advertised and promoted the features of MetaMask Swaps through its social media accounts on X, and respectfully refers the Court to those accounts for their complete and accurate contents. Consensys further admits that it has used its social media accounts on X to provide customer support for MetaMask Swaps. Consensys otherwise denies the allegations in Paragraph 57, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

58.     For example, on December 21, 2022, Consensys posted on X, "We've expanded the Swaps experience," including a link to a MetaMask news release on its website, which touted the expansion of the MetaMask Swaps platform capabilities to additional networks.

**RESPONSE:** Consensys admits that Paragraph 58 purports to quote from and characterize the contents of a December 21, 2022 post on the X account @MetaMask, available at https://x.com/MetaMask/status/1605634808385765376, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 58.

59.     In another December 21, 2022, post on X, Consensys targeted potential investors who may have been unfamiliar with MetaMask Swaps. It stated, "Wait – what even is a Swap?! We got you. Learn all about MetaMask Swaps here." The accompanying image stated that MetaMask is "[t]he best way to swap your digital tokens" and "Effortless Crypto Swapping and Token Exchange on MetaMask."

**RESPONSE:** Consensys admits that Paragraph 59 purports to quote from and characterize the contents of a December 21, 2022 post on the X account @MetaMask, available at https://x.com/MetaMask/status/1605634929861300224, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 59, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

60.     Consensys posted another "news" release promoting MetaMask Swaps on its website on July 17, 2023. In a section titled "Unrivaled convenience," Consensys stated, "Swaps is undeniably convenient. You never have to leave MetaMask to execute your transaction through our vetted group of providers." The release continued, "Swaps ensures you receive . . . the maximum value for your transaction."

**RESPONSE:** Consensys admits that Paragraph 60 purports to quote from and characterize the contents of a July 17, 2023 article posted at https://metamask.io/news/latest/how-to-use-metamasks-swap-feature-to-get-what-you-want/, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 60.

61.     On its MetaMask website and Consensys's YouTube channel, Consensys has also published a video about its MetaMask Swaps service in which it casts MetaMask Swaps as, in essence, a broker of crypto assets for investors: "Introducing MetaMask Swaps . . . The easiest way to trade Ethereum tokens right from inside your MetaMask Wallet." This video has been publicly available since March 2021.

**RESPONSE:** Consensys admits that Paragraph 61 purports to quote from and characterize the contents of a video posted to the YouTube account @Consensys, available at https://www.youtube.com/watch?v=-z-SJV4ugHU and embedded at https://metamask.io/swaps/, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 61, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

62.     The video touts the user-friendly nature of the MetaMask Swaps platform and explains that "what makes the [MetaMask Swaps platform] so useful is what it's doing behind the scenes."

**RESPONSE:** Consensys admits that Paragraph 62 purports to quote from and characterize the contents of a video posted to the YouTube account @Consensys, available at https://www.youtube.com/watch?v=-z-SJV4ugHU and embedded at https://metamask.io/swaps/, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 62.

63.     The video narration states (referring to what in the crypto asset markets are called "decentralized exchanges" or "DEXs") that MetaMask Swaps "compares various DEXs, aggregators, and market makers to find you the best price, with the lowest network fees, and the least slippage."

**RESPONSE:** Consensys admits that Paragraph 63 purports to quote from and characterize the contents of a video posted to the YouTube account @Consensys, available at https://www.youtube.com/watch?v=-z-SJV4ugHU and embedded at https://metamask.io/swaps/, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 63.

64.     The video also notes that MetaMask Swaps can split the investor's trade up "among several providers to give [the investor] access to greater combined liquidity."

**RESPONSE:** Consensys admits that Paragraph 64 purports to quote from and characterize the contents of a video posted to the YouTube account @Consensys, available at https://www.youtube.com/watch?v=-z-SJV4ugHU and embedded at https://metamask.io/swaps/, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 64, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

65.     The video concludes that MetaMask Swaps does "all that, without you having to, well, think about it, really."

**RESPONSE:** Consensys admits that Paragraph 65 purports to quote from and characterize the contents of a video posted to the YouTube account @Consensys, available at https://www.youtube.com/watch?v=-z-SJV4ugHU and embedded at https://metamask.io/swaps/, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 65.

**B.**     **Consensys Effects Transactions for MetaMask Swaps Investors.**

66.     Indeed, Consensys acts as a quintessential broker because it developed, deploys, and maintains MetaMask Swaps to, among other things, (1) interface with an investor to receive the investor's trade request (i.e., the investor's order); (2) seek out prices in the market; (3) identify the "best" one; (4) transfer the investor's asset out of the investor's possession; (5) effectuate the trade on the investor's behalf; and (6) obtain transaction-based compensation for itself.

**RESPONSE:** Consensys denies the allegations in Paragraph 66, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

67.     From the investor's perspective, the process is simple—requiring no more than a few clicks or taps on the screen.

**RESPONSE:** Consensys denies the allegations in Paragraph 67, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

68.     To use the MetaMask Swaps platform, the investor needs no technical or blockchain expertise.

**RESPONSE:** Consensys denies the allegations in Paragraph 68, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

69.     "Behind the scenes," however, Consensys's software engages in a series of technological tasks to intermediate the purchase and sale of crypto assets on behalf of investors who use MetaMask Swaps.

**RESPONSE:** Consensys denies the allegations in Paragraph 69, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

70.     The MetaMask Swaps User Guide (the "User Guide") emphasizes the ease and simplicity of the investor experience as compared to the breadth of technological work Consensys has programmed its software to perform to broker the transactions for the benefit of the investors.

**RESPONSE:** Consensys admits that Paragraph 70 purports to characterize the MetaMask Swaps User Guide, published at https://support.metamask.io/token-swaps/user-guide-swaps/, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 70, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

71.     In the "Preparing your Swap" section of the User Guide, Consensys explains: "There's a lot going on behind the scenes while you're watching Swaps search" for the best price. "This process is the secret ingredient in making MetaMask Swaps the cheapest and best swapping service out there."

**RESPONSE:** Consensys admits that Paragraph 71 purports to quote from and characterize the MetaMask Swaps User Guide, published at https://support.metamask.io/token-swaps/user-guide-swaps/, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 71.

72.     This User Guide section continues: "Swaps is searching across decentralized token exchanges and token swapping protocols to find you the most advantageous exchange rate. At the same time, it's running test transactions, checking to make sure that if you do end up submitting a transaction, that it's likely to go through—and if not, those options are filtered out. MetaMask is saving users here from the pain of a failed transaction [including gas fees]. . . . Swaps failure rate is very low, and improvements are in the works to make it almost nonexistent."

**RESPONSE:** Consensys admits that Paragraph 72 purports to quote from and characterize the MetaMask Swaps User Guide, published at https://support.metamask.io/token-swaps/user-guide-swaps/, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 72.

73.     The User Guide further explains that "Slippage," explained below, "is yet another parameter that Swaps is using in your favor."

**RESPONSE:** Consensys admits that Paragraph 73 purports to quote from and characterize the MetaMask Swaps User Guide, published at https://support.metamask.io/token-swaps/user-

guide-swaps/, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 73.

74. It says that the MetaMask software does the "DeFi number-crunching" for the investor.

**RESPONSE:** Consensys admits that Paragraph 74 purports to quote from and characterize the MetaMask Swaps User Guide, published at https://support.metamask.io/token-swaps/user-guide-swaps/, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 74, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

75. The "Executing your Swap" section of the User Guide further states: "There's a lot going on here [on the quote screen] but don't be alarmed. . . . [MetaMask] Swaps is continuing to do all the work we mentioned previously on an ongoing basis, ensuring that you're getting the most up-to-date price and availability."

**RESPONSE:** Consensys admits that Paragraph 75 purports to quote from and characterize the MetaMask Swaps User Guide, published at https://support.metamask.io/token-swaps/user-guide-swaps/, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 75.

76. The User Guide also notes that, by interfacing with third-party platforms on your behalf, MetaMask Swaps "lessen[s] your exposure to potentially hackable or malicious smart contracts."

**RESPONSE:** Consensys admits that Paragraph 76 purports to quote from and characterize the MetaMask Swaps User Guide, published at https://support.metamask.io/token-swaps/user-guide-swaps/, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 76.

    *i.*    *Consensys's MetaMask Swaps Provides Pricing Information, Advises on the "Best" Trade, and Accepts Orders.*

77. Consensys designed MetaMask Swaps to provide investors with an intuitive and easy-to-use way to trade crypto assets, including crypto asset securities.

**RESPONSE:** Consensys denies the allegations in Paragraph 77, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

78.     To request a trade through MetaMask Swaps, the investor begins by clicking a button labelled "Swap" inside the MetaMask Wallet application.

**RESPONSE:** Consensys admits that to direct a swap through MetaMask Swaps, the user of the MetaMask software begins by clicking a button labelled "Swap" inside the MetaMask Wallet software application. Consensys otherwise denies the allegations in Paragraph 78, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

79.     Next, MetaMask Wallet presents investors with a screen on which they can select (from two drop-down menus) the asset they want to sell (i.e., one they currently hold in their wallet address, or "account," for the relevant blockchain) and the asset they want to buy.

**RESPONSE:** Consensys admits that a user can select in the MetaMask Swaps interface the tokens he or she would like to "Swap from" and "Swap to" through the third-party liquidity provider. Consensys otherwise denies the allegations in Paragraph 79, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

80.     As the below screenshot shows, investors also select the quantity of the currently held asset (Crypto Asset A) that they want to spend to acquire the new asset (Crypto Asset B).



**RESPONSE:** Consensys avers that the MetaMask Swaps user interface does not initially identify a token or quantity to "Swap from" or a token to "Swap to" and admits that a user can select in the MetaMask Swaps user interface the token and quantity of the token he or she would like to "Swap from" and the token he or she would like to "Swap to" through the third-party liquidity provider. Consensys otherwise denies the allegations in Paragraph 80, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

81.     Under "advanced options," the investor can adjust the "slippage tolerance."

**RESPONSE:** Consensys admits that a user can select in the MetaMask Swaps user interface a "slippage tolerance" when conducting a swap through the third-party liquidity provider. Consensys otherwise denies the allegations in Paragraph 81, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

82.     In the words of Consensys's MetaMask Swaps User Guide: "Slippage is the amount of change between the price you click on and the final transaction price that MetaMask Swaps will tolerate. . . . [MetaMask] Swaps allows a little bit of a difference between the price you agree on and the final price, to ensure your transaction goes through—but not too much, in order to protect you from sudden spikes or drops." (Setting a slippage tolerance effectively creates a "limit order," which is an extremely common type of order offered by traditional brokers.)

**RESPONSE:** Consensys admits that Paragraph 82 purports to quote from and characterize the MetaMask Swaps User Guide, published at https://support.metamask.io/token-swaps/user-guide-swaps/, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 82.

83.     The investor then clicks a button labelled "Get quotes," at which point they are taken to another screen, on which MetaMask Swaps recommends the "best quote" or "best overall value" for the requested exchange.

**RESPONSE:** Consensys admits that a user can click a button labelled "Get Quotes" in the MetaMask Swaps user interface. Consensys otherwise denies the allegations in Paragraph 83, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

84.     In the browser extension version of the software, MetaMask Swaps allows the investor to view a list of other options, with the recommended option at the top.

**RESPONSE:** Consensys denies the allegations in Paragraph 84, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

85.     For example, by clicking the "Best of 5 quotes" link on the left, MetaMask Swaps will display to the investor the screen on the right.

**RESPONSE:** Consensys admits that a user can click the "Best of 5 quotes" link in the MetaMask Swaps user interface, after which the interface displays up to five quotes for the swap chosen by the user. Consensys otherwise denies the allegations in Paragraph 85, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.



86.     In the browser extension, an investor is able to select an option other than the one Consensys deems the "best."

**RESPONSE:** Consensys admits that a user can select in the MetaMask Swaps user interface in the MetaMask browser extension any option available to the user for a swap to be

directed by the user. Consensys otherwise denies the allegations in Paragraph 86, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

87. The mobile application, however, only permits the user to select the quote Consensys identifies as the "best."

**RESPONSE:** Denied, insofar as users of the mobile application version of the MetaMask software can access a mobile browser to select any option available for a swap directed by the user.

88. Consensys has designed its MetaMask software to display to the investors the "best" quote according to parameters Consensys has determined the software will use to calculate such a quote—such as likelihood of success (as described above) and transaction fees.

**RESPONSE:** Consensys admits that when a user requests a quote using MetaMask Swaps, the MetaMask Swaps user interface queries pricing information from third-party liquidity providers, sorts that information, and indicates the price quote that would return the largest quantity of tokens based on a mathematical calculation that factors in blockchain network transaction fees. Consensys otherwise denies the allegations in Paragraph 88, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

89. Below are additional visualizations of the MetaMask Swaps investor interface, taken from the MetaMask Swaps website and the Consensys video demonstration of MetaMask Swaps, respectively:




**RESPONSE:** Consensys admits that the webpage https://metamask.io/swaps/ contains the visualizations of the MetaMask Swaps user interface that are depicted in Paragraph 89 and refers the Court to those visualizations for their complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 89, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

90.     The investor can then click "Swap," which causes MetaMask Swaps to attempt to effect the requested transaction on the investor's behalf.

**RESPONSE:** Consensys denies the allegations in Paragraph 90, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

91.     If Consensys's MetaMask software successfully effects the transaction, the investor sees a screen that says, "Transaction complete."



**RESPONSE:** Consensys admits that if a user successfully completes a transaction with a third-party liquidity provider by submitting instructions prepared using MetaMask Swaps, the user will see a page that says "Transaction Complete." Consensys otherwise denies the allegations in Paragraph 91, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

92.     To place an order through MetaMask Swaps, the investor does not need to know or enter their private key (the cryptographic "passcode" that is necessary to transfer Crypto Asset A out of their wallet).

**RESPONSE:** Consensys denies the allegations in Paragraph 92, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

93.     The investor does not even need to know or enter the entire public blockchain address for the asset they seek to sell. Indeed, Consensys does not present this information to the investor by default.

**RESPONSE:** Consensys denies the allegations in Paragraph 93, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

94.     When placing orders through MetaMask Swaps, the investor never interfaces directly with any of the third-party liquidity providers.

**RESPONSE:** Consensys admits that when users prepare and submit transaction instructions using the MetaMask Swaps user interface, they "call" (i.e., cause the execution of the code of) smart contracts deployed on the blockchain by Consensys and by third-party liquidity providers. Consensys otherwise denies the allegations in Paragraph 94, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

> ii. _Consensys Exercises Discretion In Providing Pricing Information and A Recommendation To The Investor._

95.    Indeed, Consensys does "do all the work" by employing its own market knowledge and exercising its own discretion when displaying pricing information and providing investment advice to the investor. This type of market knowledge and discretion is employed by traditional brokers in their business of effecting transactions in securities for the account of others, including through software programs they may develop.

**RESPONSE:** Consensys denies the allegations in Paragraph 95, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

96.    When the investor clicks the "Get quotes" button described above, Consensys has programmed its software to send a query to a Consensys "Token API" server, which pulls and aggregates pricing (i.e., exchange rate) information from certain third-party liquidity providers.

**RESPONSE:** Consensys admits that when a user clicks the button labelled "Get quotes" in the MetaMask Swaps user interface, the MetaMask Swaps software sends a query to a Consensys "Token API" server, which pulls and aggregates pricing information from certain third-party liquidity providers. Consensys otherwise denies the allegations in Paragraph 96, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

97.    More specifically, Consensys has chosen approximately 14 different external markets and market makers (the "third-party liquidity providers") to make available crypto assets for buying and selling by investors, some of whom it has contracted with to integrate with the MetaMask Swaps product.

**RESPONSE:** Consensys admits that it developed smart contracts that a MetaMask Swaps user can use to "call" (i.e., cause the execution of the code of) the smart contracts of approximately 14 different third-party liquidity providers, which enables MetaMask Swaps users to interact

directly with the third-party liquidity providers without needing to know code themselves. Consensys otherwise denies the allegations in Paragraph 97, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

98.     Consensys has configured its software to interface directly with each of these third-party liquidity providers.

**RESPONSE:** Consensys admits that it has configured its smart contract code to interact with the smart contract code of approximately 14 different third-party liquidity providers, which enables MetaMask Swaps users to interact directly with the third-party liquidity providers without needing to know code themselves. Consensys otherwise denies the allegations in Paragraph 98.

99.     These third-party liquidity providers include crypto asset trading platforms and other private market makers.

**RESPONSE:** Consensys admits that it has configured its smart contract code to interact with the smart contract code of market makers, DEXs, and aggregators, which enables MetaMask Swaps users to interact directly with the third-party liquidity providers without needing to know code themselves. Consensys otherwise denies the allegations in Paragraph 99.

100.     Consensys's Token API Server pulls pricing information from these third-party liquidity providers and displays it to the investor on the quote screen (subject to the conditions described herein).

**RESPONSE:** Consensys admits that the MetaMask Swaps API pulls pricing information from third-party liquidity providers and makes it available to the MetaMask Swaps user interface, which displays it to users. Consensys otherwise denies the allegations in Paragraph 100, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

101.     Consensys's software does not query all third-party liquidity providers; it only pulls pricing information from the approximately 14 providers that Consensys configured it to interface with, at least some of whom have contracted with Consensys and with whom Consensys may share a portion of the fees it charges investors.

**RESPONSE:** Consensys admits that MetaMask Swaps does not aggregate swap pricing information from every market maker, decentralized exchange, and aggregator in existence. Consensys further admits that it has entered into contracts with certain liquidity providers. Consensys otherwise denies the allegations in Paragraph 101, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

102. Therefore, the quotes displayed to investors on MetaMask Swaps are those sourced from third parties at Consensys's discretion—specifically, this is how Consensys has programmed the MetaMask software to function. In other words, Consensys is using its own market knowledge just like brokers in the traditional securities markets do, to suggest to investors what Consensys considers the best execution venues for their customers.

**RESPONSE:** Consensys denies the allegations in Paragraph 102, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

103. The crypto asset pairs available for "swapping"—i.e., trading—through MetaMask Swaps generally include whatever crypto asset pairs are available to trade via the third-party liquidity providers with whom Consensys has configured its software to interface, so long as those crypto assets are compatible with the blockchains known as Ethereum, Polygon, and BNB Smart Chain, as well as certain other specified blockchains.

**RESPONSE:** Consensys admits that users can submit transaction instructions to swap digital asset pairs that are made available for swapping by third-party liquidity providers, so long as those assets are compatible with certain blockchains, including Ethereum, Polygon, and BNB Smart Chain. Consensys otherwise denies the allegations in Paragraph 103.

104. Consensys, however, exercises further discretion over which crypto assets it makes available to investors.

**RESPONSE:** Consensys denies the allegations in Paragraph 104, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

105. Pursuant to a "Token Restriction Policy" adopted first in August 2021 and later amended throughout 2022, Consensys does not permit investors to trade in crypto assets that are "restricted assets," as determined by Consensys. In accordance with the token restriction policy, restricted assets include tokens that Consensys has determined: (1) appear to resemble other tokens and have a likelihood of creating investor confusion; (2) extract hidden fees; or (3) tokens that

Consensys legal counsel have a very strong reason to believe might constitute regulated assets, such as securities or commodity derivatives, under U.S. law.

**RESPONSE:** Consensys admits that it has a token restriction policy, which was first adopted on August 24, 2021 and has since been amended from time to time. The remainder of Paragraph 105 purports to characterize the policy, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 105, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

106.    So long as a token is not deemed "restricted" by Consensys, Consensys collects prices for the requested trade, runs test transactions, estimates gas fees, and, based on this information, and advises the investor of the "best."

**RESPONSE:** Consensys admits that when a user requests a price quote using the MetaMask Swaps user interface for a token that is not restricted, the MetaMask software queries swap pricing information and gas fee estimates from third-party liquidity providers and "calls" (i.e., causes the execution of the code of) a simulation service built into the relevant blockchain to identify whether potential swaps reported by third-party liquidity providers are likely to result in successful blockchain transactions. Consensys denies the remaining allegations in Paragraph 106, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

   *iii.*  *Consensys Effects Transactions on the Investor's Behalf—Routing Investor Orders, Handling Investor Assets, and Taking A Fee.*

107.    If the investor selects the "best price"—or any other price—displayed on the screen and clicks "Swap," that signals Consensys's software to proceed with submitting a blockchain transaction to a Consensys owned and operated node, routing the investor's trade request (i.e., the investor's order) and transferring the investor's crypto asset to the third-party liquidity provider. During this process, Consensys-developed and Consensys-deployed smart contracts handle the investor's assets and carry out instructions in accordance with the investor's order.

**RESPONSE:** Consensys denies the allegations in Paragraph 107, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

108.    Specifically, to route the investor's order and exchange Crypto Asset A for Crypto Asset B on the investor's behalf, Consensys has programmed its software—including its

MetaMask Wallet software and other software (e.g., smart contracts) that it has deployed on Ethereum and other blockchains, interacting with each other and with other third-party software interfaces—to take the following steps:

**RESPONSE:** Consensys denies the allegations in Paragraph 108, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

109.    First, the Consensys software reads the investor's private key from the MetaMask Wallet. This is the digital password that cryptographically unlocks Crypto Asset A so that it can be transferred out of the investor's MetaMask Wallet.

**RESPONSE:** Consensys admits that a user must authorize the MetaMask software installed on his or her local device to use the user's locally stored private key to sign a transaction payload containing instructions that are transmitted using MetaMask Swaps. For the avoidance of doubt, at no point during this process does Consensys have access to the user's downloaded instance of the MetaMask software, including the private key(s) stored therein. Consensys otherwise denies the allegations in Paragraph 109, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

110.    Second, the Consensys software submits a blockchain transaction to a Consensys-operated and controlled remote procedure call or "RPC" node. The RPC node stores the blockchain transaction in a mempool (a collection of proposed transactions that are in a queue) until it is included in a block and executed, as per the steps below. More specifically, the Consensys software creates, signs (using the investor's private key), and submits this blockchain transaction to Consensys's RPC node, which when executed will transfer the specified amount of Crypto Asset A from the investor's wallet address to a Consensys-developed smart contract called "Spender.sol."

**RESPONSE:** Consensys denies the allegations in the first sentence of Paragraph 110. Consensys admits that when a user transmits instructions prepared using MetaMask Swaps, the user's transaction payload is transmitted to an RPC node and then is re-transmitted to be built into a block and then validated by a blockchain node. Consensys otherwise denies the allegations in Paragraph 110, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

111.    This Spender.sol smart contract has its own, separate public address on the Ethereum blockchain.

**RESPONSE:** Admitted.

112.    Accordingly, the Consensys software transfers Crypto Asset A to Consensys's Spender.sol smart contract's blockchain address.

**RESPONSE:** Denied.

113.    The investor has no control over Consensys's Spender.sol smart contract blockchain address.

**RESPONSE:** Consensys admits that users do not hold the private key for the Spender.sol

contract blockchain address. Consensys otherwise denies the allegations in Paragraph 113,

including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

114.    Indeed, the investor does not have any control over Crypto Asset A once Consensys software transfers it out of the investor's MetaMask Wallet.

**RESPONSE:** Consensys denies the allegations in Paragraph 114, including that the term

"investor" fairly or accurately describes users of MetaMask Swaps.

115.    Consensys's Spender.sol smart contract address temporarily holds the investor's Crypto Asset A.

**RESPONSE:** Consensys denies the allegations in Paragraph 115, including that the term

"investor" fairly or accurately describes users of MetaMask Swaps.

116.    Third, Consensys's Spender.sol smart contract will interact with a number of Consensys-developed "Adapter" smart contracts.

**RESPONSE:** Denied.

117.    Because each third-party liquidity provider is different, Consensys has built unique "Adapter" contracts to allow its Spender.sol smart contract to interact with each of the approximately 14 unique third-party liquidity providers.

**RESPONSE:** Consensys admits that it developed smart contracts that a user can use to

"call" (i.e., cause the execution of the code of) under certain circumstances smart contracts of

approximately 14 different third-party liquidity providers, which enables MetaMask Swaps users

to interact directly with the third-party liquidity providers without needing to know code themselves. Consensys otherwise denies the allegations in Paragraph 117.

118.    Accordingly, for example, if the quote selected by the investor was offered on Liquidity Provider A, the Spender.sol smart contract would rely on Consensys's Liquidity Provider A Adapter smart contract to interact with Liquidity Provider A or its liquidity pool (which refers to, in essence, a blockchain address into which crypto assets are deposited for buying and selling).

**RESPONSE:** Consensys denies the allegations in Paragraph 118, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

119.    Fourth, the corresponding Adapter smart contract facilitates the exchange with the third-party liquidity provider.

**RESPONSE:** Denied.

120.    Specifically, through the Adapter smart contract, the third-party liquidity provider will take Crypto Asset A from the Spender.sol smart contract address and place Crypto Asset B into the Spender.sol smart contract address.

**RESPONSE:** Denied.

121.    From the perspective of the third-party liquidity provider, Consensys's "Spender.sol" smart contract is the counterparty to the trade.

**RESPONSE:** Consensys admits that when a user initiates a transaction using instructions prepared and forwarded using the MetaMask Swaps software, the user calls (i.e., causes the execution of the code of) the smart contract at the Spender.sol address to call a third-party liquidity provider's smart contract. Consensys otherwise denies the allegations in Paragraph 121.

122.    The third-party liquidity provider never interacts directly with the MetaMask Swaps investor or their wallet address.

**RESPONSE:** Consensys admits that when users prepare and submit transaction instructions using the MetaMask Swaps user interface, they "call" (i.e., cause the execution of the code of) smart contracts deployed on the blockchain by Consensys and by third-party liquidity providers. Consensys otherwise denies the allegations in Paragraph 122, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

123.    Fifth, the Consensys software transfers a fee—0.875% in most circumstances—from its Spender.sol contract to a "fees" smart contract blockchain address controlled by Consensys.

**RESPONSE:** Consensys admits that users pay Consensys a fee for using MetaMask Swaps in connection with a majority of successful swaps. Consensys further admits that the fee is 0.875% of the notional amount of the transaction. Consensys otherwise denies the allegations in Paragraph 123.

124.    Sixth, the software transfers the remainder of Crypto Asset B from Consensys's Spender.sol contract to the investor's wallet address.

**RESPONSE:**  Consensys denies the allegations in Paragraph 124, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

125.    When using the MetaMask Swaps platform to request a trade, the investor does not—indeed, cannot—interface directly with the third-party liquidity provider; rather, Consensys effects the trade through software that it has programmed, including (a) MetaMask Wallet, (b) blockchain-based smart contracts, and (c) "Adapter" smart contracts that interface with third-party software applications.

**RESPONSE:** Consensys denies the allegations in Paragraph 125, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

126.    As explained by the MetaMask Swaps User Guide: "[MetaMask] Swaps enables you to trade tokens on any Ethereum-compatible network . . . ***without having to interface directly with third-party platforms.***" (Emphasis added.)

**RESPONSE:** Consensys admits that Paragraph 126 purports to quote from and characterize the MetaMask Swaps User Guide, published at https://support.metamask.io/token-swaps/user-guide-swaps/, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 126.

127.    Consensys acts as a broker and, through software it has written, performs each step necessary to intermediate the transaction between the investor and the third-party liquidity provider.

**RESPONSE:** Consensys denies the allegations in Paragraph 127, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

128.    Consensys, through the MetaMask Swaps platform, has effected over 36 million crypto asset transactions on behalf of investors and collected fees worth over $250 million.

**RESPONSE:** Consensys admits that users have completed more than 36 million swaps with third-party liquidity providers by preparing and forwarding transaction instructions using MetaMask Swaps. Consensys further admits that users have paid Consensys over $250 million in fees to use MetaMask Swaps. Consensys otherwise denies the allegations in Paragraph 128, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

## III.    THE CRYPTO ASSETS "SWAPPED" THROUGH THE METAMASK SWAPS PLATFORM INCLUDE ASSETS THAT ARE OFFERED AND SOLD AS SECURITIES.

129.    Since approximately October 2020, Consensys—through the MetaMask Swaps platform—has effected transactions in various crypto assets that are being offered and sold as investment contracts, and thus securities, for the accounts of investors. This includes, but is not limited to, the units of each of the crypto asset securities described below—with trading symbols MATIC, MANA, CHZ, SAND, and LUNA—(the "Crypto Asset Securities").

**RESPONSE:** Consensys denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term. Consensys otherwise denies the allegations in Paragraph 129, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

130.    The crypto assets on the MetaMask Swaps platform, including but not limited to each of the Crypto Asset Securities to the extent Consensys continues to make them available today, can be bought, sold, or traded for consideration, including other crypto assets.

**RESPONSE:** Consensys denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term and otherwise denies the allegations in Paragraph 130.

131.    Each unit of a particular crypto asset on the MetaMask Swaps platform, including but not limited to each of the Crypto Asset Securities, trades at the same price as another unit of that same asset.

**RESPONSE:** Consensys denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term and otherwise denies the allegations in Paragraph 131.

132.    These assets, including but not limited to each of the Crypto Asset Securities, are interchangeable (e.g., any MATIC or fraction thereof is just like any other). Accordingly, to the extent the assets change in price, all tokens of the same asset increase or decrease in price in the same amounts and to the same extent, such that one token is equal in value to any other one token, on a pro rata basis.

**RESPONSE:** Consensys denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term and otherwise denies the allegations in Paragraph 132.

133.    The purchase of any particular asset, including but not limited to each of the Crypto Asset Securities, does not appear to give an investor any special rights not available to any other investor in that asset, such as separately managed accounts, or different capital appreciation as to the value of the crypto assets that other investors in the same assets hold.

**RESPONSE:** Consensys denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term. Consensys otherwise denies the allegations in Paragraph 133, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

134.    The crypto assets on the MetaMask Swaps platform, including but not limited to each of the Crypto Asset Securities, are available for sale broadly to any person who creates an account with MetaMask Swaps, and a MetaMask website displays information (like asset price changes) in a format highly similar to that offered by registered broker-dealers in the traditional securities markets, who permit investors to transact in securities. Consensys makes these crypto assets available for trading without restricting transactions to those who might acquire or treat the asset as anything other than as an investment.

**RESPONSE:** Consensys denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term. Consensys otherwise denies the allegations

in Paragraph 134, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

135. For example, the below page on MetaMask Portfolio's website provides price movement and other information for MATIC:



**RESPONSE:** Paragraph 135 purports to characterize a page on the MetaMask Portfolio user interface. Consensys respectfully refers the Court to the MetaMask Portfolio user interface for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 135.

136. Investors can access the page for MATIC and other asset-specific pages from the "Tokens" page on MetaMask Portfolio's website; they simply search for a particular crypto asset and are redirected to a page where Consensys provides additional information about that crypto asset. The information on each asset-specific page includes, but is not limited to: (i) market cap; (ii) the 24-hour total volume for the crypto asset; (iii) circulating supply; (iv) historical information about the "price" of the asset including its "all-time high" price and the option to view the asset's price history over the last day, week, month and year including as a percentage return on investment; and (v) the opportunity to trade the asset using MetaMask Swaps. Consensys states that it uses information gathered from third-party sources as the basis for the asset-specific information displayed on MetaMask Portfolio. Because Consensys has not registered as a broker, there is no formal mechanism to ensure the accuracy or consistency of the information Consensys discloses about the crypto assets it makes available for sale, including each of the Crypto Asset Securities.

**RESPONSE:** Consensys admits that the first, second and third sentences of Paragraph 136 purport to characterize and quote from MetaMask Portfolio, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term. Consensys otherwise denies the allegations in the last sentence of Paragraph 136, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

137.    Consensys does not restrict how many units of a crypto asset, including but not limited to each of the Crypto Asset Securities, any given investor may purchase. Moreover, investors are not required to purchase quantities tied to a purported non-investment "use" that may exist for the asset, if any. To the contrary, investors may and typically do purchase these assets in any amount.

**RESPONSE:** Consensys denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term and otherwise denies the allegations in the first sentence of Paragraph 137. Consensys lacks knowledge or information sufficient to admit or deny what "require[ments]" may apply to unspecified "investors." Consensys otherwise denies the allegations in the second and third sentences of Paragraph 137. Consensys further denies that the term "investor" fairly or accurately describes users of MetaMask Swaps.

138.    The assets available for sale on the MetaMask Swaps platform, including but not limited to each of the Crypto Asset Securities, are transferable and immediately eligible for resale on the MetaMask Swaps platform, or other crypto asset trading platforms without any apparent restrictions on resale (including as to the prices or amounts of resale, or the identity of the new buyers).

**RESPONSE:** Consensys denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term and otherwise denies the allegations in Paragraph 138.

139.    Consensys has brokered crypto assets that have been the subject of prior SEC enforcement actions based upon their status as crypto asset securities. Those crypto assets include but are not limited to the following assets for which Consensys has offered brokerage services: AMP (the AMP token, available through MetaMask Swaps since October 2020), AXS (Axie Infinity Shards, available since November 2020), BNB (a token of the Binance blockchain,

available since March 2021), CHZ (discussed below), COTI (the COTI token, available since October 2020), DDX (the DerivaDAO token, available since December 2020), FLOW (the FLOW token, available since November 2020), HEX (the HEX token, available since October 2020), LCX (the LCX token, available since October 2020), MANA (discussed below), MATIC (discussed below), NEXO (the NEXO platform token, available since October 2020), OMG (the OMG Network token, available since October 2020), POWR (the Powerledger token, available since October 2020), SAND (discussed below), LUNA (discussed below), RLY (the Rally token, available since October 2020), XYO (the XYO token, available since October 2020).

**RESPONSE:** Consensys admits that the AMP, AXS, BNB, CHZ, COTI, DDX, FLOW, HEX, LCX, MANA, MATIC, NEXO, OMG, POWR, SAND, LUNA, RLY, and XYO tokens have at various times been available on the liquidity providers accessible through MetaMask Swaps but denies that all of the tokens are currently accessible through MetaMask Swaps. Consensys further admits that these tokens have been the subject of allegations in other SEC enforcement actions. Consensys avers that none of the tokens listed above were identified by the SEC as securities at the time they became available to users through MetaMask Swaps. Consensys otherwise denies the allegations in Paragraph 139.

140. Set forth below are additional details regarding a non-exhaustive list of five Crypto Asset Securities in which Consensys, through its MetaMask Swaps platform, effected transactions for the accounts of investors.

**RESPONSE:** Consensys denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term and that the term "investor" fairly or accurately describes users of MetaMask software and otherwise denies the allegations in Paragraph 140.

141. From the time of their first offer or sale, each of these Crypto Asset Securities was offered and sold, and continued to be offered and sold on Consensys's platform, as an investment contract and thus a security. For each of the Crypto Asset Securities, statements by the crypto asset issuers and promoters have led investors reasonably to expect profits based on the managerial or entrepreneurial efforts of such issuers and promoters (and associated third persons). This was investors' reasonable expectation whether they acquired the Crypto Asset Securities in their initial offering, from prior investors, or through crypto asset brokerage platforms including the MetaMask Swaps platform. For each of the Crypto Asset Securities, such statements by issuers and promoters include statements made and/or available to the investing public during the period

when those Crypto Asset Securities were available for trading through the MetaMask Swaps platform, as well as other statements described below.

**RESPONSE:** Consensys denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term and that the term "investor" fairly or accurately describes users of MetaMask software and otherwise denies the allegations in Paragraph 141.

A.   **MATIC**

142.   "MATIC" is the native token of the Polygon blockchain. Polygon, originally called the Matic Network and rebranded as Polygon in 2021, is a blockchain platform created in 2017 in Mumbai, India by, among others, Jaynti Kanani, Sandeep Nailwal, and Anurag Arjun. Since its creation, Polygon's founders have remained actively involved with Polygon through "Polygon Labs" ("Polygon"), an entity they also founded for "the development and growth of Polygon."

**RESPONSE:** Consensys admits that MATIC was at one time the native token of the Polygon blockchain, which was launched in 2017. Consensys further admits that Messrs. Kanani, Nailwal, and Arjun are reported to be the founders of the Polygon blockchain. In addition, Consensys admits that in 2023, approximately six years after the launch of the Polygon blockchain, the blockchain's founders were reported to have created Polygon Labs. Consensys lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 142, and therefore denies them on that basis.

143.   According to the Polygon website, https://polygon.technology/, the Polygon network is an Ethereum scaling platform that enables developers to build scalable user-friendly dApps with low transaction fees, purportedly by hosting "sidechains" that run alongside the Ethereum blockchain, and allows users to process transactions and initiate the transfer of assets and technology development on Polygon's supposedly less congested sidechain network.

**RESPONSE:** Paragraph 143 purports to quote from and characterize Polygon's website, to which Consensys respectfully refers the Court for its complete and accurate contents.

144.   Polygon issued a fixed supply of 10 billion MATIC tokens. MATIC holders can earn additional MATIC for staking their MATIC on the Polygon platform and becoming a validator, from delegating their MATIC to other validators in return for a portion of the fees

collected from validating transactions, or from staking their MATIC with other third parties, such as crypto asset platforms that offer staking services.

**RESPONSE:** Consensys admits that Polygon represented that MATIC had a maximum supply of 10 billion tokens. Consensys further admits that Polygon represented that MATIC holders could earn MATIC for staking their MATIC as validators, from delegating their MATIC to other validators, and for staking their MATIC through digital asset platforms that offer staking services. Consensys otherwise denies the allegations in Paragraph 144.

145. According to the initial whitepaper for MATIC, "Matic Tokens [we]re expected to provide the economic incentives … on the Matic Network [now Polygon] … [W]ithout the Matic Token, there would be no incentive for users to expend resources to participate in activities or provide services for the benefit of the entire ecosystem on the Matic Network."

**RESPONSE:** Consensys admits that Paragraph 145 purports to quote from MATIC's initial whitepaper, to which Consensys respectfully refers the Court for its complete and accurate contents.

146. In or around 2018, Polygon sold approximately 4 percent of the total supply of MATIC in two early rounds of sales raising $165,000 at a price of $0.00079 USD per 1 MATIC and $450,000 at a price of $0.00263 USD per 1 MATIC. In April 2019, Polygon sold another 19% of the total supply of MATIC to the public through a so-called "initial exchange offering" (or "IEO"— essentially, an initial offer and sale of a crypto asset security on a crypto trading platform) on the Binance.com crypto asset trading platform at a price of $0.00263 USD per 1 MATIC, raising an additional $5 million to fund development of the network.

**RESPONSE:** Consensys admits that public sources report that Polygon sold approximately $615,000 of MATIC tokens in early-round private sales. Consensys further admits that it was reported that Polygon sold approximately $5 million of MATIC, 19% of MATIC's total supply, at a price of $0.00263 per token in an offering through Binance Launchpad in 2019. Consensys lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 146, and therefore denies them on that basis.

147. From the time of its offering, MATIC was offered and sold as an investment contract and therefore a security.

**RESPONSE:** Denied.

148.   The price of all MATIC tokens goes up or down together.

**RESPONSE:** Denied.

149.   MATIC has been available for buying and selling through the brokerage services offered by MetaMask Swaps since at least July 2021.

**RESPONSE:** Denied.

150.   The information Polygon publicly disseminated would lead a reasonable investor, including those who purchased MATIC since October 2020, to view MATIC as an investment. Specifically, MATIC holders would reasonably expect to profit from Polygon's efforts to grow the Polygon protocol because this growth would in turn increase the demand for and the value of MATIC.

**RESPONSE:** Consensys denies the allegations in Paragraph 150, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

151.   For example, Polygon stated publicly, including in the whitepaper, that it would pool investment proceeds through its private and public fundraising to develop and grow its business.

**RESPONSE:** Consensys admits that Paragraph 151 purports to characterize certain public statements about Polygon, including in the Polygon white paper, to which Consensys respectfully refers the Court for their complete and accurate contents. Consensys denies any remaining allegations in Paragraph 151.

152.   Following the IEO, moreover, Polygon engaged in additional MATIC sales, stating publicly that it was doing so in order to raise the funds needed to support the growth of its network. On February 7, 2022, Polygon reported on its blog that it raised about $450 million through a purportedly private sale of its native MATIC token in a funding round to several prominent venture capital firms. Polygon reported, "[w]ith this warchest, the core team can secure Polygon's lead in paving the way for mass adoption of Web3 applications, a race that we believe will result in Ethereum prevailing over alternative blockchains."

**RESPONSE:** Consensys admits that Paragraph 152 purports to quote from and characterize a February 7, 2022 blogpost, to which Consensys respectfully directs the Court for its complete and accurate contents. Consensys otherwise lacks knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in Paragraph 152, and therefore denies

them on that basis.

153.     Polygon has also reported fundraising from other marquee and celebrity investors.

**RESPONSE:** Consensys lacks knowledge or information sufficient to form a belief as to

the truth of the allegation in Paragraph 153, and therefore denies it on that basis. Consensys further

denies that the term "investor" fairly or accurately describes users of MetaMask Swaps.

154.     Polygon also stated that it would reserve roughly 67% of MATIC to support the
Polygon ecosystem, the Foundation, and network operations. Another 20% of MATIC was further
reserved to compensate the Polygon team members and advisors, aligning their fortunes with
investors' with respect to MATIC.

**RESPONSE:** Consensys admits that it was publicly reported that MATIC tokens were

reserved for the Polygon ecosystem, the Foundation, and network operations. Consensys further

admits that Polygon reported that it originally reserved 4% and 16% of the total supply of MATIC

for its advisors and team members, respectively. Consensys otherwise denies the allegations in

Paragraph 154, including that the term "investor" fairly or accurately describes users of MetaMask

Swaps.

155.     In addition, the Polygon blog provides frequent updates on network growth and
developments at Polygon, including, prior to December 2022, weekly statistics on active wallets
and transactions per day, as well as financial metrics such as revenue per day and total network
revenue.

**RESPONSE:** Consensys admits that Paragraph 155 purports to characterize Polygon's

blog, to which Consensys respectfully directs the Court for its complete and accurate contents.

156.     Polygon has also routinely announced when crypto asset trading platforms have
made MATIC available for trading.

**RESPONSE:** Consensys admits that Polygon has made public statements announcing that

MATIC has been made available for secondary trading on various digital asset platforms.

Consensys lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 156, and therefore denies them on that basis.

157.    Polygon has explicitly encouraged MATIC purchasers to view MATIC as an investment in other ways. For example, in a February 5, 2021 tweet, 14 months after MATIC's single biggest price drop, Nailwal compared the token to a prize fighter that came back from defeat to become a champion:



**RESPONSE:** To the extent Paragraph 157 purports to quote from or characterize public statements on Twitter, Consensys respectfully directs the Court to such statements for their complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 157.

158.    Also, on November 3, 2022, Nailwal stated on Twitter: "I will not rest till @0xPolygon gets its well-deserved 'Top 3' spot alongside BTC & ETH. No other project comes even close." In a May 24, 2022 "Fireside Chat" with CNBC posted on YouTube, Bejelic described part of "what's different about Polygon" as: "[w]e are as a team very, very committed, we have a very hands on approach with all the projects out there, we are working around the clock on adoption and that is why we are currently the most adopted scaling infrastructure platform." Into 2023, the founders of Polygon continued to promote the platform through various social media. For example, on February 21, 2023, Nailwal tweeted, and Kanani retweeted, "Polygon has grown exponentially. To continue on this path of stupendous growth we have crystallized our strategy for the next 5 yrs to drive mass adoption of web3 by scaling Ethereum. Our treasury remains healthy with a balance of over $250 million and over 1.9 billion MATIC."

**RESPONSE:** Consensys admits that Paragraph 158 purports to quote from and characterize public statements, including Twitter posts by Polygon's founders in May 2022, November 2022, and February 2023, to which Consensys respectfully directs the Court for their complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 158.

159.    Since January 2022, Polygon has also marketed that it "burns" MATIC tokens accumulated as fees, indicating that the total supply of MATIC would decrease. For example, in January 2022, Polygon emphatically announced a protocol upgrade that enabled burning in a blog post titled, "Burn, MATIC, Burn!" As Polygon explained in another blog post on its website

around the same time, "Polygon's MATIC has a fixed supply of 10 billion, so any reduction in the number of available tokens will have a deflationary effect." As of March 28, 2023, Polygon had burned approximately 9.6 million MATIC tokens. This marketed burning of MATIC as part of the Polygon's network's "deflationary effect" has led investors reasonably to view their purchase of MATIC as having the potential for profit to the extent there is a built-in mechanism to decrease the supply and therefore increase the price of MATIC.

**RESPONSE:** Consensys admits that Polygon represents that its protocol allows for the "burning" of MATIC tokens, and that "burning" reduces the total supply of MATIC tokens. Consensys further admits that the first, second, and third sentences of Paragraph 159 purport to characterize or quote from Polygon's public statements and blog posts, to which Consensys respectfully refers the Court for their complete and accurate contents. Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth and fifth sentences of Paragraph 159, and therefore denies them on that basis. Consensys further denies that the term "investor" fairly or accurately describes users of MetaMask Swaps.

160.    In another white paper, Nailwal and others recently announced a revised Polygon protocol where a new token, POL, would succeed MATIC "as the native token of the Polygon ecosystem." The white paper states that: "As the successor of MATIC, POL is envisioned to become an instrumental tool for coordination and growth of the Polygon ecosystem and the main driver of the vision of Polygon as the Value Layer for the Internet."

**RESPONSE:** Consensys admits that Paragraph 160 purports to quote from and characterize the POL whitepaper, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 160.

161.    The whitepaper lays out a model "to simulate important performance indicators of the POL-powered ecosystem." The model estimates a $5 average POL price during the proposed 10-year period, a significant increase from the current price of MATIC.

**RESPONSE:** Consensys admits that Paragraph 161 purports to quote from and characterize the POL whitepaper, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 161.

### B.    MANA

162.    "MANA" is the digital token minted by Decentraland. Decentraland is a virtual reality platform that began development in June 2015 but was not made available to the public until its launch in February 2020. Decentraland was launched through an entity named Metaverse Holdings by a team of core individual developers: Ariel Meilich, Esteban Ordano, Manual Araoz, and Yemel Jardi. Decentraland operates on the Ethereum blockchain. According to Decentraland's website, www.decentraland.org, Decentraland is a three-dimensional virtual reality platform, where users can create, experience, and monetize their content and applications.

**RESPONSE:** Consensys admits that Decentraland purports to be a virtual reality platform that operates on the Ethereum blockchain, and that Decentraland established an ERC-20 token called MANA. Consensys further admits that Decentraland reportedly began development in June 2015 and was made available to the public on February 20, 2020. In addition, Consensys admits that Decentraland was reportedly launched by the entity Metaverse Holdings Ltd. and a team of developers that reportedly included Ariel Meilich, Esteban Ordano, Manuel Araoz, and Yemel Jardi. Consensys further admits that the last sentence of Paragraph 162 purports to characterize the Decentraland website, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 162, and therefore denies them on that basis.

163.    According to Decentraland's website, MANA serves as the crypto asset involved in all transactions in the Decentraland virtual reality ecosystem. On August 18, 2017, Decentraland held an initial coin offering in which MANA tokens were exchanged for ETH tokens, raising approximately $24.1 million. Currently, there is a total supply of approximately 2.19 billion MANA tokens.

**RESPONSE:** Consensys admits that the first sentence of Paragraph 163 purports to characterize the Decentraland website, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys further admits that Decentraland held an initial coin offering on August 18, 2017, in which MANA tokens were exchanged for ETH tokens. Consensys lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 163, and therefore denies them on that basis.

164.     Decentraland offered early contributors to the Decentraland ecosystem a discounted price when purchasing MANA.

**RESPONSE:** Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 164, and therefore denies them on that basis.

165.     From the time of its offering, MANA was offered and sold as an investment contract and therefore a security.

**RESPONSE:** Denied.

166.     The price of all MANA tokens goes up or down together.

**RESPONSE:** Denied.

167.     MANA has been available for buying and selling through MetaMask Swaps since at least October 2020.

**RESPONSE:** Denied.

168.     The information Decentraland publicly disseminated would lead a reasonable investor, including those who have purchased MANA since October 2020, to view MANA as an investment. Specifically, MANA holders would reasonably expect to profit from Decentraland's efforts to grow the Decentraland protocol because this growth would in turn increase the demand for and value of MANA.

**RESPONSE:** Consensys denies the allegations in Paragraph 168, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

169.     Investor proceeds raised during the MANA ICO were pooled to fund the marketing, business expenses, and completion of the Decentraland platform. For instance, on July 5, 2017— a few weeks before the MANA ICO—Jardi published a blog post detailing Decentraland's intended use of revenue from the token sale as follows:



**RESPONSE:** Consensys lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first sentence of Paragraph 169, and therefore denies them on that basis. Consensys admits that the second sentence of Paragraph 169 purports to characterize or quote from a July 5, 2017 blog post published by Yemel Jardi, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 169, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

170. The blog post further explained that the "top priority" for use of the revenue was to develop a virtual world and that even after Decentraland was created, "the development budget will focus on the continued improvement of the end-user experience within the world browser."

**RESPONSE:** Consensys admits that Paragraph 170 purports to characterize or quote from a July 5, 2017 blog post published by Yemel Jardi, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 170.

171. Indeed, Meilich explained in a separate blog post that after the ICO, Decentraland would implement a "Continuous Token Model," where it would increase the MANA supply by 8 percent in the first year, followed by a lower rate in subsequent years, to allow Decentraland to "regularly expand while accommodating new users … The proceeds of the tokens sold by [the Continuous Token Model] will finance Decentraland over the long haul, perpetually aligning it with the prosperity of the network."

**RESPONSE:** Consensys admits that Paragraph 171 purports to characterize or quote from a blog post published by Ariel Meilich, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 171.

172.     In April 2020, the Decentraland Team announced the creation of the Decentraland Foundation (the "Foundation"), which today holds the intellectual property rights over and makes available the products and services, including virtual environment and tools, offered on the Decentraland platform. Meilich publicly stated that the distribution of the initial supply of MANA tokens issued at the time of the ICO would be as follows: 20 percent to the founding team, advisors, and early contributors; 20 percent to the Foundation; 40 percent to be available for purchase by the public; and 20 percent reserved to "incentivize early users, developers, and partners who want to build within Decentraland."

**RESPONSE:** Consensys admits that the first sentence of Paragraph 172 purports to characterize an April 2020 announcement by the Decentraland Team, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first sentence of Paragraph 172, and therefore denies them on that basis. Consensys further admits that the second sentence of Paragraph 172 purports to characterize or quote from a blog post published by Ariel Meilich, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 172.

173.     As Meilich explained in his public blog post, "To incentivize value creation within Decentraland, extra tokens will be allocated to the [development team], organization, and a reserve to accelerate Community and Partner engagement."

**RESPONSE:** Consensys admits that Paragraph 173 purports to characterize or quote from a blog post published by Ariel Meilich, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 173.

174.     For example, Decentraland publicly issued a whitepaper ("Decentraland Whitepaper") describing the architecture that would be built in the virtual reality platform and steps that would be taken to support Decentraland's growth. It further made clear that the development of the platform was only beginning, and listed a number of "Challenges" that would need to be addressed in the development process in order for the platform to succeed.

**RESPONSE:** Consensys admits that Paragraph 174 purports to quote from and characterize the Decentraland Whitepaper, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 174.

175. Decentraland has continued to invest efforts in new developments and tools for the platform. According to Melich, even after the ICO, Decentraland was still "preparing a land allocation policy to ensure fair distribution, as well as a method for groups to purchase larger contiguous plots of land." Since the ICO, Decentraland has developed tools for purported use on its platform (e.g., the "Marketplace" and "Builder" tools). In a public blog post published on March 19, 2018, the Decentraland team described the marketplace tool as the "first … in what will be a series of tools."

**RESPONSE:** Consensys lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first and third sentences of Paragraph 175, and therefore denies them on that basis. Consensys admits that the second and fourth sentences of Paragraph 175 purport to characterize or quote from blog posts published by Ariel Meilich and Decentraland, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 175.

176. Additionally, the Decentraland Whitepaper explained how the Foundation would "Foster[] the Network" in that it will "hold contests to create art, games, applications, and experiences, with prizes contingent on meeting a set of milestones. At the same time, new users will be assigned allowances, allowing them to participate in the economy immediately." The Decentraland Whitepaper further claimed, "These financial incentives will help bootstrap the utility value of the network until it independently attracts users and developers."

**RESPONSE:** Consensys admits that Paragraph 176 purports to quote from and characterize the Decentraland Whitepaper, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 176.

177. The Decentraland Whitepaper and website have also marketed that the protocol "burns" (or destroys) MANA tokens when used within the Decentraland ecosystem.

**RESPONSE:** Consensys admits that Paragraph 177 purports to characterize the Decentraland Whitepaper and website, to which Consensys respectfully refers the Court for their complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 177.

178.    The Decentraland Whitepaper is still available on the Decentraland website.

**RESPONSE:** Consensys admits that the Decentraland Whitepaper is currently available

on the Decentraland website, published at https://decentraland.org/whitepaper.pdf.

C.    <u>**CHZ**</u>

179.    CHZ is a token on the Ethereum blockchain, advertised as the "native digital token for the Chiliz sports & entertainment ecosystem currently powering Socios.com," a sports fan engagement platform built on the Chiliz blockchain. The Chiliz blockchain was introduced in early 2018 by protocol founder and current CEO Alexandre Dreyfus, under a Maltese entity named HX Entertainment Ltd. The Chiliz whitepaper describes the Chiliz protocol as "a platform where fans get a direct Vote in their favorite sports organizations, connect and help fund new sports and esports entities."

**RESPONSE:** Consensys admits that CHZ is an ERC-20 token on the Ethereum

blockchain reportedly developed by HX Entertainment Ltd, a company reportedly registered under

the Laws of Malta. Consensys further admits that the first and third sentences of Paragraph 179

appear to quote from the Chiliz whitepaper, to which Consensys respectfully refers the Court for

its complete and accurate contents. Consensys denies the remaining allegations in Paragraph 179.

180.    The CHZ token purportedly allows "fans to acquire branded Fan Tokens from any team or organization partnered with the Socios.com platform and enact their voting rights as their fan influencers." Examples of voting polls that allow holders of "Fan Tokens" (purchased with CHZ tokens) to influence team decisions with their vote include selecting player warm-up apparel and choosing team pennant designs.

**RESPONSE:** Consensys admits that the first sentence of Paragraph 180 appears to quote

from the Chiliz whitepaper, to which Consensys respectfully refers the Court for its complete and

accurate contents. Consensys lacks knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 180, and therefore denies them on that basis, and

otherwise denies the allegations in Paragraph 180.

181.    According to the Chiliz whitepaper dated November 2018, during the second quarter of 2018 the Chiliz team completed fund-raising of approximately $66 million in exchange for approximately 3 billion CHZ in "Chiliz's Token Generation Event" purportedly "executed via private placement." CHZ were originally minted in 2018, and there is a maximum supply of

8,888,888,888 CHZ tokens. However, it was not until the second quarter of 2019 that Chiliz made "Fan Tokens" on Socios.com available for purchase with CHZ.

**RESPONSE:** Consensys admits that the first sentence of Paragraph 181 purports to quote from and characterize the Chiliz whitepaper, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys further admits that CHZ was minted in 2018 with a reported maximum supply of 8,888,888,888 tokens. Consensys further admits that Chiliz reported selling $66 million worth of CHZ in a private token sale. Consensys lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 181, and therefore denies them on that basis, and otherwise denies the remaining allegations in Paragraph 181.

182. CHZ has been available for buying and selling through the MetaMask Swaps platform since at least December 2020.

**RESPONSE:** Denied.

183. From the initial "private" offering of CHZ tokens in 2018, through public statements made in 2023, the Chiliz team has disseminated information and made statements, including statements made and available during the period when CHZ was available to trade on MetaMask Swaps, that have led CHZ holders reasonably to view CHZ as an investment in and to expect profits from the team's efforts to develop, expand, and grow the platform, which, in turn, would increase the demand for and the value of CHZ.

**RESPONSE:** Denied.

184. For example, the Chiliz website, www.chiliz.com, introduces the Chiliz team, which is "comprised of nearly 350+ cross-industry professionals across 27 different nationalities and is constantly growing." The Chiliz team operates both the Chiliz protocol and Socios.com.

**RESPONSE:** Consensys admits that the first sentence of Paragraph 184 purports to quote from and characterize the Chiliz website, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 184, and therefore denies them on that basis. Consensys otherwise denies the allegations in Paragraph 184.

185.     In fact, the whitepaper and other public statements by Chiliz also identify several members of the Chiliz leadership team, the bios of these "Leadership" or "Advisory" teams, and their past entrepreneurial and technology experiences and successes. The Chiliz website touts that the Chiliz team is "building the web3 infrastructure for sports and entertainment."

**RESPONSE:** Consensys admits that Paragraph 185 purports to quote from and characterize Chiliz's whitepaper and website, to which Consensys respectfully refers the Court for their complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 185.

186.     The Chiliz team also stated publicly that it would use the proceeds from CHZ sales to fund the development, marketing, business operations, and growth of the Chiliz protocol and, consequently, to increase the demand for CHZ in connection with the protocol. For example, the whitepaper explains that funding raised through token sales would be allocated as follows: 58% to Operational Expenses ("A majority of funds will be passed on from the Issuer to an affiliate to develop the Socios.com platform, secure partnerships & realize the platform's digital infrastructure."); 20% to User Acquisition ("Funds will be used to acquire new users for the Socios.com platform and grow engagement in its voting utilities."); 10% to Corporate Structuring; 5% to Security and Legal; and 7% to Ecosystem Support.

**RESPONSE:** Consensys admits that Paragraph 186 purports to quote from and characterize Chiliz's public statements and whitepaper, to which Consensys respectfully refers the Court for their complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 186.

187.     Moreover, 5% and 3% of the total CHZ tokens distributed were allocated to the Chiliz team and an advisory board, respectively—the two groups responsible for the creation and development of the platform—aligning the fortunes of management with those of CHZ investors.

**RESPONSE:** Consensys admits that the Chiliz whitepaper states that 5% and 3% of the total supply of CHZ tokens were allocated to the Chiliz team and advisory board, respectively. Consensys lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 187, and therefore denies them on that basis. Consensys further denies that the term "investor" fairly or accurately describes users of MetaMask Swaps.

188.     The CHZ whitepaper further makes evident the mutuality of interest (and the alignment of fortunes) between promoter and investor when it cautions that "if the value of BTC,

ETH and/or Chiliz fluctuates, the Company may not be able to fund development to the extent necessary, or may not be able to develop or maintain the Socios.com Platform in the manner that it intended."

**RESPONSE:** Consensys admits that Paragraph 188 purports to quote from and characterize the Chiliz whitepaper, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 188, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

189. The Chiliz team also frequently touts the growth potential in the sports and esports industry that it seeks to monetize through the Chiliz team's efforts to expand its platform. For example, the CHZ whitepaper highlighted the size of the gaming industry and potential for esports revenue as well as the use of CHZ to drive and monetize fan engagement for traditional sports. In reference to the June 2018 "Token Generation Event," the whitepaper stated: "[w]e are no longer pursuing fundraising measures, instead focusing our efforts on leveraging accrued resources to realize the Chiliz/Socios.com vision." The whitepaper continued: "[w]ith foundations set, Chiliz and the Socios.com platform it powers will look to use Football as a benchmark to expand our Tokenized Fan Voting model to other sports in order to cater to a global marketplace where different competitive verticals are dominant – prime examples of diversification are Cricket in the Indian market, Baseball for Japan, and the like."

**RESPONSE:** Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 189, and therefore denies them on that basis. Consensys admits that the second, third, and fourth sentences purport to quote from and characterize the Chiliz whitepaper, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 189.

190. Public statements that the Chiliz team and its executives made indicate that CHZ tokens are primarily deployed for purchasing "Fan Tokens" on Socios.com and that the demand for and price of CHZ tokens is directly reliant on demand for Socios fan tokens and their benefits.

**RESPONSE:** Paragraph 190 purports to characterize undated and unidentified public statements by the Chiliz team and its executives. As such, Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 190, and therefore denies them on that basis.

191.    The Chiliz team also made other public statements that emphasize the economic reality inherent in the design of the Chiliz blockchain's reliance on CHZ to function—that as Chiliz is able to grow its platform by partnering with more teams, and those teams grant attractive opportunities to token holders, the value of the respective "Fan Tokens" will increase, and in turn, the value of CHZ will also increase.

**RESPONSE:** Paragraph 191 purports to characterize undated and unidentified public statements by the Chiliz team and its executives. As such, Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 191, and therefore denies them on that basis.

192.    For instance, the FAQ section located on the Chiliz website, which was publicly available from at least December 2021 to December 2022, provided: "Demand for the Chiliz token will increase as more esports teams, leagues and game titles are added to the platform, and as more fans want voting rights."

**RESPONSE:** Consensys admits that Paragraph 192 purports to quote from and characterize Chiliz's website, to which Consensys respectfully refers the Court for its full and complete contents. Consensys otherwise denies the allegations in Paragraph 192.

193.    Chiliz' CEO has echoed this same sentiment in other public statements. In February 2020, he stated: "Tens of thousands of regular football fans have already started to use crypto, purchasing $CHZ in order to buy Fan Tokens, and in time we expect millions more to do so as we continue to add more partners to the platform and increase our reach and grow the brand." In March 2021, he tweeted: "Monthly Active Users (MAU) of the @socios app, powered by $CHZ. You can see how the demand for $CHZ (exchanges, Etherscan wallets, …) exploded. Everything is correlated. We are building a mainstream consumer-facing product, powered by @chiliz blockchain." And in February 2023, he tweeted: "I'm biased but I'm very confident that the Chiliz ecosystem is gonna bring a lot of value to fans, sports properties, and innovation in general. Long journey ahead of us. $CHZ."

**RESPONSE:** Consensys admits that the first and second sentences of Paragraph 193 appear to quote from and characterize an interview with Chiliz's CEO that was posted to Coin Telegraph's website on February 6, 2020, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys further admits that the third and fourth sentence of Paragraph 193 purport to quote from March 31, 2021 and February 2, 2023 Twitter posts by

Chiliz's CEO, to which Consensys respectfully refers the Court for their complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 193.

194.    The Chiliz team has also made efforts to drive secondary trading of CHZ by offering the token on crypto asset trading platforms. For example, an earlier version of the whitepaper highlighted "ongoing discussions" to offer CHZ on trading platforms across Asia, and the Chiliz website features a "Listing Content and Q&A" document reflecting a proposal to offer CHZ on the Binance DEX platform.

**RESPONSE:** Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 194, and therefore denies them on that basis. Consensys admits that the second sentence of Paragraph 194 purports to quote from and characterize a version of the Chiliz whitepaper, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 194.

195.    The Chiliz team also tells investors that it plans to engage in "burning" (or destroying) CHZ tokens as a mechanism to support the price of CHZ by reducing their total supply. For instance, in 2020, the Chiliz team announced through its Fan Token exchange that it would burn 20% received in net trading fees, 10% of proceeds from "Fan Token" offering sales, and 20% of net proceeds of NFT & Collectibles. As with other crypto asset securities set forth herein, this marketed burning of CHZ has led investors reasonably to view their purchase of CHZ as having the potential for profit.

**RESPONSE:** Consensys admits that the Chiliz team has publicly referenced plans to burn tokens. Consensys further admits that the second sentence of Paragraph 195 purports to characterize an announcement on Chiliz's Fan Token Exchange, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys denies the allegations in the third sentence of Paragraph 195. Consensys otherwise denies the allegations in Paragraph 195, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

### D.    SAND

196.    "SAND" was created on the Ethereum blockchain as the native token of the Sandbox platform, a virtual gaming platform first released in 2012 by Pixowl, Inc. ("Pixowl") as a game for download on mobile phones. Pixowl, which is headquartered in San Francisco, was

founded in 2011 by Arthur Madrid ("Madrid") and Sebastien Borget ("Borget"). In 2018, Animoca Brands, Inc. ("Animoca"), headquartered in Hong Kong, acquired Pixowl and announced its intention to build a new 3D version of the Sandbox by leveraging blockchain technology. After Pixowl's acquisition, the Sandbox's intellectual property, along with the rest of Pixowl's assets, were transferred to TSB Gaming Ltd ("TSB"), a wholly owned subsidiary of Animoca. Madrid is CEO of TSB, and Borget is the COO.

**RESPONSE:** Consensys admits that SAND is an ERC-20 token created on the Ethereum blockchain that is used in conjunction with the Sandbox platform, which platform today offers players a virtual world where a player can build, own, and monetize their gaming experiences. Consensys further admits that it has been publicly reported that Animoca Brands, Inc. acquired Pixowl, Inc. in 2018 and subsequently transitioned Pixowl's intellectual property to TSB Gaming Ltd. In addition, Consensys admits that Arthur Madrid and Sebastein Borget are identified as the CEO and COO of TSB Gaming Ltd., respectively. Consensys lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 196, and therefore denies them on that basis.

197.    According to Sandbox's website, SAND is required to access the Sandbox platform, participate in the platform's governance, and earn rewards through the staking program on the platform.

**RESPONSE:** Consensys admits that Paragraph 197 purports to characterize the Sandbox's website, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 197.

198.    On or about May 23, 2019, before the minting of SAND in July 2019, Animoca raised approximately $2.5 million in cash and crypto assets through TSB via the issuance of Simple Agreements for Future Equity ("SAFEs") and SAND tokens, to "fund the development of the upcoming blockchain version of The Sandbox." According to Animoca's May 23, 2019 press release, the majority of investors allocated their investment to the purchase of both SAND tokens and future equity in TSB via the SAFE agreements (in the amount of $2 million), while some investors allocated their investment exclusively to the purchase of SAND tokens ($500,000). Per the release, the funding round was led by Hashed, for approximately $1 million, and also included a number of other crypto venture capital investors.

**RESPONSE:** Consensys admits that TSB has represented that, in 2019, it raised $2.5 million through the issuance of a combination of Simple Agreements for Future Equity and SAND tokens, and that the sale included a number of crypto venture capital investors, including Hashed. Consensys further admits that Paragraph 198 otherwise purports to quote from and characterize a May 23, 2019 Animoca Brands, Inc. press release, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 198, and therefore denies them on that basis. Consensys further denies that the term "investor" fairly or accurately describes users of MetaMask Swaps.

199.   TSB then minted a total supply of 3 billion SAND on the Ethereum blockchain in or around July 2019 and offered and sold SAND through purportedly private sales and in an IEO that raised $3 million on the Binance.com crypto asset trading platform starting August 13, 2020.

**RESPONSE:** Consensys admits that TSB has represented that it sold approximately $3 million of SAND in an offering through Binance Launchpad in August 2020. Consensys further admits that it has been publicly reported that there is a maximum supply of 3 billion SAND. Consensys lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 199, and therefore denies them on that basis.

200.   SAND has been available for buying and selling through the MetaMask Swaps platform since approximately October 2020.

**RESPONSE:** Denied.

201.   The information TSB publicly disseminated has led SAND holders, including those who have purchased SAND since May 2022, reasonably to view SAND as an investment in and to expect to profit from TSB's efforts to grow the Sandbox protocol, which, in turn, would increase the demand for and the value of SAND.

**RESPONSE:** Denied.

202.   On its blog posts announcing "exchange listings," Sandbox touted its efforts to obtain "listings" and the SAND token's liquidity in the secondary market. For example, in a

September 21, 2021, Medium blog post, Sandbox stated that "$SAND is listed on over 60 global cryptocurrency exchanges, including a dozen of the top exchanges by market capitalization."

**RESPONSE:** Consensys admits that Paragraph 202 purports to quote from and characterize Sandbox blog posts, to which Consensys respectfully refers the Court for their complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 202.

203.     In addition, the Sandbox stated that it would pool the proceeds from the private token sales and the IEO to develop and promote use of the platform. For example, the May 23, 2019, press release stated: "[t]he funds raised through this transaction will be used to grow the development team and infrastructure for the [Sandbox] Game Platform, support marketing efforts through the acquisition of creators and IP licenses, and provide for security, legal, and compliance expenses as well as general and administrative costs." The Sandbox whitepaper similarly described identical uses for the $3 million in funds intended to be raised during the IEO.

**RESPONSE:**  Consensys admits that Paragraph 203 purports to quote from or characterize a May 23, 2019 press release and Sandbox's whitepaper, respectively, to which Consensys respectfully refers the Court for their complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 203.

204.     Moreover, according to the Sandbox whitepaper, of the 3 billion SAND tokens that were initially minted, 19% were to be allocated to the Sandbox founders and team, and another 25.8% were to be allocated to the Company Reserve.

**RESPONSE:** Consensys admits that Paragraph 204 purports to characterize the Sandbox's whitepaper, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 204.

205.     In addition, the Sandbox's Medium blog post on July 25, 2019, stated that "an interesting feature of [the $SAND] token is that it can accrue in value over time, due to the fact that it is scarce. There will be a limited supply of 3 billion units of $SAND available."

**RESPONSE:** Consensys admits that Paragraph 205 purports to characterize a July 25, 2019 blog post, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 205.

206.     Moreover, TSB stated publicly that it would take steps to manage the market for SAND, including the SAND whitepaper stating that the Sandbox team controls the supply of

SAND tokens and has implemented a "controllable supply mechanism, such as purchasing SAND from multiple exchanges," and that "while the total supply of SAND is fixed, the initial amount of SAND offered will provide a scarcity effect reducing the SAND available per capita and therefore fostering demand."

**RESPONSE:** Consensys admits that Paragraph 206 purports to characterize and quote from public statements, including the SAND whitepaper, to which statements Consensys respectfully refers the Court for their complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 206.

207.    Additionally, in many instances, Animoca has touted the backgrounds of Pixowl, TSB, and the Sandbox core members, including Madrid and Borget, in describing the success and future development of the Sandbox:

- After the acquisition of Pixowl, Yat Siu, the co-founder and director of Animoca, stated in a press release, dated August 27, 2018 (the "2018 Press Release") that "Pixowl's experienced developers will significantly increase our development capabilities. Its founders are highly respected game industry veterans who have developed multimillion dollar franchises. We believe the blockchain version of The Sandbox has incredible potential … We look forward to utilising the many opportunities for growth conferred by this acquisition."

- In the 2018 Press Release, Madrid also commented: "'Animoca Brands is a perfect fit for Pixowl and we are happy to add our brand relationships to its portfolio while accelerating growth for our key IP, The Sandbox …"

- The 2018 Press Release also touted that "Ed Fries, the creator of Microsoft Game Studios and co-founder of the Xbox project, is a special advisor to The Sandbox's original game developer Pixowl" and will therefore continue to serve on the advisory team.

- The Sandbox whitepaper further provided: "We have a strong product roadmap ahead and a top team to execute a strong vision to build a unique virtual world gaming platform where players can build, own, and monetize their gaming experiences and spread the power of blockchain as the lead technology in the gaming industry."

**RESPONSE:** Consensys admits that Paragraph 207 purports to characterize and quote from public press releases and the Sandbox's whitepaper, to which Consensys respectfully refers

the Court for their complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 207.

208. Moreover, the Sandbox whitepaper describes that the role of the "Sandbox Foundation" is to support the ecosystem of the Sandbox by, among other things, offering grants to incentivize high quality content and game production on the platform and further notes that the "overall valuation of the metaverse grows through the valuation of all games funded by the Foundation, creating a virtuous circle to enable funding bigger games." The Sandbox's Gitbook also notes that the Sandbox Foundation has, among other things, (a) supported play-to-earn tournaments and cross-gaming to encourage the broader adoption of SAND and (b) supported marketing activities contributing to the growth of awareness about NFTs, Metaverse and SAND adoption, including co-marketing with exchanges and influencers.

**RESPONSE:** Consensys admits that the first sentence of Paragraph 208 purports to characterize and quote from the Sandbox's whitepaper, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys further admits that the second sentence of Paragraph 208 purports to characterize Sandbox's Github webpage, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 208.

E. **LUNA**

209. LUNA was a token native to the Terra blockchain, created by Terraform and its founder, Do Kwon. The Terra blockchain was launched in April 2019 along with the creation of one billion LUNA tokens.

**RESPONSE:** Consensys admits that the Terra blockchain mainnet was reportedly launched in April 2019 by Terraform and its founder, Do Kwon. Consensys further admits that LUNA was a token native to the Terra blockchain. Consensys lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 209, and therefore denies them on that basis.

210. At all relevant times, Terraform and Kwon retained hundreds of millions of LUNA tokens for themselves.

**RESPONSE:** Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 210, and therefore denies them on that basis.

211. At least one "bridge," called "Shuttle," allowed LUNA holders to create "wrapped" versions of LUNA ("wLUNA"). The wLUNA tokens were identical in all material respects to LUNA, except that they could be traded on the Ethereum blockchain, as opposed to the Terra blockchain.

**RESPONSE:** Consensys admits that the Terra blockchain included a feature called "Shuttle Bridge," which purported to allow LUNA holders to create "wrapped" LUNA that could be traded on the Ethereum blockchain. Consensys lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 211, and therefore denies them on that basis.

212. From the time of their offerings through at least May 2022, LUNA and wLUNA were offered and sold as investment contracts and therefore securities.

**RESPONSE:** Denied.

213. Investors tendered fiat currency and/or crypto assets to obtain LUNA and wLUNA.

**RESPONSE:** Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 213 regarding the behavior of unspecified "[i]nvestors" and denies them on that basis. Consensys further denies that the term "investor" fairly or accurately describes users of MetaMask Swaps.

214. Each unit of LUNA was fungible with and was indistinguishable from any other unit of LUNA. Each unit of wLUNA was fungible with and was indistinguishable from any other unit of wLUNA. LUNA and wLUNA prices were the same, and they were exchangeable with each other on a one-to-one basis. Any holder of wLUNA had the right and ability at any time to exchange the wLUNA for LUNA.

**RESPONSE:** Consensys admits that each unit of LUNA is identical and each unit of wLUNA is identical and otherwise denies the allegations in Paragraph 214.

215. Thus, investors in LUNA and wLUNA shared equally in price increases and decreases, such that if one investor profited, all investors did so as well in equal proportion to their total LUNA or wLUNA holdings.

**RESPONSE:** Consensys admits that each unit of LUNA is identical and each unit of wLUNA is identical. Consensys otherwise denies the allegations in Paragraph 215, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

216.   LUNA or wLUNA was first made available for trading through MetaMask Swaps in January 2021.

**RESPONSE:** Denied.

217.   The repeated drumbeat of information Terraform publicly disseminated about LUNA or wLUNA and Terraform's plans to undertake efforts to make those assets more valuable led reasonable investors, including those who purchased LUNA or wLUNA since January 7, 2021, to view LUNA and wLUNA as investments into Terraform's efforts. Specifically, LUNA and wLUNA holders would reasonably expect to profit from Terraform's efforts to grow the Terraform blockchain because this growth would in turn increase the demand for, and the value of, LUNA and wLUNA.

**RESPONSE:** Consensys denies the allegations in Paragraph 217, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

218.   Terraform and Kwon told investors that Terraform would use proceeds from LUNA sales to fund operations and help build and expand the Terraform ecosystem. For example, in a July 2018 token sale agreement, Terraform represented to potential investors that the funding round was "in furtherance of the establishment and operation of the systems" to be developed by Terraform.

**RESPONSE:** Consensys admits that the first sentence of Paragraph 218 purports to characterize public statements by Terraform and Do Kwon, to which Consensys respectfully refers the Court for their complete and accurate contents. Consensys further admits that the second sentence of Paragraph 218 purports to characterize a July 2018 Terraform token sale agreement, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 218, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

219.   In a 2021 public interview, Terraform's business development lead stated that LUNA "is the 'equity' in our co[mpany]."

**RESPONSE:** Consensys admits that Paragraph 219 purports to quote from and characterize a public interview with Terraform's unidentified business development lead, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 219.

220.    On April 7, 2021, Kwon posted on X, "in the long run, $Luna value is actionable—it grows as the ecosystem grows." Luna holders could simply "sit back and watch me kick ass."

**RESPONSE:** Consensys admits that Paragraph 220 purports to quote from and characterize an April 7, 2021 post on X by Do Kwon, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 220.

221.    The Terraform Director of Special Projects similarly stated in a June 2021 video presentation, "[o]wning LUNA is essentially owning a stake in the network and a bet that the value will continue to accrue over time."

**RESPONSE:** Consensys admits that Paragraph 221 purports to quote from and characterize a June 2021 video presentation by the Terraform Director of Special Projects, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 221.

222.    In marketing materials, Terraform further touted the professional expertise of its team, claiming that Terraform was "led by serial entrepreneurs" and was a team with "deep relevant expertise."

**RESPONSE:** Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning the unspecified Terraform marketing materials referenced in Paragraph 222, and therefore denies them on that basis.

223.    On December 28, 2023, based on these facts, and others, a federal court in the Southern District of New York found that both LUNA and wLUNA have been offered and sold as investment contracts. *SEC v. Terraform Labs Pte. Ltd et al.*, 23-cv-1346, 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023).

**RESPONSE:** Consensys admits that Paragraph 223 purports to characterize the United States District Court for the Southern District of New York opinion in *SEC* v. *Terraform Labs Pte. Ltd. et al.*, 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023), to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 223.

## IV. CONSENSYS, THROUGH METAMASK STAKING, ENGAGED IN THE UNREGISTERED OFFER AND SALE OF LIDO'S AND ROCKET POOL'S STAKING PROGRAMS, WHICH ARE SECURITIES.

### A. <u>Background: Staking</u>

224.    "Proof of Stake" ("PoS") refers to a consensus mechanism used by some blockchain networks to reach agreement about which transactions are valid, to add transactions in new blocks to the blockchain, and to reward participants with additional crypto assets.

**RESPONSE:** Admitted.

225.    A blockchain network using a PoS consensus mechanism typically selects a "validator" from a group of blockchain participants who have agreed to certain requirements necessary to maintain the blockchain and add new blocks.

**RESPONSE:** Consensys admits that in a proof-of-stake consensus mechanism certain blockchain participants called validators are responsible for checking that new blocks propagated over the network are valid and for creating and propagating new blocks themselves and otherwise denies the allegations in Paragraph 225.

226.    To be considered for selection into the group or pool of validators, a potential validator must among other things commit, or "stake," a pre-established minimum set amount of the blockchain's native asset (e.g., ETH for the Ethereum blockchain).

**RESPONSE:** Coinbase admits that in a proof-of-stake consensus mechanism the blockchain protocol may require a minimum amount of the blockchain's native token to be staked in order to be an active validator eligible to be chosen to validate transactions and otherwise denies the allegations in Paragraph 226. Consensys further avers that the Ethereum consensus mechanism operates as described in the protocol specifications at https://github.com/ethereum/consensus-

specs/tree/dev, and respectfully refers the Court to the protocol specifications for a complete and accurate statement of its contents.

227. On Ethereum, a validator must stake 32 ETH, and these staked assets are "locked up" while staked in the blockchain's PoS consensus mechanism, in part to incentivize validators to faithfully perform required functions.

**RESPONSE:** Consensys admits that to participate as an active validator on the Ethereum blockchain, a user must deposit 32 ETH into the relevant deposit contract and that, while deposited, the staked ETH cannot be transferred. Consensys otherwise denies the allegations of Paragraph 227. Consensys further avers that the Ethereum consensus mechanism operates as described in the protocol specifications at https://github.com/ethereum/consensus-specs/tree/dev, and respectfully refers the Court to the protocol specifications for a complete and accurate statement of its contents.

228. A "correction penalty" is deducted from the staked crypto assets of validators who do not meet a variety of standards including server uptime, consistency, and accuracy.

**RESPONSE:** Consensys admits that validators can become subject to penalties resulting in a forfeiture of some or all of their staked digital assets due to underperformance or protocol violations and otherwise denies the allegations in Paragraph 228. Consensys further avers that the Ethereum consensus mechanism operates as described in the protocol specifications at https://github.com/ethereum/consensus-specs/tree/dev, and respectfully refers the Court to the protocol specifications for a complete and accurate statement of its contents.

229. "Slashing"—forced removal of a validator's node from the network and an associated gradual loss of all of its staked ETH—occurs when a validator engages in affirmatively malicious activity.

**RESPONSE:** Consensys admits that validators can become subject to slashing on the Ethereum network, resulting in the forced removal of a validator from the network and an associated loss of their staked ETH, and that validators are slashed when they engage in malicious activity. Consensys otherwise denies the allegations in Paragraph 229. Consensys further avers

that the Ethereum consensus mechanism operates as described in the protocol specifications at https://github.com/ethereum/consensus-specs/tree/dev, and respectfully refers the Court to the protocol specifications for a complete and accurate statement of its contents.

230. Conversely, validators earn rewards for their efforts, in the form of additional amounts of ETH—for example, by timely voting on proposed blocks, proposing new blocks, and participating in other consensus-related activities.

**RESPONSE:** Admitted. Consensys further avers that the Ethereum consensus mechanism operates as described in the protocol specifications at https://github.com/ethereum/consensus-specs/tree/dev, and respectfully refers the Court to the protocol specifications for a complete and accurate statement of its contents.

231. To create a new block to add to the chain of blocks, the protocol chooses a validator from among those that have staked. The more the holder stakes, and the less server downtime a potential validator exhibits, the more likely that holder is to be selected as a validator and receive the maximum staking reward. Thus, the most successful staking operations maximize the chances of being selected by staking a large number of assets across nodes and having better computer resources to minimize server downtime.

**RESPONSE:** Consensys admits the allegations in the first sentence of Paragraph 231. Consensys denies the allegations in the second sentence of Paragraph 231. Consensys further avers that the Ethereum consensus mechanism operates as described in the protocol specifications at https://github.com/ethereum/consensus-specs/tree/dev, and respectfully refers the Court to the protocol specifications for a complete and accurate statement of its contents. Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 231, which seeks an admission regarding the behavior of unspecified third-party "staking operations," and denies them on that basis.

232. Since September 2022, the Ethereum network has employed the PoS mechanism described above.

**RESPONSE:** Consensys admits that the Ethereum blockchain employs a proof-of-stake consensus mechanism, as described in the protocol specifications at

https://github.com/ethereum/consensus-specs/tree/dev, to which Consensys respectfully refers the Court to the protocol specifications for a complete and accurate statement of its contents, and otherwise denies the allegations in Paragraph 232.

233. To serve as an Ethereum validator and potentially earn rewards, a validator must stake at least 32 ETH (worth more than $100,000 as of June 25, 2024) and run an Ethereum node.

**RESPONSE:** Admitted. Consensys further avers that the Ethereum consensus mechanism operates as described in the protocol specifications at https://github.com/ethereum/consensus-specs/tree/dev, and respectfully refers the Court to the protocol specifications for a complete and accurate statement of its contents.

234. The ETH used for staking is held in a smart contract called the "Beacon Deposit Contract" (referred to herein as the "Ethereum validator deposit contract," which is part of the Ethereum staking and validation system).

**RESPONSE:** Admitted. Consensys further avers that the Ethereum consensus mechanism operates as described in the protocol specifications at https://github.com/ethereum/consensus-specs/tree/dev, and respectfully refers the Court to the protocol specifications for a complete and accurate statement of its contents.

235. For those staking ETH, "rewards" are paid out in the form of additional ETH. The amount of rewards that each validator earns depends on the validator's performance.

**RESPONSE:** Consensys admits the allegations in the first sentence of Paragraph 235. Consensys further avers that the Ethereum consensus mechanism operates as described in the protocol specifications at https://github.com/ethereum/consensus-specs/tree/dev, and respectfully refers the Court to the protocol specifications for a complete and accurate statement of its contents. Consensys denies the allegations in the second sentence of Paragraph 235.

236. For example, a validator earns rewards for keeping its node online and participating in various blockchain maintenance activities, including but not limited to timely voting and proposing new blocks.

**RESPONSE:** Admitted. Consensys further avers that the Ethereum consensus mechanism operates as described in the protocol specifications at https://github.com/ethereum/consensus-specs/tree/dev, and respectfully refers the Court to the protocol specifications for a complete and accurate statement of its contents.

237. Conversely, validators can be penalized for poor performance or slashed for malicious activity.

**RESPONSE:** Consensys admits that validators can be subject to penalties and slashing and otherwise denies the allegations in Paragraph 237. Consensys further avers that the Ethereum consensus mechanism operates as described in the protocol specifications at https://github.com/ethereum/consensus-specs/tree/dev, and respectfully refers the Court to the protocol specifications for a complete and accurate statement of its contents.

### B. Liquid Staking Pool Providers: Lido and Rocket Pool

238. Lido and Rocket Pool have each created and maintained respective staking programs, designed to capture the staking rewards described above.

**RESPONSE:** Consensys admits that both Lido and Rocket Pool allow users to stake ETH and receive a transferable digital asset token as a form of receipt. Consensys otherwise denies the allegations in Paragraph 238.

239. Lido and Rocket Pool each call their program a "liquid staking" program because—as described below—investors are issued a tradable token in exchange for depositing funds into the program. This token represents the investor's interest in the program. The token issued in exchange is referred to as a "liquid staking token" or "LST" and the LST can be traded on the secondary market.

**RESPONSE:** Consensys admits that both Lido and Rocket Pool allow users to stake ETH and receive a transferable digital asset token as a form of receipt and that this is sometimes referred to as "liquid staking." Consensys further admits that markets exist where those tokens can be swapped for other digital asset tokens. Consensys otherwise denies the allegations in

Paragraph 239, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

240.    In Lido, the LST is called stETH; in Rocket Pool, the LST is called rETH.

**RESPONSE:** Admitted.

241.    The amount of LST an investor receives is proportional to the amount of ETH they deposit.

**RESPONSE:** Consensys denies the allegations in Paragraph 241, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

242.    These staking programs allow investors to both obtain the rewards of staking and also purportedly retain the ability to redeem the value of their investment at any time.

**RESPONSE:** Consensys admits that both Lido and Rocket Pool allow users to stake ETH and receive a transferable digital asset token as a form of receipt, and that markets exist where those tokens can be swapped for other digital asset tokens. Consensys otherwise denies the allegations in Paragraph 242, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

> ### i.    *The Lido Staking Program Is An Investment Contract.*

243.    Lido launched its liquid staking platform in December 2020.

**RESPONSE:** Consensys admits that the Lido protocol launched on the Ethereum mainnet in December 2020. Consensys otherwise denies the allegations in Paragraph 243.

244.    To participate, investors deposit ETH with Lido.

**RESPONSE:** Consensys admits that when a person stakes ETH through Lido, they deposit ETH in smart contracts deployed by Lido. Consensys otherwise denies the allegations in Paragraph 244, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

245.     In return, Lido issues the investor another crypto asset, "stETH," representing the investor's pro rata interest in Lido's staking program, including the investor's original deposit of ETH plus any accumulated returns.

**RESPONSE:** Consensys admits that when a person stakes ETH through Lido, they receive stETH. Consensys otherwise denies the allegations in Paragraph 245, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

246.     Lido then uses investors' deposited ETH in the Ethereum consensus mechanism to earn staking rewards—the financial returns for investors.

**RESPONSE:** Consensys admits that when a person deposits ETH in the Lido smart contract, Lido will stake that ETH to earn rewards for participating in the Ethereum consensus mechanism. Consensys otherwise denies the allegations in Paragraph 246, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

247.     Specifically, Lido pools the ETH deposited by investors into a Lido smart contract, which initiates the creation of a validator by depositing a 32 ETH bundle to the Ethereum validator deposit contract.

**RESPONSE:** Consensys denies the allegations in Paragraph 247, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

248.     As of June 25, 2024, over 28% of all staked ETH on Ethereum is staked in Lido's staking program.

**RESPONSE:** Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 248, and therefore denies it on that basis.

249.     Lido takes, as a fee, 10% of the staking rewards earned.

**RESPONSE:** Consensys admits that the Lido protocol reports that it applies a 10% fee on staking rewards, which is split between node operators and the Lido DAO. Consensys otherwise denies the allegations in Paragraph 249.

250.     The remaining rewards are accrued, pro rata, by stETH token holders.

**RESPONSE:** Denied.

251.    Lido markets its staking program as an investment opportunity.

**RESPONSE:** Denied.

252.    Lido also leads investors to reasonably expect that investors' profits will come from Lido's efforts.

**RESPONSE:** Consensys denies the allegations in Paragraph 252, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

253.    According to Lido's website, from December 2020 to February 2024, Lido's staking program returned an annualized percentage gain of 3% to 9%.

**RESPONSE:** Consensys admits that Paragraph 253 purports to characterize Lido's website, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 253, and therefore denies them on that basis.

254.    In a blog post dated December 28, 2020, Lido stated: "Lido allows users to stake any amount of ETH – without the need to maintain complex infrastructure."

**RESPONSE:** Consensys admits that Paragraph 254 purports to quote from and characterize a December 28, 2020 blogpost, to which Consensys respectfully directs the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 254.

255.    From at least June 2021 to June 2024, in a "Help" article on its website, Lido stated that staking "requires expert knowledge and complex and costly infrastructure" and that through Lido "users can eliminate these inconveniences."

**RESPONSE:** Consensys admits that Paragraph 255 purports to quote from and characterize Lido's website, to which Consensys respectfully directs the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 255.

256.    Lido claimed in an October 2020 document posted to its website that it is "more profitable" than other staking pool providers because of its fee model and the quality of its node operators.

**RESPONSE:** Consensys admits that Paragraph 256 purports to quote from and characterize Lido's website, to which Consensys respectfully directs the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 256.

257.    From at least February 2023 to June 2024, another "Help" article on Lido's website claims to allocate investors' staked ETH across multiple, high-quality validator node operators (that is, participants in the Ethereum network consensus mechanism), minimizing the risks associated with staking ETH.

**RESPONSE:** Consensys admits that Paragraph 257 purports to characterize Lido's website, to which Consensys respectfully directs the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 257, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

258.    In the same Help article, Lido states that it elects "professional and reputable node operators" and that the penalty and slashing risks are reduced "given the quality of the Lido validator set and its proven track record."

**RESPONSE:** Consensys admits that Paragraph 258 purports to quote from and characterize Lido's website, to which Consensys respectfully directs the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 258.

259.    In short, Lido purportedly offers investors a "simplified participation in staking"—deploying its resources and expertise to achieve staking rewards that individual investors typically would not be able to achieve on their own.

**RESPONSE:** Consensys denies the allegations in Paragraph 259, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

260.    The holder of any stETH—whether issued directly from Lido or purchased in the secondary market—has the right to deliver the stETH to Lido to get back the pro-rata staked ETH plus accrued rewards.

**RESPONSE:** Consensys admits that the Lido smart contracts are programmed to allow holders of stETH to send their stETH to the Lido protocol and to receive in return their staked ETH plus accrued rewards, and otherwise denies the allegation in Paragraph 260.

261.    Lido treats all investors' deposited ETH as fungible. It does not purport to segregate investor funds.

**RESPONSE:** Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 261, and therefore denies them on that basis. Consensys further denies that the term "investor" fairly or accurately describes users of MetaMask Staking.

262.    In light of the above, Lido offered and sold its staking program as an investment contract.

**RESPONSE:** Denied.

ii.     *The Rocket Pool Staking Program Is An Investment Contract*

263.    Rocket Pool launched its platform in October 2021.

**RESPONSE:** Consensys admits that the Rocket Pool protocol launched on the Ethereum mainnet in October 2021. Consensys otherwise denies the allegations in Paragraph 263.

264.    To participate, investors deposit ETH with Rocket Pool.

**RESPONSE:** Consensys admits that when a user stakes ETH through Rocket Pool, the user deposits ETH in smart contracts deployed by Rocket Pool. Consensys otherwise denies the allegations in Paragraph 264, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

265.    In return, Rocket Pool issues another crypto asset, "rETH," representing the investor's pro rata interest in Rocket Pool's staking program, including the investor's original deposit of ETH plus any accumulated returns.

**RESPONSE:** Consensys admits that when a user stakes ETH through Rocket Pool, the user receives rETH. Consensys otherwise denies the allegations in Paragraph 265, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

266.    Rocket Pool then uses investors' deposited ETH in the Ethereum consensus mechanism to earn staking rewards—the financial returns for investors.

**RESPONSE:** Consensys admits that when a user deposits ETH in the Rocket Pool smart contract, Rocket Pool will assign that ETH to an Ethereum validator node (when such node is available), to earn rewards for participating in the Ethereum consensus mechanism. Consensys otherwise denies the allegations in Paragraph 266, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

267.     Specifically, Rocket Pool pools the ETH deposited by investors into a Rocket Pool smart contract, which initiates the creation of a validator by depositing a 32-ETH bundle to the Ethereum validator deposit contract.

**RESPONSE:** Consensys denies the allegations in Paragraph 267, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

268.     Rocket Pool takes a 0.05% fee of the staking rewards it earns.

**RESPONSE:** Denied. Consensys avers that Rocket Pool reports on its website that the Rocket Pool protocol does not collect any fee from users.

269.     The remaining staking rewards accrue, pro-rata, to investors.

**RESPONSE:** Consensys denies the allegations in Paragraph 269, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

270.     Rocket Pool also markets its staking program as an investment opportunity.

**RESPONSE:** Denied.

271.     According to Rocket Pool's website, rETH "accrues value over time."

**RESPONSE:** Consensys admits that Paragraph 271 purports to quote from and characterize Rocket Pool's website, to which Consensys respectfully directs the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 271.

272.     Rocket Pool also leads investors to reasonably expect that investors' profits will come from the efforts of Rocket Pool.

**RESPONSE:** Consensys denies the allegations in Paragraph 272, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

273.    As of June 2024, Rocket Pool advertised on its website an annual percentage return of approximately 3.11%.

**RESPONSE:** Consensys admits that Paragraph 273 purports to characterize Rocket Pool's website, to which Consensys respectfully directs the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 273.

274.    In an FAQ available on its website, Rocket Pool notes that its staking service makes staking available to investors who might not otherwise have the technical expertise necessary to interact with smart contracts or keep a node running 24/7.

**RESPONSE:** Consensys admits that Paragraph 274 purports to characterize Rocket Pool's website, to which Consensys respectfully directs the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 274, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

275.    Indeed, according to Rocket Pool's FAQ, its program "removes several high barriers to entry that exist with Proof of Stake on Ethereum."

**RESPONSE:** Consensys admits that Paragraph 275 purports to quote from and characterize Rocket Pool's website, to which Consensys respectfully directs the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 275.

276.    In a January 22, 2021, Medium Post, Rocket Pool stated that its program was "an easy and permissionless way to engage in staking without needing to run any staking infrastructure or even have 32 ETH."

**RESPONSE:** Consensys admits that Paragraph 276 purports to quote from and characterize a January 22, 2021 Medium blog post by Rocket Pool, to which Consensys respectfully directs the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 276.

277. The Rocket Pool FAQ states that it will "allow anyone to earn rewards on deposits as small as 0.01 ETH."

**RESPONSE:** Consensys admits that Paragraph 277 purports to quote from and characterize Rocket Pool's website, to which Consensys respectfully directs the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 277.

278. On its website, Rocket Pool also attempts to differentiate itself from other staking pool providers, claiming that "Rocket Pool is the only staking platform with a perfect score on ethereum.org."

**RESPONSE:** Consensys admits that Paragraph 278 purports to quote from and characterize Rocket Pool's website, to which Consensys respectfully directs the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 278.

279. According to Rocket Pool's website, its protocol is highly secure and its "smart contracts have been extensively audited, multiple times, by some of the best auditors in the Ethereum ecosystem."

**RESPONSE:** Consensys admits that Paragraph 279 purports to quote from and characterize Rocket Pool's website, to which Consensys respectfully directs the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 279.

280. Rocket Pool also touts other reasons for investors to stake their ETH with Rocket Pool.

**RESPONSE:** Paragraph 280 purports to characterize unidentified statements by the Rocket Pool. As such, Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 280, and therefore denies them on that basis. Consensys further denies that the term "investor" fairly or accurately describes users of MetaMask Staking.

281. In the January 2021 Medium post, Rocket Pool notes that the value of rETH is "protected against node slashing and downtime by several built in insurance mechanisms."

**RESPONSE:** Consensys admits that Paragraph 281 purports to quote from and characterize a January 22, 2021 Medium blog post by Rocket Pool, to which Consensys respectfully directs the Court for its complete and accurate contents.

282. Specifically, Rocket Pool requires individuals that run Rocket Pool validator nodes to put up collateral to protect against losses that may result from penalties and slashing.

**RESPONSE:** Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 282, and therefore denies them on that basis.

283. Rocket Pool's website states that "every rETH token is exactly the same, you will **automatically receive the benefits of staking just by holding the token!**" (Emphasis in original.)

**RESPONSE:** Consensys admits that Paragraph 283 purports to quote from and characterize Rocket Pool's website, to which Consensys respectfully directs the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 283.

284. In light of the above, Rocket Pool offered and sold its staking program as an investment contract.

**RESPONSE:** Denied.

285. Neither Lido nor Rocket Pool have ever filed registration statements with the SEC for the offer and sale of their respective staking program investment contracts.

**RESPONSE:** Consensys admits that, to the best of its knowledge, no registration statement has been filed with the SEC in connection with the Lido or Rocket Pool protocols. Consensys otherwise denies the allegations in Paragraph 285.

C. **Consensys—through MetaMask Staking—Offers and Sells the Lido and Rocket Pool Investment Contracts.**

i. *Through MetaMask Staking, Consensys Promotes, Offers, and Sells the Lido and Rocket Pool Investment Contracts To Its Users.*

286. On January 13, 2023, Consensys publicly announced the release of a program called MetaMask Staking.

**RESPONSE:** Consensys admits that on January 13, 2023, it publicly announced the MetaMask Staking feature. Consensys otherwise denies the allegations in Paragraph 286.

287. Consensys created MetaMask Staking to offer and sell the Lido and Rocket Pool staking program investment contracts to investors.

**RESPONSE:** Consensys denies the allegations in Paragraph 287, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

288. The January 13 announcement stated: "MetaMask Staking allows you to engage in liquid staking with two prominent providers, Lido and Rocket Pool, where by you can deposit your ETH and receive a token representing the value of your stake in return."

**RESPONSE:** Consensys admits that Paragraph 288 purports to quote from and characterize the webpage https://metamask.io/news/latest/metamask-introduces-liquid-staking-in-dapp-for-an-easy-and-convenient-way-to-stake-eth, posted on January 13, 2023, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 288.

289. It called MetaMask Staking "an easy and convenient way to stake ETH."

**RESPONSE:** Consensys admits that Paragraph 289 purports to quote from and characterize the webpage https://metamask.io/news/latest/metamask-introduces-liquid-staking-in-dapp-for-an-easy-and-convenient-way-to-stake-eth, posted on January 13, 2023, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 289.

290. On January 13, 2023, Consensys posted on the MetaMask Twitter account: "We are extremely happy to announce that you can now stake ETH with Lido or Rocket Pool through the [MetaMask] Portfolio Dapp." This post included an image advertising "5.22% rewards" with Lido and "4.59% rewards" with Rocket Pool—highlighting the former as the "Highest rewards."

**RESPONSE:** Consensys admits that Paragraph 290 purports to quote from and characterize a January 13, 2023 post on the X account @MetaMask, available at https://x.com/MetaMask/status/1613953273957945352, to which Consensys respectfully refers

the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 290.

291. On May 16, 2023, Consensys posted on the MetaMask Twitter account: "[U]sers can now stake and withdraw ETH directly from our liquid staking providers, Rocket Pool and Lido." And "Get started here," pointing to a link to the MetaMask portfolio website.

**RESPONSE:** Consensys admits that Paragraph 291 purports to quote from and characterize a May 16, 2023 post on the X account @MetaMask, available at https://mobile.x.com/MetaMask/status/1658539666356723727, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 291.

292. In promotional materials, Consensys claimed that MetaMask Staking would make it easier for individual holders of ETH to participate in staking.

**RESPONSE:** Paragraph 292 purports to characterize unidentified promotional materials by Consensys. Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 292, and therefore denies them on that basis.

293. Specifically, in its January 13, 2023, announcement on its website, Consensys stated: "[S]taking can be a convoluted and complicated process for end-users. MetaMask Staking will offer an easy-to-understand and trusted entry point for users interested in staking. Through this new feature, users can compare the rewards rate, network control, and popularity of different liquid staking providers and choose the one they want to stake with."

**RESPONSE:** Consensys admits that Paragraph 293 purports to quote from and characterize the content of the webpage https://metamask.io/news/latest/metamask-introduces-liquid-staking-in-dapp-for-an-easy-and-convenient-way-to-stake-eth, posted on January 13, 2023, to which Consensys respectfully refers the Court for its complete and accurate contents. Consensys otherwise denies the allegations in Paragraph 293.

ii. *Consensys's MetaMask Staking User Interface.*

294. To use MetaMask Staking, investors must have ETH in their MetaMask Wallet.

**RESPONSE:** Consensys admits that an individual cannot stake on Lido or Rocket Pool unless that individual has access to the private key of an Ethereum blockchain address that holds ETH. Consensys otherwise denies the allegations in Paragraph 294, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

295.    First, from the browser extension or mobile app, the investor clicks on "Stake," or "Staking." They are then taken to the MetaMask Portfolio site, where they can then choose "ETH."

**RESPONSE:** Consensys denies the allegations in Paragraph 295, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

296.    At this point, Consensys's graphical interface presents the investor with two options: Lido and Rocket Pool.



**RESPONSE:** Consensys admits that the MetaMask Staking user interface presents information on liquid staking through Lido and Rocket Pool. Consensys otherwise denies the allegations in Paragraph 296, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

297.    Consensys's MetaMask Staking program will highlight the option with the "highest rewards."

**RESPONSE:** Consensys admits that when a user accesses the liquid staking panel of MetaMask Staking, the user interface queries information from Lido and Rocket Pool regarding protocol performance, sorts that information, and identifies the liquid-staking provider that is

reported as having the highest rewards. Consensys otherwise denies the allegations in Paragraph 297.

298. If either Lido or Rocket Pool is at or near capacity, Consensys's MetaMask Staking software disables the ability to stake with that program.

**RESPONSE:** Consensys admits that if Rocket Pool reports that it is at or near capacity, MetaMask Staking displays that information to the user. Consensys otherwise denies the allegations in Paragraph 298.

299. In any event, an investor can choose either the Lido or Rocket Pool staking program by clicking "Stake."

**RESPONSE:** Consensys admits that a user can select in the MetaMask Staking user interface either the Lido or Rocket Pool liquid staking protocol to stake his or her ETH. Consensys otherwise denies the allegations in Paragraph 299, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

300. On the following screen, an investor can input the number of ETH that they would like to invest in one of the staking program investment contracts and click "review."

**RESPONSE:** Consensys admits that a user can specify in the MetaMask Staking user interface the amount of ETH that he or she would like to stake using Lido or Rocket Pool. Consensys otherwise denies the allegations in Paragraph 300, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

301. At that point, Consensys's MetaMask Staking software shows the investor a screen with the number of the staking pool tokens they will receive in return, their "estimated rewards," and the "estimated gas fee."

**RESPONSE:** Consensys admits that MetaMask Staking queries information from third parties and displays it to the user, including information regarding staking rewards and network transaction fees. Consensys otherwise denies the allegations in Paragraph 301, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

302.    If the investor wishes to proceed with their request to invest in the staking program investment contract, the investor clicks "confirm."

**RESPONSE:** Consensys admits that a user can stake his or her ETH using Lido or Rocket Pool by clicking "confirm" in the MetaMask Staking user interface. Consensys otherwise denies the allegations in Paragraph 302, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

303.    If MetaMask Staking successfully completes the transaction, the investor will see a screen that says, "Transaction Complete."

**RESPONSE:** Consensys denies the allegations in Paragraph 303, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

iii.    <u>*Consensys Offers and Sells the Lido and Rocket Pool Investment Contracts To Investors.*</u>

304.    Accordingly, Consensys offers and sells the Lido and Rocket Pool investment contracts to investors through the MetaMask Staking platform.

**RESPONSE:** Consensys denies the allegations in Paragraph 304, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

305.    Consensys makes this process appear simple and easy to non-technical investors, while performing the technical series of actions necessary to transfer the investor's ETH to Lido or Rocket Pool and transfer stETH or rETH to the investor in return.

**RESPONSE:** Consensys denies the allegations in Paragraph 305, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

306.    When the investor clicks "confirm," this signals the MetaMask Staking software to take the steps necessary to exchange the investor's ETH for rETH or stETH. Specifically, Consensys has programed MetaMask Staking software to take the steps described below.

**RESPONSE:** Consensys denies the allegations in Paragraph 306, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

307.    First, Consensys's MetaMask Staking software reads the private key associated with the ETH in the investor's MetaMask Wallet.

**RESPONSE:** Consensys admits that a user can utilize the MetaMask software installed on his or her local device to use the user's locally stored private key to sign a transaction payload containing instructions that are prepared using MetaMask Staking. For the avoidance of doubt, Consensys avers that at no point during this process does Consensys have access to the user's downloaded instance of MetaMask Wallet, including the private key(s) stored therein. Consensys otherwise denies the allegations in Paragraph 307, including that the term "investor" fairly or accurately describes users of MetaMask Swaps.

308.    Second, using this key, the software creates a blockchain transaction and transfers the investor's ETH from the investor's MetaMask Wallet into a smart contract called the MetaMask Staking Aggregator Router Smart Contract (the "MM Staking Router Smart Contract").

**RESPONSE:** Consensys denies the allegations in Paragraph 308, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

309.    The MM Staking Router Smart Contract has its own Ethereum blockchain address.

**RESPONSE:** Admitted.

310.    The investor has no control over the MM Staking Router Smart Contract.

**RESPONSE:** Consensys admits that users do not hold the private key for the MM Staking Router Smart Contract blockchain address. Consensys otherwise denies the allegations in Paragraph 310, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

311.    The MM Staking Router Smart Contract address temporarily holds the investor's ETH.

**RESPONSE:** Consensys denies the allegations in Paragraph 311, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

312.    Although Consensys has programmed its MetaMask Staking software so that Consensys can take a fee for each transaction, Consensys currently sets the fee variable at zero (i.e., it does not take a fee at this time).

**RESPONSE:** Consensys admits that it has not received any fees from users in connection with MetaMask Staking's liquid staking feature. Consensys otherwise denies the allegations in Paragraph 312.

313.    Consensys could, however, change the software at any time to assess a fee, in which case the amount of the fee would be diverted from the MM Staking Router Smart Contract into a blockchain address designated by Consensys.

**RESPONSE:** Consensys admits that it could program the MetaMask Staking smart contract to charge users a fee for completing a transaction using MetaMask Staking and otherwise denies the allegations in Paragraph 313.

314.    Third, Consensys's software transfers the investor's ETH from the MM Staking Router Smart Contract to the Lido or Rocket Pool Proxy smart contract (deployed by Lido and Rocket Pool, respectively).

**RESPONSE:** Consensys denies the allegations in Paragraph 314, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

315.    These Proxy smart contracts mint stETH or rETH, respectively, upon receiving a deposit of ETH, and, if the MM Staking Router Smart Contract sends ETH to the Proxy smart contracts, the Proxy smart contracts will transfer newly minted stETH or rETH, respectively, to the MM Staking Router Smart Contract.

**RESPONSE:** Consensys denies the allegations in Paragraph 315, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

316.    Fourth, the MM Staking Router Smart Contract transfers the stETH or rETH, as the case may be, to the investor's MetaMask Wallet.

**RESPONSE:** Consensys denies the allegations in Paragraph 316, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

317.    As of March 11, 2024, investors had invested 100,252 ETH in the Lido staking program through MetaMask Staking and 8,375 ETH in the Rocket Pool staking program through MetaMask Staking.

**RESPONSE:** Consensys admits that users of MetaMask Staking had staked at least 100,252 ETH through the Lido protocol as of March 11, 2024. Consensys further admits that users of MetaMask Staking had staked at least 8,375 ETH through the Rocket Pool protocol as of March 11, 2024. Consensys otherwise denies the allegations in Paragraph 317, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

318.    As of March 11, 2024, Consensys, through MetaMask Staking, offered and sold the Lido staking program to 32,449 unique blockchain addresses and offered and sold the Rocket Pool staking programs to 2,215 unique blockchain addresses.

**RESPONSE:** Denied.

319.    For its part, Lido embraced MetaMask Staking as a platform through which its staking program would be offered and sold.

**RESPONSE:** Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 319 and denies them on that basis.

320.    On January 17, 2023, Lido announced on its blog that "Ethereum staking with Lido is now live on MetaMask! Stake your ETH on MetaMask to earn yield and secure the Ethereum network from the comfort of your wallet."

**RESPONSE:** Paragraph 320 purports to quote from and characterize a January 17, 2023 Lido blogpost, to which Consensys respectfully directs the Court for its complete and accurate contents.

321.    Moreover, a former Lido employee testified that "in terms of a distribution channel [Consensys's MetaMask was] a very highly valued target."

**RESPONSE:** Paragraph 321 purports to quote from and characterize testimony from an unidentified former Lido employee. Consensys lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 321 and therefore denies them on that basis.

322.    Accordingly, by the conduct described above, Consensys offered and sold, and continues to offer and sell, investment contracts for Lido and Rocket Pool, participating directly in the distribution of securities from the issuers—Lido and Rocket Pool—to the investor.

**RESPONSE:** Consensys denies the allegations in Paragraph 322, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

## V. CONSENSYS WAS REQUIRED TO, BUT DID NOT, REGISTER AS A BROKER WITH RESPECT TO METAMASK SWAPS.

323. As fully set forth in the preceding paragraphs, Consensys, through MetaMask Swaps, used the means and instrumentalities of interstate commerce to engage in the business of effecting transactions in securities for the account of others by, for example, soliciting potential investors in crypto asset securities, holding itself out as a place to buy and sell crypto assets (including crypto asset securities), providing investment advice by highlighting the "best" prices or "best" value, and otherwise facilitating trading in crypto asset securities by creating customer wallets (i.e., "accounts"), routing customer orders, handling customer crypto asset securities through Consensys-operated smart contract addresses, facilitating order execution by submitting blockchain transactions to a Consensys node, and receiving transaction-based compensation for doing so. Consensys was therefore required to register with the SEC as a broker or operate pursuant to an exemption or exception but did not do so.

**RESPONSE:** Paragraph 323 states legal conclusions to which no response is required. To the extent a further response is required, Consensys denies the remaining allegations in Paragraph 323. Consensys further denies that the term "investor" fairly or accurately describes users of MetaMask Swaps.

## VI. CONSENSYS ALSO ACTS AS A BROKER WITH RESPECT TO THE LIDO AND ROCKET POOL INVESTMENT CONTRACTS.

324. Through its MetaMask Staking program, Consensys also acts as a broker by effecting transactions in the Lido and Rocket Pool investment contracts for the account of others.

**RESPONSE:** Denied.

325. As alleged above, Consensys solicits potential investors, holds itself out as a place to buy and sell the investment contracts, and recommends which of the two investment contracts will offer the highest rewards.

**RESPONSE:** Consensys denies the allegations in Paragraph 325, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

326. Consensys then effects the transaction on the investor's behalf.

**RESPONSE:** Consensys denies the allegations in Paragraph 326, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

327.    Specifically, as noted, Consensys through the MetaMask Staking software handles the investor's assets by removing the investor's ETH from the investor's MetaMask wallet and transferring it to the MM Staking Router Smart Contract, which, in turn, transfers it to the Lido or Rocket Pool proxy smart contract.

**RESPONSE:** Consensys denies the allegations in Paragraph 327, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

328.    Finally, Consensys's software, transfers the acquired token—stETH or rETH—into the investor's MetaMask Wallet.

**RESPONSE:** Consensys denies the allegations in Paragraph 328, including that the term "investor" fairly or accurately describes users of MetaMask Staking.

## FIRST CLAIM FOR RELIEF
### Violation of Exchange Act Section 15(a)

329.    The Commission re-alleges and incorporates by reference here the allegations in Paragraphs 1 through 328.

**RESPONSE:** Consensys repeats and incorporates by reference its responses to the foregoing allegations in the Complaint.

330.    By engaging in the acts and conduct described in this Complaint, Consensys, a person other than a natural person under the Exchange Act, is a broker and made use of the mails and the means and instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities for the account of others, without registering as a broker, and without having an exemption or exception from such registration.

**RESPONSE:** Denied.

331.    By reason of the foregoing, Consensys violated, and, unless enjoined, will continue to violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

**RESPONSE:** Denied.

## SECOND CLAIM FOR RELIEF
## Violations of Securities Act Sections 5(a) and 5(c)

332.     The Commission re-alleges and incorporates by reference here the allegations in Paragraphs 1 through 331.

**RESPONSE:** Consensys repeats and incorporates by reference its responses to the foregoing allegations in the Complaint.

333.     By virtue of the foregoing, Consensys, through its offers and sales of the Lido and Rocket Pool staking program investment contracts, directly and indirectly: (a) without a registration statement in effect as to those securities, (1) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of any prospectus or otherwise, and (2) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale; and (b) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

**RESPONSE:** Denied.

334.     By reason of the conduct described above, Consensys violated, is violating, and, unless enjoined, will continue to violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

**RESPONSE:** Denied.

## PRAYER FOR RELIEF

Answering the prayer for relief, Consensys denies that Plaintiff is entitled to any of the relief sought.

## DEFENSES

Consensys asserts the following defenses without assuming the burden of proof or any other burden if such burden would otherwise be on Plaintiff:

## FIRST DEFENSE: FAILURE TO STATE A CLAIM

The Complaint fails to state a claim upon which relief may be granted.

## SECOND DEFENSE: NO AUTHORITY TO REGULATE

The SEC has no authority to regulate Consensys under Section 15(a) of the Exchange Act or Section 5 of the Securities Act because none of the tokens identified in the Complaint is a security within the meaning of the Exchange Act, because Consensys does not through MetaMask Swaps and MetaMask Staking broker securities transactions, and because Consensys does not through MetaMask Staking offer or sell any securities.

## THIRD DEFENSE: MAJOR QUESTIONS DOCTRINE

Were there ambiguity regarding the SEC's authority to regulate Consensys under Section 15(a) of the Exchange Act or Section 5 of the Securities Act, application of the major questions doctrine would require that that ambiguity be resolved against a finding of authority.

## FOURTH DEFENSE: NO SECURITIES ARE AVAILABLE ON METAMASK SWAPS

Consensys did not violate Section 15(a) of the Exchange Act because none of the tokens identified in the Complaint is a security with the meaning of the Exchange Act.

## FIFTH DEFENSE: METAMASK SWAPS AND METAMASK STAKING DO NOT INVOLVE THE BROKERING OF SECURITIES

Consensys does not through MetaMask Swaps and MetaMask Staking broker securities transactions and is therefore not required to register as a broker.

## SIXTH DEFENSE: METAMASK STAKING DOES NOT INVOLVE THE OFFER OR SALE OF SECURITIES

Consensys did not violate Section 5 of the Securities Act by offering MetaMask Staking, because Consensys does not through MetaMask Staking offer or sell any securities.

## SEVENTH DEFENSE: LACK OF DUE PROCESS AND FAIR NOTICE

Consensys did not have, and Plaintiff failed to provide, fair notice that its conduct was in violation of law.

## EIGHTH DEFENSE: ABUSE OF DISCRETION

Plaintiff abused its discretion by bringing this enforcement action instead of engaging in notice-and-comment rulemaking.

## NINTH DEFENSE: EQUITABLE ESTOPPEL

Plaintiff is equitably estopped from pursuing its claims.

## RESERVATION OF DEFENSES

Additional facts may be revealed by future discovery that support additional defenses presently available to, but unknown to, Consensys. Consensys therefore reserves the right to assert additional defenses, cross-claims, and third-party claims not asserted herein of which it may become aware through discovery or other investigation as may be appropriate.

WHEREFORE, Consensys respectfully requests entry of judgment granting the following relief:

A.    dismissing the Complaint with prejudice and granting judgment in favor of Defendant on all claims; and

B.    granting such further relief as this Court may deem just and proper.

Dated: November 1, 2024
New York, New York

Respectfully submitted,

/s/ Kevin S. Schwartz
Kevin S. Schwartz
Adam M. Gogolak
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000
KSchwartz@wlrk.com
AMGogolak@wlrk.com

*Attorneys for Defendant*